JAMES P. BENNETT (CA SBN 65179)
JBennett@mofo.com
STUART C. PLUNKETT (CA SBN 187971)
SPlunkett@mofo.com
JACQUELINE BOS (CA SBN 243938)
JBos@mofo.com
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California  94105-2482
Telephone:  (415) 268-7000
Facsimile:  (415) 268-7522

SUSAN V. VAUGHAN (CA SBN 223576)
SVaughan@mofo.com
MORRISON & FOERSTER LLP
755 Page Mill Road
Palo Alto, California 94304-1018
Telephone:  (650) 813-5600
Facsimile:  (650) 494-0792

Attorneys for Plaintiff DOCMAGIC, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| DOCMAGIC, INC., a California corporation,<br><br>Plaintiff,<br><br>v.<br><br>ELLIE MAE, Inc., a Delaware corporation,<br><br>Defendant. | Case No. 3:09-CV-4017-MHP<br><br>**DOCMAGIC, INC.'S FIRST AMENDED COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL**<br><br>**[PUBLIC REDACTED VERSION]** |

# TABLE OF CONTENTS

**Page**

I. NATURE OF THE ACTION ................................................................................................. 1

II. JURISDICTION AND VENUE .......................................................................................... 2

III. INTRADISTRICT ASSIGNMENT .................................................................................... 2

IV. PARTIES ............................................................................................................................ 3

V. TRADE AND COMMERCE .............................................................................................. 3

VI. BACKGROUND ................................................................................................................. 3

    A. DocMagic ................................................................................................................. 3

    B. Ellie Mae ................................................................................................................. 4

        1. The ePASS Network ................................................................................... 5

        2. Encompass Loan Origination Software ...................................................... 8

        3. Ellie Mae Docs ......................................................................................... 10

    C. DocMagic's Business Relationship With Ellie Mae ............................................. 10

    D. Ellie Mae's Scheme To Exclude DocMagic and Monopolize the Online
       Document Preparation Services Market ................................................................. 12

        1. Development of Ellie Mae Docs Using DocMagic's Proprietary
           Information ............................................................................................... 13

        2. Termination of Contracts .......................................................................... 17

        3. The Data Lock Down ................................................................................ 20

        4. The Customer "Migration" Plan ............................................................... 22

        5. The Attempt to Monopolize ..................................................................... 23

        6. The IPO ..................................................................................................... 25

    E. Injury to DocMagic ............................................................................................... 26

VII. MARKET DEFINITION, STRUCTURE, AND MARKET POWER ............................... 26

    A. Network Market ..................................................................................................... 27

    B. LOS Market ........................................................................................................... 29

    C. Document Market .................................................................................................. 31

FIRST CLAIM FOR RELIEF (MONOPOLY LEVERAGING, 15 U.S.C. § 2) .......................... 32

**TABLE OF CONTENTS**
(continued)

Page

SECOND CLAIM FOR RELIEF  (ATTEMPTED MONOPOLIZATION, 15 U.S.C. § 2)......... 37

THIRD CLAIM FOR RELIEF (REFUSAL TO DEAL, 15 U.S.C. § 2) ..................................... 38

FOURTH CLAIM FOR RELIEF (DENIAL OF ACCESS TO ESSENTIAL FACILITY,
        15 U.S.C. § 2) ................................................................................................................... 40

FIFTH CLAIM FOR RELIEF (UNFAIR COMPETITION, LANHAM ACT SECTION
        43(A), 15 U.S. C. § 1125(A)) ......................................................................................... 42

SIXTHCLAIM FOR RELIEF (FALSE ADVERTISING, LANHAM ACT SECTION
        43(A), 15 U.S. C. § 1125(A)) ......................................................................................... 44

SEVENTH CLAIM FOR RELIEF (COPYRIGHT INFRINGEMENT, COPYRIGHT
        ACT § 501, 17 U.S.C. § 501) ........................................................................................... 45

EIGHTH CLAIM FOR RELIEF (INTENTIONAL INTERFERENCE WITH
        CONTRACTUAL RELATIONSHIP) ................................................................................. 46

NINTH CLAIM FOR RELIEF (INTERFERENCE WITH PROSPECTIVE ECONOMIC
        ADVANTAGE) .................................................................................................................... 47

TENTH CLAIM FOR RELIEF (BREACH OF RESELLER AGREEMENT) ........................... 48

ELEVENTH CLAIM FOR RELIEF (BREACH OF BRIDGE AGREEMENT) ........................ 51

TWELFTH CLAIM FOR RELIEF (TRADE SECRET MISAPPROPRIATION)...................... 52

THIRTEENTH CLAIM FOR RELIEF (UNFAIR COMPETITION, CAL. BUS. & PROF.
        CODE § 17200, ET SEQ.) ............................................................................................... 55

FOURTEENTH CLAIM FOR RELIEF (DECLARATORY JUDGMENT)................................ 57

PRAYER FOR RELIEF ............................................................................................................. 58

DEMAND FOR JURY TRIAL .................................................................................................. 62

## I.   NATURE OF THE ACTION

1.   Plaintiff DocMagic, Inc. ("DocMagic" or "Plaintiff") brings this action against Defendant Ellie Mae, Inc. ("Ellie Mae" or "Defendant") seeking relief for Ellie Mae's unlawful conduct in violation of the laws of the United States and the State of California.

2.   Ellie Mae and DocMagic both provide products and services that help automate and streamline residential mortgage loan transactions.  This action concerns an unlawful scheme by Ellie Mae to leverage its monopoly power in two separate product markets for the purpose of excluding competition in, and thereby monopolizing, a third market — the market for online loan document preparation services in which DocMagic is Ellie Mae's principal competitor.

3.   For years, Ellie Mae did not compete with DocMagic in the online document preparation market, but instead had a contractual and business relationship with DocMagic for the provision of such services.  By virtue of its relationship with DocMagic and its access to DocMagic's confidential information, including customer information, Ellie Mae realized the lucrative nature of DocMagic's business.  In the latter half of 2008 — faced with declining revenue, investor pressure, and vanishing hopes for a long-sought-after public stock offering — Ellie Mae decided to end its relationship with DocMagic and proceed with an unlawful scheme to leverage its substantial power in two upstream markets to squeeze DocMagic out of the downstream online document preparation market and take for itself the substantial profits associated with document preparation services.

4.   Ellie Mae did not attempt to compete with DocMagic and others in the document preparation market by building a better product or otherwise competing on the merits.  Instead, beginning in 2008, Ellie Mae sought to accomplish its anticompetitive goal by illegally cutting off DocMagic from its own customers, acting against its own economic interests to exclude DocMagic from participating in Ellie Mae's network, breaching its contracts with DocMagic, misappropriating DocMagic's trade secrets, interfering with DocMagic's business relationships, stealing DocMagic's intellectual property, and threatening litigation when DocMagic did nothing more than try to continue to provide service to its own customers.

5.      Ellie Mae's goal was, and is, the complete elimination of DocMagic and other competitors from the online document preparation services market.  Ellie Mae's motive was to bolster its sagging balance sheet to position itself to go public.  Indeed, by April 2010, Ellie Mae had moved substantially closer to its goal.  That month, it announced its IPO, and in a prospectus filed with the Securities Exchange Commission, Ellie Mae candidly admitted that its $4.1 million revenue increase from 2008 to 2009 — the only bright spot in Ellie Mae's financial disclosures — was "primarily related to our document preparation services."

6.      Ellie Mae's conduct has resulted in substantial harm to DocMagic, which has been systematically cut off from access to customers in the online document preparation services market.  Ellie Mae's conduct has also resulted in substantial harm to competition in the document preparation market, diminishing the number of document preparation companies available to customers and raising, or threatening to raise, prices.  The harm to DocMagic and to competition will only increase if Ellie Mae is not enjoined from continuing its illegal exclusionary practices, as described herein.

## II.      JURISDICTION AND VENUE

7.      This is a civil action arising under federal antitrust and unfair competition laws, 15 U.S.C. § 2, 15 U.S.C. § 1125(a), and copyright law, 17 U.S.C. § 101 et seq.  This Court has subject matter jurisdiction under 15 U.S.C. §§ 4, 15, and 26 and 28 U.S.C. §§ 1221, 1331, 1337, 1338, 2201, and 2202, over the federal claims alleged below.  This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over the state law claims alleged below.

8.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(a), because Ellie Mae resides in this judicial district.

## III.      INTRADISTRICT ASSIGNMENT

9.      A substantial part of the events and conduct giving rise to the claims set forth in this Complaint occurred in the city of Pleasanton, Alameda County, California.  Ellie Mae resides in the city of Pleasanton, and the contracts between the parties (discussed below) were entered into, and certain of the obligations arising thereunder were to be performed, in Alameda County.

## IV.    PARTIES

10.    Plaintiff DocMagic is, and all times pertinent hereto was, a California corporation with its principal place of business in the city of Carson, Los Angeles County, California.

11.    On information and belief, Defendant Ellie Mae is a Delaware corporation with its principal place of business in the city of Pleasanton, Alameda County, California.

## V.    TRADE AND COMMERCE

12.    Ellie Mae is engaged in activity affecting interstate commerce in the United States, including sales and marketing of loan origination and settlement services.

13.    Ellie Mae operates in interstate commerce and the conduct described herein affects interstate commerce.

14.    Defendant's predatory and exclusionary conduct that gives rise to the antitrust claims asserted herein has an intended and substantial effect within the United States, including harming DocMagic's ability to compete in interstate commerce.

## VI.    BACKGROUND

### A.    DocMagic

15.    DocMagic was founded in 1988.  It is based in Carson, California and offers a leading electronic mortgage loan-document preparation service used by mortgage brokers, mortgage bankers, and lenders.  To use DocMagic's document preparation service, customers can download DocMagic's proprietary software to their computers, or access the software either online through DocMagic's website or through an electronic data connection such as an API (application programming interface) connection which allows data to be transferred seamlessly from third-party systems to DocMagic's system.  Customers use that software to compile a variety of data required to prepare loan documents, including property information, applicant information, and appraisal and loan information.  The data is then electronically transmitted to DocMagic where it is checked or "audited" against DocMagic's proprietary audit criteria and extensive database, a step that is designed to assure accurate and compliant documents.  If the proposed loan clears the audit process, DocMagic electronically delivers a set of executable closing documents to the customer.  If the proposed loan does not clear the audit, and errors are

found, the customer may click on the portion of the audit report listing the error and be linked directly to the software and field where the error exists to facilitate quick and efficient modification of the data.

16.     Because DocMagic carefully designed the workflow for its proprietary software so that it would solicit the data required to produce a complete set of accurate closing documents, DocMagic's proprietary software is an integral part of the DocMagic document preparation service.  One cannot be used without the other.

17.     When DocMagic first designed its document preparation service, it decided to include the internal "audit" function that checks the data and alerts the customer to any deficiencies between the data that was entered and the acceptable parameters for a particular loan product.  For example, it will alert the customer if a date is missing or stale (such as documents dated 2009 during the first few weeks of 2010), if a closing company has not been identified, or if flood insurance has not been obtained for a property in a flood zone.  By having the data audited as part of the document preparation service, DocMagic's customers can avoid ordering and paying for loan documents that cannot be used.  DocMagic was the first document preparation company to include an internal audit function as part of its document preparation service, and it has been a feature that sets its document preparation service apart from its competitors.

18.     Because of DocMagic's innovations in developing its document preparation service, it became a leading document preparation company in the United States.  DocMagic continues to be known for offering an efficient automated loan document preparation service that allows its customers easily to create and print error-free loan documents delivered electronically via the internet.

**B.     Ellie Mae**

19.     Ellie Mae provides three principal products in the residential mortgage industry, each of which is relevant to DocMagic's claims:  the ePASS Network, Encompass Loan Origination Software, and Ellie Mae Docs.

- 4 -

1

### 1.      The ePASS Network

2       20.     Since 2000, Ellie Mae has owned and operated an online network of loan

3   originators, wholesale lenders, and mortgage service providers called, at various times, the

4   ePASS Business Center and the ePASS Network (hereinafter, "ePASS" or "ePASS Network").[1]

5   Loan originators (generally mortgage brokers and retail lenders) use ePASS to connect to and

6   seamlessly integrate with various types of loan service providers, or vendors, whose services are

7   needed to complete a mortgage transaction.  Mortgage service providers on ePASS include

8   companies offering, among other services, document preparation, credit checks, title insurance,

9   flood insurance, and mortgage insurance.  Loan originators, which have already entered the

10  voluminous data for a particular loan transaction into a computerized loan origination program,

11  use ePASS to transmit the loan data, without the need for re-keying or reformatting, to the

12  particular vendors they select within ePASS to provide the services necessary to complete the

13  loan.

14      21.     The ePASS Network is not simply "a set of links to the publicly-available websites

15  of downstream vendors," as Ellie Mae's attorneys have represented to the Court.[2]  To the

16  contrary, Ellie Mae competes for, and recruits, vendors to agree to join the ePASS Network.

17  Vendors who agree to join ePASS enter into contracts with Ellie Mae that provide for, among

18  other things, the commitments necessary to allow connectivity to, and integration with,

19  originators using ePASS.  Vendors on ePASS are contractually bound to provide Ellie Mae the

20  hardware and software necessary to provide the connectivity and functionality for communication

21  and data transmission on ePASS.  As Ellie Mae explains in its April 2010 SEC filing, it enters

22  into contracts with ePASS vendors that provide for "access to, and interoperability with,

23  mortgage originators" over the ePASS Network; "[l]enders and service providers enter into

24  contracts with us that allow their proprietary operating systems to interoperate with the [ePASS

25

26      [1] In April 2010, the ePASS Network was renamed the Ellie Mae Network.

27      [2] *See* Defendant Ellie Mae, Inc.'s Response to Plaintiff's Submission Regarding Antitrust
    Claims, Dkt. No. 31, at 4.

28

Network].”  ePASS vendors agree to pay Ellie Mae a fee each time a vendor's services are used via ePASS.  In exchange, Ellie Mae tells ePASS vendors that by participating in ePASS they will be “seamlessly integrated” with “thousands of third-party mortgage originators.”

22.     The benefit of ePASS to originators is not simply the ability to “click” on a “link” to access a vendor's website.  Rather, as Ellie Mae has publicly acknowledged again and again, the benefit of ePASS is the seamless connectivity and interoperability that allows loan data already entered in an origination system to be transferred to and used by participating ePASS vendors so the vendor can provide the desired service during the mortgage transaction process. Ellie Mae's public statements contradict the assertion that ePASS is merely a “set of links”:

- “Lenders, investors and service providers can seamlessly receive data directly from mortgage originators, reducing redundant data entries and errors and lowering loan-fulfillment and customer support costs.”

- “Time-consuming and complicated file export procedures, redundant data entry, phone tag and faxing of loan documents will no longer be the norm” with use of ePASS.

- “Dramatically streamlining the loan submission process securely via the Internet, ePASS enables effortless population of file data already in your LOS system.  Requests and submissions for loan products and services are automatically populated from the existing loan file, eliminating the time and money needed to fax, mail, re-enter, and submit loan information.”

- ePASS “streamlines the entire loan process helping to dramatically cut the time and effort required to prequalify, originate, process, underwrite and close a loan.  With ePASS you will have immediate electronic access and connectivity to thousands of companies allowing you to instantly and securely submit loan information directly from your existing LOS to your desired ePASS partners.”

- “[Y]ou can order all the services you need to complete a loan transaction without having to re-key data or fax information.  With access to thousands of

1     settlement service providers, it is easy to take a loan from origination to

2     closing."

3     23.    Ellie Mae has been highly successful in recruiting and adding vendors to the

4  ePASS Network.  Ellie Mae boasts that ePASS provides loan originators online access to, and

5  technical compatibility with, a network consisting of thousands of vendors that provide

6  comprehensive online loan origination settlement services.

7     24.    The ePASS Network is by far the industry's leading network, and Ellie Mae is not

8  shy about saying so.  As early as 2004, Ellie Mae trumpeted ePASS as the "industry standard"

9  transaction platform, "connecting more than 30,000 third-party mortgage origination companies

10 with leading wholesale and correspondent lenders and 90,000 settlement service providers."  Ellie

11 Mae called ePASS the "industry-leading web transaction platform, providing seamless

12 connectivity between the loan origination desktops and the nation's leading wholesale lenders and

13 settlement service providers."  Ellie Mae states that 55,000 originators use ePASS.

14    25.    Ellie Mae has compared the power of its ePASS Network to Microsoft, drawing

15 parallels to the "network effects" phenomenon recognized in the Microsoft antitrust litigation:

16
17
18
19
> The "network effect," a phenomenon made famous by Microsoft
> and the Internet, is the process by which something becomes more
> valuable as more and more people use it.  ePASS is a classic
> example of the power of the network effect.  When new mortgage
> professionals register as ePASS users, the value of the portal to
> existing users and partners grows . . . and grows . . . and grows.

20
21
22
> Since ePASS is the original Internet portal dedicated to mortgage
> origination professionals, the number of originators and service
> providers using its services is rapidly approaching the total number
> of such professionals who use the Internet.  The value of ePASS to
> each of them is thus approaching the maximum possible network
> effect.

23    26.    Ellie Mae has publicly outlined the "benefits" that the ePASS "network effect"

24 bestows on all network participants:

25
26
> Loan Originators.  Loan originators who join ePASS (at no cost)
> reap the benefits of participating in a network that has reached and
> surpassed critical mass — helping them to realize immediate gains
> in productivity, efficiency, competitiveness, and profitability.

27
28
> Lender Partners.  Lenders participating in the ePASS partner
> program tap into a huge, technology-enabled marketplace,

1        integrating their technology with loan-origination desktops, growing market share cost-effectively, and increasing their levels of

2        service.

3        Service Partners.  Settlement service providers participating in the ePASS partner program also become a part of a huge online

4        marketplace, streamlining sales, increasing transaction speed and volume, and reducing their costs pers loan.

5

6      27.     Ellie Mae reiterated these points in its April 2010 SEC filing:

7        Our mission is to be the industry standard electronic network for domestic residential mortgage originations.  Key elements of our strategy include:  Increase the number of participants on the Ellie

8        Mae Network.  According to Metcalfe's law,[3] as the number of participants in a network grows, the benefit to all its participants

9        increases.

10     28.     As described below, DocMagic was an ePASS vendor from 2003 until 2009, when

11   Ellie Mae, with no legitimate business justification, terminated DocMagic's contract and took

12   other steps to foreclose DocMagic from access to customers.

13          **2.**      **Encompass Loan Origination Software**

14     29.     The second Ellie Mae product relevant to DocMagic's claims is called Encompass.

15   Since the 1990s, many loan originators have used computerized loan origination systems

16   ("LOS's") offered by third-parties, including Ellie Mae, to produce the loan packages required for

17   the underwriting and closing of mortgage loans.  Third-party LOS software is used by mortgage

18   brokers and lenders to help manage all aspects of the loan transaction, including origination,

19   processing, and closing.

20     30.     When a transaction is commenced, the voluminous information that is necessary to

21   manage and process the loan through closing, including the consumer's personal and financial

22   information, is entered into the LOS, which becomes the "system of record" for the particular

23   loan transaction.  Because the LOS becomes the system of record, the data for a particular loan

24   transaction must either be retrieved from the LOS or manually re-keyed into another system for

25   use by different service providers during the loan transaction.  Because of the difficulty,

26

27      [3] "Metcalfe's law" states that the value of a telecommunications network is proportional to the square of the number of connected users of the system.

28

sf-2838358

1  inefficiency, and risk of error associated with re-keying loan information in multiple systems, an

2  LOS provider employing unfair business practices, like Ellie Mae, has the ability to ensure that

3  data entered into an LOS becomes captive in the LOS.

4      31.    In 2003, Ellie Mae began marketing and selling the LOS software that is today

5  known as Encompass.  Ellie Mae describes Encompass as "a comprehensive operating system

6  that handles key business and management functions in running a mortgage origination business."

7  Encompass has been a highly successful product, and Ellie Mae's share of the LOS market has

8  grown rapidly.  Ellie Mae's principal competitor in this market is Calyx Technology, Inc., which

9  sells an LOS known as POINT.

10     32.    Encompass users have access to the ePASS Network.  Indeed, as described in

11  more detail below, Encompass users have virtually no other choice but to use the ePASS Network

12  to obtain settlement services.  However, ePASS is not merely a "feature" of Encompass, as

13  represented by Ellie Mae's attorneys to the Court.[4]  Ellie Mae markets and sells ePASS and

14  Encompass separately.  Ellie Mae accounts for its revenue from ePASS and Encompass

15  separately.  Ellie Mae offered ePASS long before it offered Encompass.  And, Ellie Mae has

16  marketed ePASS for use with non-Encompass LOS products.  In 2001, Ellie Mae stated that its

17  overriding goal was to make ePASS available not only to Ellie Mae's LOS customers, but to

18  customers using all LOS products.  Ellie Mae stated that ePASS was "designed to automate

19  seamless exchanges between your suppliers and any brand of loan origination software you

20  choose."

21     33.    In pursuing its goal, Ellie Mae made ePASS compatible with POINT — the LOS

22  offered by Ellie Mae's chief competitor, Calyx.  Ellie Mae announced that it had placed an

23  embedded link to ePASS in POINT.  In 2004, Ellie Mae announced the launch of an ePASS

24  integration with the Pipeline LOS, a product offered by Pipeline Solutions.  Ellie Mae has

25  advertised that ePASS can be used to "originate [loans] using Calyx Point, Harland or other

26

27      [4] See Defendant Ellie Mae, Inc.'s Response to Plaintiff's Submission Regarding Antitrust
   Claims, Dkt. No. 31, at 2.

28

sf-2838358

1   LOS."  In another advertisement, Ellie Mae stated that ePASS "already interfaces with most

2   major LOS's."

3                          **3.      Ellie Mae Docs**

4          34.      Ellie Mae not only sells LOS software and operates the ePASS Network, it is now

5   also a vendor on its own ePASS network in the document preparation category, and, as such,

6   competes directly with other document preparation companies, including DocMagic.  As

7   described by Ellie Mae, document preparation is a "service that automates the process of

8   preparing the legal documents required for closing a loan."

9          35.      Prior to 2009, Ellie Mae provided document preparation services by licensing

10  DocMagic's services and rebranding them as Ellie Mae document preparation services.  The

11  DocMagic software used by Ellie Mae's ePASS customers was rebranded as Ellie Mae Docs and

12  the DocMagic software used by Ellie Mae's Encompass customers was rebranded and accessed

13  by Encompass users through a feature called Encompass Closer.

14         36.      In October 2008, Ellie Mae acquired Online Documents, a document preparation

15  system, from Stewart Lender Services Inc.  Online Documents was nowhere near as sophisticated

16  as DocMagic's document preparation service.  Because Ellie Mae's customers had become

17  accustomed to the level of services offered through DocMagic under the Ellie Mae brands, Online

18  Documents could not replace DocMagic's services without severe disruption to Ellie Mae's

19  customers.  That changed, however, when Ellie Mae decided to terminate its relationship with

20  DocMagic in 2009 and to use DocMagic's proprietary information, trade secrets, and business

21  methods to transform the user experience associated with Online Documents to replicate the

22  DocMagic document preparation service that Ellie Mae had been offering its customers.  (For

23  ease of reference, Ellie Mae's document preparation service, whether provided on ePASS or

24  provided through Encompass or Encompass Closer, is referred to herein as "Ellie Mae Docs.")

25                 **C.      DocMagic's Business Relationship With Ellie Mae**

26         37.      For a number of years, DocMagic and Ellie Mae had a business relationship

27  benefiting both companies and their customers.  During the time period that Ellie Mae and

28  DocMagic had a business and contractual relationship, DocMagic was one of the most successful

sf-2838358

1   and widely used document preparation companies, offering a product that was reliable and robust,

2   yet easy to use.

3       38.     Two contracts between DocMagic and Ellie Mae are relevant to DocMagic's

4   claims.  First, in November 2003, the parties executed an agreement titled "Electronic Bridge

5   Agreement Between Ellie Mae and Participator" (hereinafter "Bridge Agreement").  Pursuant to

6   the terms of the Bridge Agreement, DocMagic became a vendor on the ePASS Network in the

7   category of "Document Preparation."  In exchange, DocMagic agreed to pay Ellie Mae a fee of

8   $1, $2, or $3 per transaction, depending on volume.  Ellie Mae expressly agreed in the contract

9   that the fees were "fair and reasonable compensation for the value" of the services provided.

10      39.     Pursuant to the terms of the Bridge Agreement, DocMagic agreed to provide Ellie

11  Mae with the "computer, communication devices, software and hardware" that Ellie Mae required

12  "to provide the connectivity and functionality necessary and appropriate to link" participants on

13  ePASS.  The parties also acknowledged that Ellie Mae would have access to DocMagic's

14  confidential and proprietary information, including "names of customers, customer addresses,

15  customer telephone numbers and customer email addresses, the identities of customer

16  representatives [and] customer contracts, . . . customer services, the type, quantity and

17  specifications of products and services . . . received by" DocMagic's customers, "and any and all

18  related information."  The contract provided in paragraph 10.4 that Ellie Mae would not disclose

19  DocMagic's proprietary information, would take steps to secure it, and would "not use any such

20  information for any purpose other than in connection with the performance of its . . . functions

21  contemplated by this Agreement."  Upon termination of the Bridge Agreement, Ellie Mae was

22  required to return all proprietary information to DocMagic.

23      40.     The Bridge Agreement automatically renewed every year.  It could be terminated

24  upon notice given 120 days before the beginning of the next automatic renewal. DocMagic

25  participated as an ePASS vendor under the Bridge Agreement from 2003 until 2009, with the

26  Bridge Agreement renewing automatically each year during that period.

27      41.     Second, in September 2006, the parties executed a Reseller Agreement.  Pursuant

28  to the terms of that agreement, DocMagic became the provider of document preparation services

sf-2838358

rebranded by Ellie Mae as Ellie Mae Docs, as described above.  The Reseller Agreement provided that Encompass Closer and Ellie Mae Docs users would be able "to connect to the servers and other system components maintained by DocMagic for the provision of DocMagic Products and to access DocMagic Products."  Ellie Mae paid a fee to DocMagic each time DocMagic delivered documents through Encompass or Ellie Mae Docs.

42.    Under the terms of the Reseller Agreement, Ellie Mae was entrusted with DocMagic's proprietary information.  Paragraph 7.1(b) defines DocMagic's "proprietary information and/or trade secrets" as including, among other things "software, code, files, materials, data, methodologies, methods, know-how, concepts, ideas, formulae, inventions, processes and procedures used in the provision of DocMagic Products" and "patents, copyrights, trade secrets, trademarks, service marks, trade names and dress and applications relating to the same," as well as "all information relating to DocMagic's business, finances, marketing, products, services, customers or other third parties, or manner of operation."  Paragraph 7.3 precludes Ellie Mae from disclosing or using DocMagic's proprietary information "other than in the course of carrying out the contemplated purposes" of the agreement.  Paragraph 1.4(a) provided that Ellie Mae would not acquire any rights in any of DocMagic's products by virtue of the Reseller Agreement.

43.    The Reseller Agreement had a term of three years and automatically renewed every year thereafter.  It could be terminated upon notice given 120 days before the beginning of the next automatic renewal.

D.    **Ellie Mae's Scheme To Exclude DocMagic and Monopolize the Online Document Preparation Services Market**

44.    In 2008, Ellie Mae was faced with declining revenues from its core Encompass and ePASS products.  On information and belief, Ellie Mae was under pressure from its investors to improve its financial performance as quickly as possible to position the company for an initial public stock offering.  On information and belief, many of Ellie Mae's investors had anticipated that they would have cashed out their investment in Ellie Mae years earlier through an IPO, and

thus, as of 2008, these investors had been funding Ellie Mae for far longer than they originally anticipated.

45.     By virtue of its contractual relationship with DocMagic and its access to DocMagic's proprietary information and trade secrets since as early as 2003, Ellie Mae was well aware of the lucrative nature of DocMagic's business.  On information and belief, Ellie Mae management decided in the latter half of 2008 that the surest path to improve the company's revenues and take it public was to terminate its relationship with DocMagic, to find a way to take DocMagic's customers by providing them with a service they could not distinguish from DocMagic's service, and to foreclose DocMagic as well as other document preparation companies from accessing customers, both by refusing to deal with them and by imposing technological restrictions.

46.     Pursuant to this plan, Ellie Mae embarked on a course of conduct intended to systematically drive DocMagic and others from the online document preparation services market and take for itself the profits associated with document preparation by offering its "own" product, cobbled together from DocMagic's proprietary information and replicating DocMagic's unique user experience.

### 1.     Development of Ellie Mae Docs Using DocMagic's Proprietary Information

47.     While Ellie Mae was offering DocMagic's loan document preparation service pursuant to the Reseller Agreement, Ellie Mae began designing its own document preparation service.  On information and belief, Ellie Mae began using and copying DocMagic's proprietary information to develop a loan document preparation service, including a software designed to replicate the unique user experience of DocMagic's software.  On information and belief, Ellie Mae intended to offer that loan document preparation service to customers in place of DocMagic's loan document preparation service and those of other document preparation companies.

48.     On or about October 2, 2008, Ellie Mae acquired Online Documents, Inc., a loan document preparation service.  The Online Documents service, however, did not provide Ellie

DocMagic, Inc.'s First Amended Complaint
sf-2838358

1    Mae with the technology or know-how it needed to produce a document preparation service that

2    could replace DocMagic.  On information and belief, the acquisition of Online Documents was

3    part of the Ellie Mae's plan to replace the DocMagic service offered and rebranded by Ellie Mae

4    under the Reseller Agreement with a new Ellie Mae service modeled after the DocMagic service

5    and incorporating DocMagic's proprietary information, and the acquisition of Online Documents

6    provided Ellie Mae the cover it needed to begin the process of squeezing out DocMagic and

7    stealing its customers.

8            49.     On information and belief, using DocMagic's proprietary information and Online

9    Documents, Ellie Mae developed Ellie Mae Docs (sometimes called Online Documents, but

10   referred to herein as Ellie Mae Docs).  Ellie Mae Docs effectively duplicates the unique user

11   experience of the DocMagic service.  On information and belief, Ellie Mae was only able to

12   duplicate DocMagic's service with the aid of its access to DocMagic's proprietary information

13   provided pursuant to the parties' contracts.  On information and belief, Ellie Mae appointed a

14   team of employees to review all information about DocMagic's document preparation service and

15   software available to Ellie Mae in an effort to create a document preparation service and software

16   that customers would not be able to distinguish from DocMagic's.  Ellie Mae knew that it could

17   only succeed in its plan to exclude DocMagic and steal its customers if it could create a service

18   and product that looked and felt like DocMagic.

19           50.     Ellie Mae has duplicated, among other things, the structures, workflows, and data

20   of the DocMagic document preparation service, as well as the screens, terminology, and overall

21   look and feel of the DocMagic software.  Not only does Ellie Mae Docs copy the "look and feel"

22   and other trade dress and functionality of DocMagic's software as whole, it infringes DocMagic's

23   trademark and trade dress rights because it copies specific trademarks and trade dress that

24   DocMagic has incorporated into its DocMagic software.

25           51.     DocMagic was the first document preparation service to include an internal audit

26   process as an integral part of its service.  DocMagic designed a creative report to display the

27   results of this audit process in a manner that is accessible to the user.  In designing the report,

28   DocMagic selected the deficiencies to be identified by the DocMagic software during the audit

sf-2838358

1   process and decided how the deficiencies should be categorized.  These deficiencies are arranged

2   and displayed in a 3-column table-like list without internal borders, with field names on the left, a

3   descriptive message in the middle, and a space for additional details on the right.  The field names

4   are the trademarks WARNING™ and FATAL™, as described in further detail below, and are

5   color-coded red and yellow.[5]

6       52.     Because it wanted to highlight the valuable internal audit process and contrast its

7   service with those of its competitors, DocMagic developed distinctive trademarks and a

8   distinctive trade dress to identify its audit process.  Its intent was for its customers to know that

9   when they saw the distinctive trademarks and trade dress when using the software, they could be

10  assured that they were using a DocMagic service rather than a competitor's service.  This

11  assurance would be available regardless of how the DocMagic documentation preparation service

12  was accessed, because the distinctive trademarks and trade dress were integrated into the software

13  itself.  Thus, they would appear even if the software itself was being offered under a brand other

14  than "DocMagic," as under the Reseller Agreement.

15      53.     Specifically, for over eight years, DocMagic has always used the trademark

16  FATAL™ in red letters and the trademark WARNING™ in yellow letters as part of its audit

17  process.  Until Ellie Mae copied them to replicate the DocMagic document preparation service as

18  part of its scheme to exclude DocMagic from the online document preparation services market,

19  these terms had not been used by any other document preparation service.  As a result of

20  DocMagic's long-standing and exclusive use of these trademarks in their contrasting colors,

21  FATAL™ and WARNING™ have become strong and distinctive trademarks of DocMagic and

22  serve to identify DocMagic as the source of its services and the software used to access those

23  services.

24      54.     Moreover, DocMagic has consistently presented its FATAL™ and WARNING™

25  trademarks, in their contrasting colors, in exactly the same fashion in its audit reports.  The red

26  _____

27      [5] DocMagic is in the process of registering its software, including the look and feel of the
    audit report described herein, with the U.S. Copyright Office.

28

FATAL™ term appears at the top of the report, followed to the right with a deficiency, also in red.  This is repeated for each relevant deficiency that is identified through the audit process.  The yellow WARNING™ term appears immediately below the red FATAL™ term, followed to the right with a deficiency, in black.  This is repeated for each relevant deficiency that is identified through the audit process.  As a result of its long-standing and exclusive use of this particular format and combination of colors in its audit reports, the audit report style has become a strong and distinctive trade dress of DocMagic and serves to identify DocMagic as the source of its software.

55.     In fact, even when Ellie Mae rebranded DocMagic's document preparation services as Ellie Mae services under the Reseller Agreement, users knew that their documents were actually being prepared by DocMagic, not Ellie Mae.  They knew this because the document preparation service had an internal audit function that allowed for direct and easy correction of deficiencies, which was then offered only by DocMagic, and because the distinctive trademarks and trade dress used in the audit reports pointed to DocMagic as the source of the services.

56.     Although the information to be displayed in the audit report could be selected, arranged, and presented in any number of ways, DocMagic elected to create a consistent and distinct format for its audit reports to highlight that feature of its service and to develop it as a creative and source-identifying feature for its document preparation service.  Indeed, the audit report format had been used by no one else in the field until Ellie Mae decided to replicate DocMagic's software in 2009.

57.     In developing its replacement document preparation service, Ellie Mae needed to develop an internal audit process that allowed for direct and easy correction of deficiencies.  It did so by copying the DocMagic audit report and incorporating DocMagic's trademarks and trade dress into the audit reports that are generated by its internal audits.  Ellie Mae's use of DocMagic's trademarks and trade dress in this fashion is likely to lead to confusion as to the source of Ellie Mae's document preparation services.  Not only has Ellie Mae's document preparation service, as a whole, been designed to copy the workflow of DocMagic's document preparation service, Ellie Mae has also copied the selection, arrangement, and display of the

- 16 -

1   DocMagic audit report, as well as the trademarks, trade dress, and look and feel of DocMagic's

2   software to replicate the unique user experience associated with DocMagic's product.  Moreover,

3   Ellie Mae is now offering the service that it designed to replicate DocMagic to customers who

4   previously used DocMagic and who are most familiar with the DocMagic trademarks, trade dress,

5   and look and feel.

6          58.    Utilizing DocMagic's Proprietary Information, Ellie Mae has attempted to

7   replicate the entire DocMagic user experience from the initial data entry steps, to the audit

8   process, and ultimately to the loan document creation process.

9          59.    On information and belief, Ellie Mae began rolling out its new Ellie Mae Docs

10  service to certain mortgage brokers and mortgage bankers while it was still under contract with

11  DocMagic pursuant to the terms of the Reseller Agreement.  On information and belief, Ellie Mae

12  wanted to test the replacement document preparation service that it had developed as part of its

13  scheme to drive competitors from the online document preparation market.

**2.      Termination of Contracts**

15         60.    Ellie Mae's goal of taking DocMagic's customers and ultimately driving out all

16  competitors from the document preparation market could not succeed if DocMagic were able to

17  provide its services to Encompass or ePASS customers, which is exactly what DocMagic was

18  contractually permitted to do pursuant to both the Bridge Agreement and the Reseller Agreement.

19  Ellie Mae thus had no choice but to terminate those contracts at any cost, which is exactly what

20  Ellie Mae did.

21         61.    In the spring of 2009, Ellie Mae developed an internal plan and timeline for

22  replacing the document preparation services offered through Encompass Closer, including

23  DocMagic, with the Ellie Mae Docs service that had been engineered using DocMagic's

24  proprietary information, as described above.  Key to that plan was the termination of the Reseller

25  Agreement, first, and then the Bridge Agreement a month later.  On April 27, 2009, Ellie Mae

26  notified DocMagic of its intent to terminate the Reseller Agreement effective August 30, 2009.

27  On May 21, 2009, Ellie Mae notified DocMagic of its intent to terminate the Bridge Agreement

28  effective August 30, 2009.

62.     Ellie Mae told DocMagic that it was terminating the Bridge Agreement because the fee that DocMagic had been paying under that agreement was too low.  Ellie Mae's stated reason was purely pretextual.  Ellie Mae knew that it needed to terminate the Bridge Agreement, because terminating only the Reseller Agreement would not effectively cut DocMagic off from its customers and thereby force them to use Ellie Mae Docs:  without also terminating the Bridge Agreement, customers could easily continue to access DocMagic through ePASS and would do so because DocMagic had the superior products and customer relations.  Termination of the Bridge Agreement was thus essential to Ellie Mae's plan.  The plan could not succeed if DocMagic were allowed on ePASS, regardless of the amount of the transaction fee DocMagic might agree to pay.

63.     Several facts available to DocMagic reveal that Ellie Mae's claimed reason for terminating the Bridge Agreement was pretextual.  First, Ellie Mae has publicly stated that the success of its ePASS Network is dependent on its ability to provide customers access to a large number of vendors.  It was thus against Ellie Mae's economic interests to exclude the largest and most well-known document preparation provider from the ePASS Network.  Second, Ellie Mae had never before indicated that the agreed-upon fee was too low, even though the parties had been performing under the agreement for several years.  Nothing had happened in the industry to justify a substantial price increase.  Third, Ellie Mae did not raise the issue of price before terminating the agreement, which shows Ellie Mae's intent to terminate the relationship regardless of price.  Only after DocMagic questioned the termination did Ellie Mae suggest that the relationship could perhaps be salvaged if DocMagic paid more money.  Fourth, the non-negotiable price Ellie Mae "offered" to DocMagic after terminating the agreement — $6 per transaction — was clearly not one that Ellie Mae thought DocMagic would, or could, accept.  The $6 per transaction fee represented as much as a 600% price increase and Ellie Mae knew that this price would require DocMagic to offer many of its services at a loss because it was far higher than DocMagic would be able to charge its customers for those services, and Ellie Mae prohibited DocMagic from increasing prices for its services to recoup ePASS transaction fees.  Fifth, on information and belief, Ellie Mae's price increase bears no relationship to what other ePASS

- 18 -

1   vendors pay Ellie Mae, further demonstrating Ellie Mae's anticompetitive intent.  Sixth, because

2   its true intent was to cut off access to DocMagic altogether, on information and belief, Ellie Mae

3   had developed plans and strategies for dealing with the customer relations nightmare that it knew

4   would result from systematically cutting off access to DocMagic by customers who had used

5   DocMagic for years.

6        64.   ████████████████████████████████████

7   ████████████████████████████████████████

8   ████████████████████████████████████████

9   ████████████████████████████████████████████

10  ████████████████████████████████████████

11  ████████████████████████

12

13

14

15

16

17

18

19

20       65.   For all of these reasons, and contrary to the representations of Ellie Mae's

21  attorneys, the termination of the Bridge Agreement was not merely a "commercial impasse over

22  pricing."[6]  Ellie Mae intended to terminate the agreement regardless of price.  It never intended

23  that DocMagic would accept its commercially unreasonable, and pretextual, "offer."

24

25

26  _____

27       [6] *See* Defendant Ellie Mae, Inc.'s Response to Plaintiff's Submission Regarding Antitrust
    Claims, Dkt. No. 31, at 1.

28

### 3.     The Data Lock Down

66.     Ellie Mae's goal of cutting off DocMagic from its customers and forcing customers to use Ellie Mae Docs was nearly complete as a result of the termination of the Reseller Agreement and the Bridge Agreement.  Ellie Mae had to take just one more step to ensure complete foreclosure.

67.     Ellie Mae built its Encompass LOS to provide clients with the option of connecting with, and transferring data to, third-party applications outside of the Encompass LOS environment and outside of the ePASS Network.  Customers could license the Encompass Software Development Kit ("SDK") to enable them to retrieve loan data, including consumer financial information, from Encompass and to use that data in connection with third-party products that were not available through the ePASS Network.

68.     Indeed, in 2008, DocMagic developed and began marketing a version of DocMagic, called DocMagic XL, that would operate on the work stations of loan originators, such as brokers or lenders, and allow them to transfer data from an LOS, such as Encompass, directly to DocMagic Online.  DocMagic XL was designed to address a gap that existed between LOS interfaces and the DocMagic Online product that existed when DocMagic's document preparation services were used by brokers and lenders outside of a network, such as the ePASS Network.  The DocMagic XL software interacts with an LOS's SDK to pull mortgage application data from the LOS files.  The DocMagic XL software then delivers the mortgage application data to the DocMagic server for use in preparing DocMagic closing documents.  The DocMagic XL software is designed to be used with a number of different LOS providers, including Ellie Mae's Encompass.

69.     Because of the intentional design of the Encompass SDK and the availability of DocMagic XL, DocMagic could continue to provide service to Encompass customers even after termination of the Reseller Agreement and the Bridge Agreement so long as the LOS customer licensed the SDK.  This, of course, was a major problem for the implementation of Ellie Mae's plan to force all customers to use Ellie Mae Docs — a problem to which Ellie Mae immediately directed its attention after notifying DocMagic of the termination of the contracts.

70.     Ellie Mae took several steps to deny DocMagic access to DocMagic's own customers via the Encompass SDK.  First, it threatened DocMagic and its customers with litigation if they attempted to use DocMagic outside of the ePASS Network, even though the customers and DocMagic were doing nothing more than employing the SDK for its intended purpose.  Second, Ellie Mae stopped licensing the SDK to customers who it believed would use the SDK to connect with DocMagic.  On information and belief, Ellie Mae had numerous communications with customers designed to persuade them not to use DocMagic via the DocMagic XL product and the Encompass SDK.  Third, Ellie Mae intentionally disabled a utility or feature of its Encompass SDK that effectively made it impossible even for licensed users of the SDK to submit data from Encompass to DocMagic.

71.     Most significantly, however, on August 9, 2009, Ellie Mae modified its Encompass SDK License Agreement to close the loophole and once and for all prevent Encompass users from utilizing the Encompass SDK to transfer mortgage application and loan data from the Encompass LOS to any party outside the ePASS Network, including DocMagic. The additional language in the revised SDK License Agreement, appearing in all caps, could not more clearly express Ellie Mae's determination to force customers to use Ellie Mae Docs as their document provider:  "YOU MAY NOT USE THE SDK TO TRANSFER DATA FROM YOUR ENCOMPASS SOFTWARE TO THIRD PARTY PROVIDER PRODUCTS AND SERVICES THEREBY BYPASSING THE USE OF ELLIE MAE'S EPASS SERVICES . . . ."

72.     The August 2009 revision of the SDK — made just weeks before DocMagic's agreements would terminate — had two profound effects, not only on the parties' business relationship, but also on the operation of the loan origination market and the provision of downstream ancillary services like document preparation.  First, the revision effectively cut off DocMagic and other providers of ancillary services, including document preparation providers other than Ellie Mae Docs, from providing services to any customer using Ellie Mae's Encompass LOS without going through the ePASS Network.  Second, the revision resulted in a data lock down for Encompass LOS users.  These customers could no longer access ancillary service providers outside of the ePASS Network.  The alternatives — manually re-keying voluminous

- 21 -

1   loan data information, for example, or working by facsimile or some other paper method — were

2   not viable for LOS customers, and Ellie Mae was well aware of that fact.  Thus, the SDK revision

3   had the effect of locking DocMagic and other service providers out, and locking Encompass LOS

4   customers in.  This data lock down allowed Ellie Mae to exercise improper control over loan data.

5          73.     The data lock down effectively cut off DocMagic from servicing its existing

6   customers, and caused DocMagic to lose numerous customers and substantial revenue.

7                        **4.      The Customer "Migration" Plan**

8          74.     Ellie Mae went even further in its efforts to cut DocMagic off from its customers

9   and to force them into using Ellie Mae Docs.  In the Spring of 2009, Ellie Mae developed and

10   began implementing a plan to aggressively solicit DocMagic's customers and convert them to

11   Ellie Mae Docs.  Ellie Mae referred to this plan as the "migration" plan.  The plan utilized

12   DocMagic's proprietary and trade secret information about its customers, and ultimately involved

13   a campaign to disparage DocMagic's products.  The "migration" plan also included a concerted

14   and heavily managed effort by Ellie Mae to ensure that its Ellie Mae Docs service presented the

15   same user experience to potential customers, and that Ellie Mae Docs looked and felt like

16   DocMagic to users.

17          75.     On information and belief, during implementation of the "migration" plan, Ellie

18   Mae also utilized DocMagic pricing information and other confidential information about

19   DocMagic's customers obtained from, among other sources, a former DocMagic employee hired

20   by Ellie Mae.

21          76.     As part of the plan, and using DocMagic's proprietary information and trade

22   secrets, Ellie Mae communicated with DocMagic's customers with whom DocMagic had

23   contracts or otherwise had ongoing business relationships to convince the customers to switch to

24   Ellie Mae Docs.  For example, Ellie Mae has been notifying DocMagic's customers that

25   DocMagic's access to the ePASS Network has been terminated and encouraging them to use Ellie

26   Mae's competing loan document preparation service.  In a letter dated July 31, 2009, Ellie Mae

27   announced to DocMagic customers and other customers that starting September 1, 2009,

28

DocMagic, Inc.'s First Amended Complaint

sf-2838358

1   DocMagic would no longer be available on ePASS or in Encompass Closer and that Ellie Mae

2   was providing a new "upgraded" solution.

3          77.     As part of the "migration" plan, Ellie Mae representatives contacted DocMagic

4   clients and threatened that if the client used DocMagic's services, they risked being shut off

5   completely or not being able to order documents without re-entering all of the loan data.  Ellie

6   Mae representatives also told DocMagic clients that use of DocMagic XL violated the clients user

7   and/or SDK agreements.

8          78.     By the end of Summer 2009, Ellie Mae had already stolen a substantial number of

9   DocMagic customers through its "migration" plan, and Ellie Mae had begun boasting about the

10  number of customers stolen and the substantial revenue associated with the "migration."

11         79.     Ellie Mae has disparaged DocMagic's software, including to DocMagic's existing

12  customers to whom Ellie Mae now has exclusive access.  In the July 31, 2009 letter, Ellie Mae

13  represents that the "new solution" (Ellie Mae Docs) will "enable us to provide you with greater

14  automation, safeguards and control to help you easily stay compliant now."  Ellie Mae's

15  statements are false and misrepresent the nature, characteristics, and qualities of Ellie Mae's

16  services and of DocMagic's services.  The new document preparation service that Ellie Mae

17  started offering on September 1, 2009 does not provide clients with "greater automation,

18  safeguards and control" than the previously offered DocMagic service.  Moreover, it is not easier

19  for customers to stay compliant with Ellie Mae's document preparation service.

20         80.     In August 2009, as a result of the discovery by DocMagic of the misappropriation

21  of its proprietary information by Ellie Mae, DocMagic gave notice to Ellie Mae of Ellie Mae's

22  breach of the Reseller Agreement and the immediate termination of the Reseller Agreement by

23  DocMagic "for cause" pursuant to Paragraph 9.2(ii).  Pursuant to Paragraph 9.6 of the Reseller

24  Agreement, the provisions of Paragraph 7 that protect DocMagic's proprietary information

25  survive the termination of the Reseller Agreement by either party.

26                 **5.     The Attempt to Monopolize**

27         81.     Ellie Mae sought, and seeks, not only to foreclose DocMagic from competing with

28  Ellie Mae Docs, but also to foreclose all competition in the online document preparation services

1    market.  On information and belief, Ellie Mae has internally formulated and begun implementing

2    a plan to exercise its control over the LOS market and the network services market to exclude

3    competition from all online document preparation service vendors in the same manner that Ellie

4    Mae has systematically excluded DocMagic.  On information and belief, this includes the

5    prevention of all significant competitors from offering document preparation services through

6    Encompass Closer or through ePASS.

7        82.    ████████████████████████████████████████

8    ████████████████████████████████████████████████████

9    ████████████████████████████████████████████████

10   ████████████████████████████████████████████████

11   ██████████

22       83.    The Encompass data lock down described above is directed not only at DocMagic,

23   but at all document preparation service providers.  Its exclusionary effects extend beyond

24   DocMagic to all document preparation service providers unable to access customers through

25   ePASS or Encompass Closer.  And for those document preparation service providers on ePASS,

26   Ellie Mae intends to further cripple their ability to compete with Ellie Mae Docs by requiring that

27   they conform to outdated 2004 industry standards known as MISMO 2.3.1, while upgrading Ellie

28   Mae Docs on Encompass Closer to 2007 industry standards (MISMO 2.4).  On information and

- 24 -

1   belief, Ellie Mae further intends to limit the ability of any remaining document preparation

2   company to compete by not providing them with updates on Encompass.  By not providing

3   updates, Ellie Mae would make it impossible for a document preparation service provider to

4   produce a compliant set of documents, crippling that provider's ability to compete against Ellie

5   Mae.

6        84.     Further evidencing its monopolistic intent, and as discussed below, Ellie Mae has

7   expanded available vendors in categories in its ePASS Network where Ellie Mae does not offer a

8   competing service, but has reduced the number of vendors in the document preparation category

9   where Ellie Mae offers a competing service — Ellie Mae Docs.

10                       **6.     The IPO**

11       85.     Ellie Mae is on the verge of achieving the long-intended results of its unfair

12  business practices.  In April 2010, Ellie Mae announced its intention to make an initial public

13  stock offering.  Ellie Mae's prospectus filed with the SEC that month is the first public insight

14  into Ellie Mae's current and historical financial performance.  The prospectus confirms the

15  critical condition Ellie Mae found itself in during 2008 and the key role of its monopolistic

16  conduct in positioning itself for an IPO.  The one bright spot in the financial disclosures is the

17  greater than 10% increase Ellie Mae achieved in 2009 over 2008 revenue, despite the dismal state

18  of the real estate market in 2009.  Ellie Mae attributes the bounce in 2009 to revenue it received

19  from its Ellie Mae Docs product:  "The $4.1 million increase in revenues from 2008 to 2009 was

20  due to an increase in Software and Services revenues, primarily related to our document

21  preparation services."

22       86.     But as described herein, Ellie Mae achieved this revenue growth only by illegally

23  trampling on DocMagic and Ellie Mae's other competitors.  Ellie Mae cannot truthfully claim to

24  its potential investors that it won its sudden and dramatic increase in document preparation

25  revenue by building a better product and competing on the merits.  Its "success" was due solely to

26  its misuse and misappropriation of a rival's proprietary information, and to its ability to exercise

27  substantial power in the LOS market and the network market in which ePASS competes to

28  exclude potential rivals in the document market.

### E.    Injury to DocMagic

87.    Ellie Mae's conduct has caused, and continues to cause, substantial injury to DocMagic.

88.    As a direct result of Ellie Mae's conduct, DocMagic has lost hundreds of customers and the revenue associated with those customers.  As a result of Ellie Mae's unlawful conduct, many of these customers were forced to migrate to Ellie Mae Docs, and thus Ellie Mae is profiting substantially from its anticompetitive actions.

89.    DocMagic is also damaged, and has lost customers, because it has been cut off from all ePASS customers and from all Encompass customers.  DocMagic's clients are accustomed to a completely seamless method of ordering documents that DocMagic is no longer able to provide to ePASS and Encompass customers as a result of Ellie Mae's unlawful conduct.

90.    Ellie Mae's actions have crippled DocMagic's ability to compete in the document preparation market (defined below).

91.    Ellie Mae's actions have damaged DocMagic's reputation and goodwill.

92.    Ellie Mae's theft of DocMagic's trade secrets and proprietary information, and its misappropriation of DocMagic's intellectual property has also damaged DocMagic, as described below.

93.    Ellie Mae's wrongful conduct is ongoing, and so is the damage to DocMagic.  If Ellie Mae is not enjoined from engaging in the conduct described herein, DocMagic will continue to suffer damage in its business and property.

### VII.    MARKET DEFINITION, STRUCTURE, AND MARKET POWER

94.    Three product markets are relevant to DocMagic's competition claims:  (1) the online loan origination settlement services networks market (the "Network Market"), where Ellie Mae has monopoly power; (2) the third-party loan origination software market (the "LOS Market"), where Ellie Mae has monopoly power; and (3) the online loan documents preparation market (the "Document Market"), where Ellie Mae has sought to acquire monopoly power by unlawfully exercising its power in the Network Market and LOS Market.  The geographic scope for each of these markets is the United States.

sf-2838358

### A.  Network Market

95.     The Network Market consists of online loan origination settlement service networks, such as the ePASS Network, that provide access, connectivity, interoperability, and data transmission capabilities among loan originators using third-party LOS's, lenders, and settlement service providers (or vendors).  Settlement service providers include persons or companies that provide document preparation services, mortgage loans, appraisals, credit reports, fraud reports, flood information, title and escrow services, and underwriting services, among other loan fulfillment services necessary in the mortgage finance industry.

96.     The Network Market is a two-sided market, meaning that participants in the market compete, on one side of the market, for the participation of loan originators who seek to buy services provided by network members and, on the other side of the market, for wholesale lenders and service providers to join the network and pay fees to the network in exchange for connectivity and interoperability with, and access to, originators.  Participants on both sides of the Network Market, as in other such network markets, benefit from the increased size of the network:  the network becomes more valuable to loan originators the greater number of service providers that participate in the network; and the network becomes more valuable to service providers the greater number of loan originators that participate in the network.  As a result, a network that achieves a certain critical size and scale can become the dominant network in the market such that membership becomes essential to compete.  Ellie Mae has itself touted the "network effect" inherent in its ePASS product.

97.     In this age, neither mortgage originators nor settlement service providers view traditional methods of obtaining and providing settlement services — such as paper, facsimile, courier, and mail — as substitutes for an electronic network.  Traditional methods offer different and less-efficient functionality; they are offered on a separate vendor-by-vendor basis, do not have coordinated data formats, often require the re-keying of customer and loan data by the loan originator, and can take days (rather than minutes) to complete and to obtain responses from settlement service providers.

98.     While a number of LOS providers have established loan origination settlement service networks, none has reached Ellie Mae's size or technical compatibility with settlement service providers.  In its SEC filing, Ellie Mae identifies only Calyx as a competitor in the Network Market, but while Ellie Mae boasts that thousands of settlement service providers have joined the ePASS Network, Calyx has fewer than 200 settlement service providers.  Moreover, only ePASS boasts fully integrated technical compatibility; each settlement service provider in Ellie Mae's network has modified a specific version of its website to accept data that comes through the ePASS Network to provide originators with seamless connectivity and pre-completed forms.  This is not available through Calyx.

99.     The scale and scope of ePASS are unparalleled, giving Ellie Mae market power in the Network Market.  Ellie Mae's de facto control over industry standards gives Ellie Mae tremendous power over the industry, and the network structure of ePASS reinforces the monopoly power that Ellie Mae already has through its LOS customer base.  Ellie Mae has referred to its ePASS Network as an "astonishing success."  In its April 2010 SEC filing, Ellie Mae claimed it has one of the largest networks in the country.  Ellie Mae calls ePASS "the industry's most-used online transaction platform."  In March 2007, Ellie Mae reported that "nearly one third of the nation's $3 trillion in loans are transmitted through the ePASS Network linking originators to their wholesale lenders and settlement service providers."  Ellie Mae has claimed that "95% of all mortgage professionals in the United States have access to Ellie Mae's ePASS Network," and that ePASS is the industry-standard platform.  Ellie Mae has claimed that millions of transactions pass through the ePASS Network each year and that ePASS enables 55,000 originators to do business online with the country's leading lenders and nearly 100,000 service providers.  Based on statistics provided in its April 2010 SEC filing, it appears that as much as 60% of all third-party LOS transactions in the country pass through the ePASS Network.  Ellie Mae further claims that the ePASS Network streamlines and automates transactions with the GSEs (Government Sponsored Entities), 45 of the nation's leading wholesale and correspondent lenders, over 88,000 appraisers, and 2,200 settlement service providers including credit, title, flood, insurance, and document providers.

DocMagic, Inc.'s First Amended Complaint

1    100.    The Network Market is characterized by high barriers to entry.  Ellie Mae's

2  ePASS Network has reached such a critical size that new entrants and existing rivals cannot

3  compete effectively.  A new entrant or rival would have to achieve comparable scale to ePASS to

4  compete effectively.  The ePASS Network links so many settlement service providers, loan

5  originators, lenders, and other entities that it has reached a critical size, making membership

6  essential to online-loan-related businesses.  It has become extremely difficult, or impossible, for

7  any competitor to duplicate the ePASS Network or to effectively compete with it.

8    101.    Other competitors have attempted, ineffectively, to enter the Network Market.

9  The next largest competitor is Calyx, which has not managed to achieve commercial success in

10  the Network Market.  Calyx's network consists of only 173 settlement service providers, which

11  does not compare to the ePASS Network of thousands of such providers.  Further, Calyx's

12  comparatively few network members have not offered the same level of interoperability as the

13  ePASS Network.

14              **B.    LOS Market**

15    102.    The LOS Market consists of loan origination software systems supplied by third-

16  party LOS providers to bankers, mortgage brokers, and lenders to manage all aspects of the loan

17  origination process.  The LOS Market does not include the proprietary loan origination software

18  or systems of large retail lenders.  Those proprietary systems are not substitutes for third-party

19  LOS's from the perspective of loan originators such as mortgage brokers and small retail lenders.

20    103.    Furthermore, mortgage originators do not view traditional loan origination

21  methods as substitutes for online loan origination systems.  Traditional methods offer different

22  and less-efficient functionality.  As Ellie Mae explains in its April 2010 SEC filing:

23              Originating a residential mortgage involves multiple parties and
             requires a complex series of data-laden transactions that must be
24              handled accurately under tight time constraints.  By the time a
             mortgage has been funded, the typical loan package contains over
25              one thousand pages of documents that come from over a dozen
             different entities, usually operating on disparate technology systems
26              and databases.  Traditionally, much of the data used to prepare
             these documents has been gathered manually, rather than
27              electronically, with documents exchanged among the many
             participants by facsimile, courier or mail.  The entire process [i.e.,
28              traditional method] results in significant duplicative efforts, time

- 29 -

delays, errors, costs and redundant paper documentation, and often exposes borrower data to privacy and security breaches.

104.    In its SEC filing, Ellie Mae identifies the following competitors in the LOS Market:  Calyx Technology, Inc., Byte Software, Inc., Del Mar DataTrac, Inc., and Harland Financial Solutions.

105.    Ellie Mae's Encompass LOS has been extraordinarily successful, giving Ellie Mae market power in the LOS Market.  As early as 2001, Ellie Mae referred to itself as the "largest Loan Origination Software (LOS) provider in the U.S."  Ellie Mae later reported that in 2002 its LOS product had 20 percent market share.  In March 2007, Ellie Mae reported that its market share had grown tremendously, with "half of the country's loans" being originated through Ellie Mae's software.  Since 2007, Ellie Mae's market share has increased considerably.  Its principal competitor, Calyx, traditionally had the largest share of the broker LOS market, whereas Ellie Mae had more banker LOS customers.  But since 2007, the number of brokers has declined about 72%, resulting in the concentration of loan origination with bankers.  This shift in the market from broker to banker substantially decreased Calyx's market share while increasing Ellie Mae's share.  Thus, Ellie Mae's share of the LOS Market today is greater than 50%.  Furthermore, since approximately 48% of mortgages in the United States are originated by large retail lenders which typically do not use third-party LOS's, Ellie Mae's share of the LOS Market likely exceeds 60%.

106.    Ellie Mae has used its dominance in the Network Market to increase its dominance in the LOS Market.  If, as Ellie Mae claims, it now restricts access to the ePASS Network to Encompass LOS users and does not make ePASS compatible with other LOS's, it did so to increase its share of the LOS Market.  Ellie Mae previously offered ePASS for all LOS's, which, on information and belief, it did for the purpose of growing its network to the critical size necessary to exclude competition.  On information and belief, once ePASS had reached that critical size, Ellie Mae closed the network to rival LOS's in order to further increase its dominance of the LOS market.

107.    The LOS Market is characterized by high barriers to entry and limited substitution by customers.  An LOS represents a significant investment to a customer, both in terms of the

sf-2838358

1  cost of the LOS and the time and expense involved in integrating the LOS into the company's

2  operations.  LOS customers are thus extremely reluctant to switch systems due to the expense and

3  business interruption that would result.  Switching LOS's has been likened to switching

4  accounting systems — something that most companies would consider doing only infrequently.

5  Due to the difficulty of obtaining a meaningful customer base to cover the expenses associated

6  with designing, developing, marketing, selling, and supporting an LOS, new entrants capable of

7  competing with companies like Ellie Mae in the LOS market are essentially nonexistent.  Because

8  of high barriers to entry and limited demand-side substitution by customers, Ellie Mae's high

9  market share gives Ellie Mae monopoly power in the LOS Market.

10                          **C.      Document Market**

11        108.    The Document Market consists of online document preparation services to brokers

12  and lenders using third-party LOS's in conjunction with residential mortgage transactions.  Ellie

13  Mae is a participant in this market, through its product Ellie Mae Docs.

14        109.    In its SEC filing, Ellie Mae identifies the following competitors in the Document

15  Market:  DocMagic, MRG, DigitalDocs, ProClose, Guardian Mortgage Documents, Wolters

16  Kluwer Financial Services, and DocuTech Corporation.  Only two of these companies, DocMagic

17  and DocuTech, were recognized by Mortgage Technology Magazine in 2009 as providing leading

18  document preparation services.

19        110.    Although Ellie Mae does not currently possess market power in the Document

20  Market, there is a dangerous probability that it will if it is allowed to continue its anticompetitive

21  behavior.  Through its exclusionary conduct in which Encompass customers are forced to use

22  Ellie Mae's document preparation service, Ellie Mae has been able to obtain a market share of the

23  Document Market at least equivalent to its LOS Market share.  Furthermore, through its

24  exclusionary conduct described above, Ellie Mae is fast becoming the dominant document

25  preparation option on the ePASS Network.

26

27

28

1

2

**FIRST CLAIM FOR RELIEF**

**(Monopoly Leveraging, 15 U.S.C. § 2)**

3      111.    DocMagic incorporates the allegations in paragraphs 1 through 110 above, as if set

4      forth fully herein.

5      112.    Ellie Mae has exercised its monopoly power in the Network and LOS Markets for

6      purposes of acquiring and maintaining a monopoly, or attempting to do so, in the downstream

7      Document Market.  Ellie Mae's monopoly leveraging violates Section 2 of the Sherman Act, 15

8      U.S.C. § 2.

9      113.    Ellie Mae has monopoly power in the Network Market.  As set forth above in

10     paragraphs 99-101, which are incorporated herein by reference, Ellie Mae's ePASS Network

11     controls a substantial share of the market, and its share continues to increase.  In addition to its

12     high market share, Ellie Mae has engaged in conduct that demonstrates its power to control prices

13     and exclude competition in the Network Market.  On the service provider side of the market, Ellie

14     Mae has attempted to impose price increases as high as 600%.  Ellie Mae has also excluded a

15     service provider, DocMagic, by refusing to deal with the provider on reasonable terms.  On

16     information and belief, Ellie Mae intends to exclude additional service providers who pose a

17     competitive threat to Ellie Mae's revenue streams.  On the originator side of the Network Market,

18     Ellie Mae has taken action to force its LOS customers to use ePASS service providers exclusively

19     by unilaterally imposing restrictions on use of loan data, including consumer financial

20     information, entered in the LOS.

21     114.    Ellie Mae has monopoly power in the LOS Market.  As set forth above in

22     paragraphs 105-107, which are incorporated herein by reference, Ellie Mae's Encompass LOS

23     controls a substantial share of the market, and its share continues to increase.  In addition to its

24     high market share, Ellie Mae has engaged in conduct that demonstrates its power to exclude

25     competition in the LOS Market.  Ellie Mae has imposed restrictions on its LOS customers that

26     essentially lock them into the Encompass environment, thereby excluding legitimate competition

27     from LOS companies or other service providers.

28

sf-2838358

115. Ellie Mae has exercised its monopoly power in the Network and LOS Markets and engaged in anticompetitive exclusionary conduct directed at achieving its goal of monopolizing the Document Market.

116. In the Network Market, Ellie Mae has engaged in exclusionary conduct to reduce the number of document preparation companies available to ePASS users — conduct that will eventually leave, if it has not already left, Ellie Mae as the only viable document preparation provider on ePASS.

117. Ellie Mae excluded its largest and most important competitor, DocMagic, from ePASS in 2009 when it refused to renew the Bridge Agreement on reasonable terms. As set forth above in paragraphs 62-65, which are incorporated herein by reference, the termination of the Bridge Agreement was not merely a "commercial impasse over pricing," as Ellie Mae's attorneys have represented to the Court. Consistent with Ellie Mae's unlawful intention of excluding DocMagic from ePASS and thereby excluding its most significant competition for document preparation services, Ellie Mae premised its renewal "offer" on a non-negotiable price increase of 600% for most transactions (from $1 to $6 per transaction). The amount of the price increase was clearly intended to exclude DocMagic, because $6 is more than DocMagic charges its own customers for many of its document preparation services. And since Ellie Mae prohibits ePASS vendors from raising their prices to cover the cost of ePASS fees, Ellie Mae knew that DocMagic would not be able to recoup the 600% price increase and that DocMagic could only accept Ellie Mae's "offer" by operating at a loss going forward. Furthermore, on information and belief, the fees Ellie Mae charges other service providers on ePASS, including the percentage of the ePASS fee compared to the cost of the service, further demonstrates Ellie Mae's unlawful goal: Ellie Mae's $6 offer represented a sum wildly out of proportion to what it charges other ePASS vendors compared to the cost of their services.

118. ███████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████ ██████████████

119.    Ellie Mae's exclusionary conduct extends beyond DocMagic.  Although Ellie Mae has repeatedly, and publicly, acknowledged that increasing the number of ePASS Network participants is critical to its ability to compete in the Network Market, Ellie Mae cut the number of document service providers on ePASS over the period 2007 to 2010.  Yet, during the same period, Ellie Mae substantially increased the number of vendors in other categories.  What explains the diametrical treatment of document preparation vendors and other types of vendors is the fact that Ellie Mae offers a competing product in the Document Market, but not in the other downstream ancillary service markets.  The elimination of DocMagic and other document preparation service providers on ePASS constitutes an unlawful exercise of Ellie Mae's power in the Network Market for the purpose of monopolizing the Document Market.  The goal of this conduct is to eliminate competition in the Document Market by cutting off competitors' access to a critical, and continuously growing, base of customers.

120.    ████████████████████████████████
████████████████████████████████████
████████████████████████████████████████
██████████████████████████████████████████
████████████████

121.    Ellie Mae's exclusion of competitors from the ePASS Network is economically irrational conduct in the short term, has no legitimate business rationale, and serves only to foreclose competition in the Document Market.

122.    Ellie Mae has also leveraged its monopoly power in the LOS Market for the purpose of monopolizing the Document Market.  After terminating the Reseller Agreement and the Bridge Agreement, Ellie Mae has taken steps to preclude DocMagic from providing document services to any Encompass users.  Through its amended SDK and its threats of litigation, Ellie Mae has locked up its LOS customers' loan information in Encompass and effectively forced all of its Encompass LOS customers to use either Ellie Mae Docs or the document vendors on ePASS.  Because of Ellie Mae's monopolistic conduct in the Network Market, this LOS data lock down has the direct and immediate effect of excluding competition in the Document Market.

123.    Further, Ellie Mae has taken steps in the operation of its Encompass LOS to restrict the technology available to non-Ellie Mae ePASS document vendors by limiting them to 2004 standards rather than current standards, further restricting their ability of non-Ellie Mae document venders to compete in the Document Market.

124.    Ellie Mae's conduct in the LOS market has no sound business justification, and instead operates solely to foreclose competition from DocMagic and others.

125.    Ellie Mae's specific intent to monopolize the Document Market is demonstrated by its course of conduct, described herein.  For example, Ellie Mae — against its own competitive interests in the upstream markets — has excluded DocMagic and others from participation in the ePASS network.  Ellie Mae has also restricted its customers' freedom to choose the service providers they want to work with by locking down loan data in the LOS.  This, too, is against Ellie Mae's competitive interests in the upstream markets, as demonstrated by Encompass customer complaints.  On information and belief, Ellie Mae received a flood of complaints from its LOS customers who, due to Ellie Mae's termination of the Reseller Agreement and the Bridge Agreement, were unable to access DocMagic and were forced by Ellie Mae to use an inferior document preparation product.

126.    ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

127.    There is a dangerous probability that Ellie Mae will achieve monopoly power in the Document Market.  Ellie Mae's LOS and ePASS customers are forced to use Ellie Mae Docs, or an inferior alternative available on ePASS.  Ellie Mae is thus able to obtain a market share of the Document Market at least equivalent to its share in the Network and LOS Markets.  Ellie Mae is fast becoming the dominant document preparation option on the ePASS Network.  Indeed, Ellie Mae already promotes Ellie Mae Docs as "the industry's leading" product.  Ellie Mae's exclusion of DocMagic and other document preparation vendors increases Ellie Mae's probability of

sf-2838358

1   solidifying or achieving monopoly power.  The document service providers remaining on ePASS

2   today do not offer meaningful competition to Ellie Mae:  one of the document companies uses

3   outdated and limited technology; several of the document companies are not document

4   preparation companies at all, but are instead law firms or attorney groups who review documents

5   for compliance; another company deals only with reverse mortgages and therefore does not

6   meaningfully compete with Ellie Mae Docs; and other companies focus solely on specific

7   geographic reasons and do not provide meaningful competition.

8          128.   Furthermore, as the efficiency and effectiveness of its ePASS Network becomes

9   more widely recognized, access will become even more necessary for competitors in downstream

10   markets.  It follows that if Encompass services well over 50% of the LOS Market, and Ellie Mae

11   continues to reduce options to Encompass users, ultimately leaving its own document product as

12   the only viable choice for Encompass and ePASS users, Ellie Mae Docs will also instantly attain

13   over 50% of the Document Market.  That percentage would be even greater if ePASS is used with

14   LOS's other than Encompass.

15          129.   Ellie Mae's monopolistic, exclusionary, and anticompetitive conduct in leveraging

16   its power in the LOS and Network Markets to monopolize the Document Market frustrates

17   competition on the merits, deprives customers of choice, and injures competitors and other market

18   participants.  DocMagic has suffered injury as the direct result of Ellie Mae's conduct, because it

19   has been excluded from ePASS and shut off from all Encompass users and has, as a result, lost

20   customers.  If Ellie Mae succeeds in achieving monopoly power in the Document Market,

21   DocMagic will be injured further and likely foreclosed from the market altogether.

22          130.   DocMagic's injury flows directly from the anticompetitive consequences of Ellie

23   Mae's unlawful acts in furtherance of its monopoly leveraging.  Thus, as a direct and proximate

24   result of Ellie Mae's violation of Section 2 of the Sherman Act, DocMagic has suffered and will

25   continue to suffer monetary damages from Ellie Mae's unlawful conduct in an amount not yet

26   determined.  Additionally, DocMagic has incurred and will incur liability for costs and attorneys'

27   fees.

28

DocMagic, Inc.'s First Amended Complaint

sf-2838358

1    131.   Ellie Mae's conduct also substantially harms competition by eliminating

2 competitors from the Document Market, severely limiting consumer choice of document

3 providers, and positioning Ellie Mae to further restrict competition and increase prices that

4 consumers pay for document preparation services.  Ellie Mae's conduct is not competition on the

5 merits, nor does it protect customers or increase choices.

6    132.   Unless enjoined, Ellie Mae's conduct will continue to cause DocMagic irreparable

7 harm.

8                          **SECOND CLAIM FOR RELIEF**

9                     **(Attempted Monopolization, 15 U.S.C. § 2)**

10    133.   DocMagic incorporates the allegations in paragraphs 1 through 132 above, as if set

11 forth fully herein.

12    134.   The conduct described herein constitutes an unlawful attempt by Ellie Mae to

13 monopolize the Document Market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

14    135.   As set forth in paragraphs 115-124, which are incorporated herein by reference,

15 Ellie Mae has engaged in anticompetitive, exclusionary conduct directed at, and in furtherance of,

16 its attempt to monopolize the Document Market.

17    136.   As set forth in paragraphs 44-84 and 125-126, which are incorporated herein by

18 reference, Ellie Mae's conduct demonstrates its specific intent to control and destroy competition

19 in the Document Market, and to monopolize the Document Market.

20    137.   As set forth in paragraphs 127-128, which are incorporated herein by reference,

21 there exists a dangerous probability that Ellie Mae will achieve monopoly power in the Document

22 Market.

23    138.   As set forth in paragraphs 87-93 and 129-130, which are incorporated herein by

24 reference, Ellie Mae's anticompetitive conduct has injured DocMagic and will continue to injure

25 DocMagic if Ellie Mae is not stopped.

26    139.   As set forth in paragraph 131, which is incorporated herein by reference, Ellie

27 Mae's conduct has injured, and will continue to injury, competition in the Document Market.

28

DocMagic, Inc.'s First Amended Complaint
sf-2838358

140.    Unless enjoined, Ellie Mae's conduct will continue to cause DocMagic irreparable harm.

### THIRD CLAIM FOR RELIEF

### (Refusal To Deal, 15 U.S.C. § 2)

141.    DocMagic incorporates the allegations in paragraphs 1 through 140 above, as if set forth fully herein.

142.    Ellie Mae has unlawfully exercised its monopoly power in the Network and LOS Markets by refusing to deal with DocMagic without legitimate business justification in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

143.    As set forth in paragraphs 99-101, which are incorporated herein by reference, Ellie Mae has monopoly power in the Network Market, as demonstrated by its substantial share of the market, and also by specific conduct that demonstrates its power to control prices and exclude competition in the Network Market.

144.    As set forth in paragraphs 105-107, which are incorporated herein by reference, Ellie Mae has monopoly power in the LOS Market, as demonstrated by its substantial share of the market, and also by specific conduct that demonstrates its power to exclude competition in the LOS Market.

145.    As a monopolist in the Network and LOS Markets, Ellie Mae has engaged in exclusionary conduct by refusing to deal with its competitor, DocMagic.  As set forth in paragraphs 60-65, which are incorporated herein by reference, Ellie Mae terminated the Bridge Agreement for the purpose of denying DocMagic access to the ePASS Network.  Ellie Mae has refused to deal with DocMagic to permit it access to the ePASS Network.  As set forth in paragraphs 60-61, which are incorporated herein by reference, Ellie Mae also canceled the Reseller Agreement, further denying DocMagic access to customers through Encompass Closer, which also constitutes a refusal to deal.  As set forth in paragraphs 66-73, which are incorporated herein by reference, Ellie Mae locked up data on its Encompass LOS and denied DocMagic access to its customers by amending the Encompass SDK, which also constitutes a refusal to deal.

DocMagic, Inc.'s First Amended Complaint

sf-2838358

146.   Ellie Mae's purported "offer" to allow DocMagic access to ePASS for a higher fee was made on unreasonable terms and therefore amounted to a practical refusal to deal.  As set forth in paragraphs 62-65, which are incorporated herein by reference, Ellie Mae's offer of a 600% price increase was a pretextual offer that Ellie Mae never intended DocMagic to accept, and indeed, it would have been economically infeasible for DocMagic to have accepted it.

147.   Ellie Mae lacks any legitimate business justification for its refusal to deal with DocMagic; rather, the sole purpose of Ellie Mae's refusal is to stifle competition.  As set forth in paragraphs 60-82, which are incorporated here by reference, Ellie Mae's refusal to allow DocMagic access to the ePASS Network and its refusal to allow DocMagic access to customers as a result of the termination of the Reseller Agreement were against Ellie Mae's own economic interest and done for the purpose of cutting off DocMagic's access to customers so Ellie Mae could "migrate" those customers to Ellie Mae Docs.  As set forth in paragraphs 62-65, which are incorporated herein by reference, Ellie Mae's stated reason for refusing to deal with DocMagic by terminating the Bridge Agreement was not its actual reason for doing so.

148.   The anticompetitive intent of Ellie Mae's refusal to deal is further demonstrated by the sudden reversal and eradication of the long-standing relationship between DocMagic and Ellie Mae that began before Ellie Mae achieved monopoly power in the Network and LOS Markets — a relationship that ended without a legitimate business justification and based on pretextual representations.  Since 2003, Ellie Mae not only allowed DocMagic to be part of its ePASS Network and to access Encompass LOS customers, but also offered DocMagic's services and software for its own brand of document preparation service.  While DocMagic was part of the Ellie Mae Network and an Encompass service provider, both Ellie Mae and DocMagic encouraged DocMagic's customers to adopt Ellie Mae's Encompass software and to use the ePASS Network as a way to access DocMagic's service.  DocMagic's status as an ePASS and Encompass service provider was a factor in the decision of many loan originators to adopt Ellie Mae's technology.  That strong relationship came to a sudden and unforeseeable halt when Ellie Mae determined, with unlawful intent, to refuse to deal with DocMagic.  The timing of Ellie Mae's refusal to deal with DocMagic — a decision made only after Ellie Mae became a

- 39 -

1    competitor in the downstream Document Market — alone demonstrates Ellie Mae's

2    anticompetitive intent.

3            149.    Ellie Mae' refusal to deal has the effect of restricting Encompass and ePASS

4    customers from accessing DocMagic's service precisely because Ellie Mae exercises substantial

5    monopoly power in the LOS and Network Markets.  If loan originators could freely choose LOS

6    or network providers that offered services and products competitive with Ellie Mae's offerings,

7    they may be driven to use an LOS or settlement service provider network that allowed access to

8    DocMagic, in the same way many customers adopted Ellie Mae's Encompass in the past after

9    being referred by DocMagic.  Instead, with Ellie Mae dominating the Network and LOS Markets,

10   and given the substantial disincentives associated with switching, customers will not switch

11   LOS's or networks to access DocMagic or other document service providers.  Ellie Mae's refusal

12   to deal thus has the anticompetitive consequences Ellie Mae intends.

13           150.    Ellie Mae's conduct in refusing to deal with DocMagic and reducing the number

14   of loan document preparation providers in its network harms the competitive process by denying

15   Encompass users and ePASS users access to DocMagic's services.  Ellie Mae's refusal to deal

16   also restricts the choice of document preparation services offered to Encompass and ePASS users.

17   It further harms the competitive process and DocMagic by denying DocMagic access to the

18   ePASS Network, which is critical to its ability to compete, and denying DocMagic access to its

19   own customers and their data, which is held captive in Encompass.

20           151.    As set forth in paragraphs 87-93 and 129-130, which are incorporated herein by

21   reference, Ellie Mae's anticompetitive conduct has injured DocMagic and will continue to injure

22   DocMagic if Ellie Mae is not stopped.

23           152.    Unless enjoined, Ellie Mae's conduct will continue to cause DocMagic irreparable

24   harm.

25                          **FOURTH CLAIM FOR RELIEF**

26                  **(Denial of Access to Essential Facility, 15 U.S.C. § 2)**

27           153.    DocMagic incorporates the allegations in paragraphs 1 through 152 above, as if set

28   forth fully herein.

154.   Ellie Mae, exercising its monopoly power in the Network Market, has denied its competitor, DocMagic, access to a facility, the ePASS Network, that is essential to DocMagic's ability to compete in the Document Market.  This conduct violates Section 2 of the Sherman Act, 15 U.S.C. § 2.

155.   As set forth in paragraph 99-101, which are incorporated herein by reference, Ellie Mae has monopoly power in the Network Market, as demonstrated by its substantial share of the market, and also by specific conduct that demonstrates its power to control prices and exclude competition in the Network Market.

156.   Ellie Mae owns and operates, and therefore controls, the ePASS Network.

157.   Ellie Mae's decision to terminate the Bridge Agreement, thereby ending Ellie Mae's long-standing business relationship with DocMagic, denied DocMagic access to the ePASS Network.

158.   The ePASS Network constitutes an essential facility, because a competitor in the Document Market cannot effectively compete in that market without access to the ePASS Network.  As a result of its dominant position and the "network effect" characteristic of the market, the ePASS Network has reached such a critical size and scale that document preparation vendors require access to the facility to reach the overwhelming majority of customers in the Network and LOS Markets.

159.   As set forth in paragraphs 20-28 and 99-101, which are incorporated herein by reference, the scale and scope of ePASS are unparalleled, giving Ellie Mae tremendous power over the effected markets.  The network structure of ePASS reinforces the monopoly power that Ellie Mae already has through its customer base.

160.   It is not possible for a competitor to reasonably duplicate the facility, because it has reached such a critical size it has become far and away the dominant network connecting originators, lenders, and service providers.  Because of significant "network effects," smaller networks cannot compete effectively with ePASS.  Other competitors have attempted, ineffectively, to enter the Network Market.  The next largest competitor is Calyx, but as described

1    in paragraph 98, which is incorporated herein by reference, Calyx has not managed to achieve

2    commercial success in the Network Market and is far smaller than ePASS.

3          161.    DocMagic was an ePASS Network member for six years.  Thus, it is plainly

4    feasible for Ellie Mae to provide DocMagic access to ePASS.

5          162.    As set forth in paragraphs 87-93 and 129-130, which are incorporated herein by

6    reference, Ellie Mae's anticompetitive refusal to allow DocMagic access to customers via the

7    ePASS Network has injured DocMagic and will continue to injure DocMagic if Ellie Mae is not

8    stopped.

9          163.    As set forth in paragraph 130, which is incorporated herein by reference, Ellie

10   Mae's conduct has injured, and will continue to injury, competition in the Document Market.

11         164.    Unless enjoined, Ellie Mae's conduct will continue to cause DocMagic irreparable

12   harm.

### FIFTH CLAIM FOR RELIEF

### (Unfair Competition, Lanham Act Section 43(a), 15 U. S. C. § 1125(a))

15         165.    DocMagic incorporates the allegations in paragraphs 1 through 164 above, as if set

16   forth fully herein.

17         166.    DocMagic has protectable rights in the following trademarks used in the audit

18   reports in its document preparation service:  WARNING™ and FATAL™.  Through nearly ten

19   years of consistent and substantially exclusive use, these trademarks have come to be associated

20   with DocMagic as the sole source for its document preparation service with the integrated internal

21   audit process.

22         167.    DocMagic also has protectable rights in the trade dress used in the audit reports.

23   Specifically, the trade dress is the layout with top "FATAL" listings where the FATAL™

24   trademark is in red, followed to the right with a relevant deficiency, also in red, in combination

25   with bottom "WARNING" listings, with the WARNING™ trademark in yellow appearing

26   immediately below the red FATAL™ trademark.  This is followed to the right with a relevant

27   deficiency, in black.  As a result of its long-standing and exclusive use of these trademarks and

28   this particular format and combination of colors in its audit reports, the trademarks and the trade

1    dress in the audit reports have become strong and distinctive trademarks and trade dress of

2    DocMagic and serve to identify DocMagic as the source of its services and software.  These

3    trademarks and trade dress provide end users with the certainty that they are receiving

4    DocMagic's high quality document preparation services, including its internal audit services.

5         168.    The trade dress does not serve any function other than to identify DocMagic as the

6    source of the audit reports and the associated document preparation services.

7         169.    Through its long-standing and exclusive use by DocMagic, the trade dress has

8    acquired secondary meaning and serves to identify DocMagic as the source of the audit reports

9    and the associated document preparation services.

10        170.    Although it could have chosen any style for the audit reports that it developed for

11   its new document preparation service, Ellie Mae chose to copy the DocMagic trademarks and

12   trade dress so that use of Ellie Mae's document preparation service would replicate as closely as

13   possible the DocMagic user experience.  For this reason, Ellie Mae incorporated the

14   WARNING™ and FATAL™ trademarks into its competing document preparation service's audit

15   reports.  Moreover, Ellie Mae has copied the trade dress of the DocMagic audit report.

16   Specifically, the Ellie Mae audit report also has top "FATAL" listings with the term FATAL in

17   red to the left.  It is followed to the right with a relevant deficiency, also in red.  Immediately

18   below that are "WARNING" listings, with the term WARNING to the left and followed to the

19   right with a relevant deficiency, in black.  The only difference in the overall audit report is that

20   Ellie Mae does not display the term WARNING in yellow.  But for this difference in color for

21   one trademark, the reports are indistinguishable from each other.

22        171.    Ellie Mae's infringement of DocMagic's trademarks and trade dress has caused

23   confusion and is likely to continue to cause confusion as to the source of Ellie Mae's document

24   preparation services.

25        172.    Ellie Mae's infringement of DocMagic's trademarks and trade dress has caused

26   confusion and is likely to continue to cause confusion as to the affiliation, connection or

27   association between Ellie Mae and DocMagic and between Ellie Mae's document preparation

28   services and DocMagic.

1    173.    The conduct alleged above constitutes unfair competition, in violation of

2    Section 43(a) of the Lanham Act (15 U.S.C. § 1125(a)).

3    174.    Ellie Mae's acts have caused, and will continue to cause, damages as well as

4    irreparable harm to DocMagic for which DocMagic has no adequate remedy at law.

5    175.    On information and belief, Ellie Mae undertook the acts described herein with full

6    knowledge of DocMagic's rights and with the intent to cause confusion and harm to DocMagic

7    and to compete unfairly with DocMagic.

8    **SIXTH CLAIM FOR RELIEF**

9    **(False Advertising, Lanham Act Section 43(a), 15 U.S. C. § 1125(a))**

10    176.    DocMagic incorporates the allegations in paragraphs 1 through 175 above, as if set

11    forth fully herein.

12    177.    Ellie Mae has misrepresented the quality of both its proprietary document

13    preparation service and DocMagic's document preparation service in advertisements and other

14    promotional materials.  Ellie Mae has falsely stated that, in contrast with DocMagic's document

15    preparation service, Ellie Mae's proprietary service enables Ellie Mae to provide customers with

16    "greater automation, safeguards and control" to help them "easily stay compliant now."

17    178.    Ellie Mae's statements are false and misrepresent material facts.  The proprietary

18    document service that Ellie Mae started offering on September 1, 2009 does not provide

19    customers with "greater automation, safeguards and control" than the previously offered

20    DocMagic service.  Moreover, it is not easier for customers to stay compliant with Ellie Mae's

21    proprietary service.

22    179.    Ellie Mae's false statements and misrepresentations of the nature, characteristics,

23    and qualities of its service and of DocMagic's service have harmed and are likely to continue to

24    harm DocMagic.

25    180.    The conduct alleged above constitutes false advertising, in violation of

26    Section 43(a) of the Lanham Act (15 U.S.C. § 1125(a)).

27    181.    Ellie Mae's acts have caused, and will continue to cause, damages as well as

28    irreparable harm to DocMagic for which DocMagic has no adequate remedy at law.

1    182.    On information and belief, Ellie Mae undertook the acts described herein with full

2    knowledge and intent to cause harm to DocMagic.

3                              **SEVENTH CLAIM FOR RELIEF**

4         **(Copyright Infringement, Copyright Act § 501, 17 U.S.C. § 501)**

5    183.    DocMagic incorporates the allegations in paragraphs 1 through 182 above, as if set

6    forth fully herein.

7    184.    DocMagic's selection, arrangement, and display of data from its audit process in

8    its audit reports are copyrightable subject matter under the Copyright Act, 17 U.S.C. § 101 *et seq.*

9    More specifically, the following elements are original, creative, and thus protectable at various

10   levels:  (1) the selection of deficiencies and field names; (2) the arrangement of deficiencies into

11   two groups with specific field names; and (3) the arrangement and display of field names and

12   deficiencies in a color-coded table format.

13   185.    As shown above, Ellie Mae had access to DocMagic's audit reports, and, without

14   consent, approval, or license, knowingly, willingly, and unlawfully copied and continues to copy:

15   (1) DocMagic's selection of deficiencies and field names; (2) DocMagic's arrangement of

16   deficiencies into two groups with specific field names; and (3) DocMagic's arrangement and

17   display of field names and deficiencies in a color-coded table format.  Ellie Mae has infringed and

18   continues to infringe certain exclusive rights of DocMagic by (1) unlawfully copying DocMagic's

19   selection, arrangement, and display of data in its audit reports, (2) distributing and displaying its

20   infringing Encompass software, and/or (3) creating an unauthorized derivative work.

21   186.    Although it could have chosen any style for the audit reports that it developed for

22   its new document preparation service, including alternative classification systems with a different

23   number of fields, different field names, or different methods of arranging and displaying the data,

24   Ellie Mae chose to copy DocMagic's selection and arrangement so that use of Ellie Mae's

25   document preparation service would replicate as closely as possible the DocMagic user

26   experience.

27   187.    DocMagic has complied with Title 17 of the United States Code and is in the

28   process of registering the above-referenced copyright with the United States Copyright Office.

sf-2838358

188.    DocMagic has been damaged by, and Ellie Mae has profited from, Ellie Mae's wrongful conduct in an amount to be proven at trial.  DocMagic is entitled to recover from Ellie Mae the damages DocMagic has sustained and will sustain, and any gains, profits, and advantages obtained by Ellie Mae as a result of Ellie Mae's acts of infringement and Ellie Mae's use of the copied materials for a commercial purpose.  At present, the amount of such damages, gains, profits, and advantages cannot be fully ascertained by DocMagic.

189.    Ellie Mae's wrongful conduct has caused and is continuing to cause irreparable injury to DocMagic and to the business, reputation, and goodwill represented thereby, and unless enjoined, will cause further irreparable injury from which DocMagic has no adequate remedy at law.

190.    On information and belief, Ellie Mae undertook the acts described herein with full knowledge and intent to cause harm to DocMagic.

### EIGHTH CLAIM FOR RELIEF

### (Intentional Interference with Contractual Relationship)

191.    DocMagic incorporates the allegations in paragraphs 1 through 190 above, as if set forth fully herein.

192.    DocMagic provides electronic loan document preparation services to thousands of customers — mortgage brokers, mortgage bankers, and lenders — allowing them effortlessly to produce, deliver, and print error-free loan documents.  Through contractual relationships established by DocMagic with its customers over many years, DocMagic became one of the most successful independent loan document preparation companies in the United States.

193.    DocMagic's customer relationships flourished during the time DocMagic and Ellie Mae had a business and contractual relationship.  Ellie Mae, as the owner of the ePASS Network, knew of the existence of DocMagic's customer relationships.  Moreover, because of Ellie Mae's access to DocMagic's proprietary information since as early as 2003, Ellie Mae was well aware of DocMagic's lucrative contracts with its customers.

194.    On information and belief, beginning no later than 2008, it became Ellie Mae's goal to destroy DocMagic's customer relationships, with the intent to steal DocMagic's customers

for itself.  Ellie Mae engaged in a course of conduct that induced DocMagic to provide Ellie Mae

with its confidential customer information.  Ellie Mae also induced DocMagic to promote Ellie

Mae's ePASS Network and related products to DocMagic's customers.  Ellie Mae then used

DocMagic's confidential customer information to implement a plan to take DocMagic's

customers and to obstruct DocMagic's customers from continuing to do business with DocMagic.

In furtherance of that scheme, Ellie Mae systematically cut off DocMagic's access to its own

customers, disrupting its contractual customer relationships.

195.    As a direct and proximate cause of Ellie Mae's conduct, DocMagic has suffered

and will continue to suffer monetary damages.  Additionally, DocMagic has incurred and will

incur liability for costs and attorneys' fees.

196.    Unless Ellie Mae is restrained and enjoined by this Court, Ellie Mae's acts will

continue to cause irreparable harm and injury to DocMagic.

197.    Each of the acts by Ellie Mae complained of in this cause of action is willful,

wanton, malicious, oppressive, and in conscious disregard of DocMagic's rights, justifying the

imposition of punitive and exemplary damages under California Civil Code § 3294.

### NINTH CLAIM FOR RELIEF

### (Interference with Prospective Economic Advantage)

198.    DocMagic incorporates the allegations in paragraphs 1 through 197 as if set forth

fully herein.

199.    DocMagic had business relationships with numerous customers to produce,

deliver, and print loan documents.  Through those business relationships, DocMagic grew into

one of the most successful independent loan document preparation companies in the United

States.  Due to the strength of DocMagic's products, services, and customer relationships,

DocMagic was likely to receive significant future economic benefit from those relationships.

200.    As the owner of the ePASS Network, Ellie Mae knew of the existence of

DocMagic's business relationships.  Moreover, because of Ellie Mae's access to DocMagic's

Proprietary Information since as early as 2003, Ellie Mae was well aware of the lucrative nature

of DocMagic's business.

201.    On information and belief, beginning no later than 2008, it became Ellie Mae's goal to destroy DocMagic's customer relationships, with the intent to steal DocMagic's customers for itself.  Ellie Mae engaged in a course of conduct that induced DocMagic to provide Ellie Mae with its confidential customer information.  Ellie Mae also induced DocMagic to promote Ellie Mae's ePASS Network and related products to DocMagic's customers.  Ellie Mae then used DocMagic's confidential customer information to implement a plan to take DocMagic's customers and obstruct DocMagic's customers from continuing to do business with DocMagic. In furtherance of that scheme, Ellie Mae systematically cut off Doc Magic's access to its own customers.  Ellie Mae has contacted DocMagic's customers, informing them of Ellie Mae's refusal to provide DocMagic access to the ePASS Network, and urging DocMagic's customers to utilize Ellie Mae's competing products and services.

202.    As a direct and proximate cause of Ellie Mae's conduct, DocMagic has suffered and will continue to suffer monetary damages.  Additionally, DocMagic has incurred and will incur liability for costs and attorneys' fees.

203.    Unless Ellie Mae is restrained and enjoined by this Court, Ellie Mae's acts will continue to cause irreparable harm and injury to DocMagic.

204.    Each of the acts by Ellie Mae complained of in this cause of action is willful, wanton, malicious, oppressive, and in conscious disregard of DocMagic's rights, justifying the imposition of punitive and exemplary damages under California Civil Code § 3294.

**TENTH CLAIM FOR RELIEF**

**(Breach of Reseller Agreement)**

205.    DocMagic incorporates the allegations in paragraphs 1 through 204 as if fully set forth herein.

206.    The Reseller Agreement constitutes a valid written contract between DocMagic and Ellie Mae.

207.    DocMagic has performed all conditions, covenants, and obligations under the Reseller Agreement, except as waived, prevented, or excused by Ellie Mae.

208.   Pursuant to the Reseller Agreement, Ellie Mae was obligated to pay to DocMagic a wholesale fee for each time an Encompass user ordered documents and DocMagic was producing those docs for Ellie Mae.  Ellie Mae was further obligated by the Reseller Agreement to provide access to DocMagic's products and services to all Ellie Mae Encompass users.

209.   Under the Reseller Agreement, Ellie Mae gained access to DocMagic's intellectual property, including proprietary information and trade secrets.  Paragraph 7.1(b) of the Reseller Agreement identified the scope information considered by the parties as proprietary:

> The Parties agree that all of DocMagic's (i) patents, copyrights, trade secrets, trademarks, service marks, trade names and dress and applications relating to the same, services customers or other third parties, or manner of operation, and (ii) proprietary software, code, files, materials, data, methodologies, methods, know-how, concepts, ideas, formulae, inventions, processes or procedures used in the provision of DocMagic Products, including without limitation, all related written, magnetic or recorded information, documents, or materials, data and graphics prepared or developed by DocMagic (collectively, "DocMagic Proprietary Information") constitute proprietary information and/or trade secrets belonging to DocMagic and shall be and remain DocMagic's sole property.

210.   Paragraph 7.3 of the Reseller Agreement required that Ellie Mae protect DocMagic's proprietary information and refrain from use of such information for purposes beyond the intended purpose of the agreement:

> With respect to the other party's Proprietary Information, each of the parties agrees that it shall, and shall cause its Representatives to (i) treat such information as strictly confidential and shall not disclose such information to any third party or Representative, except those Representatives who are required to have such information in order to perform their responsibilities in the ordinary course of business relative to the purposes of this Agreement, (ii) use all commercially reasonable efforts to safeguard such information from unauthorized use or disclosure, and (iii) not use or permit the use of such information other than in the course of carrying out the contemplated purposes of this Agreement.  Each party shall advise any of its Representatives that are provided such Proprietary Information of their obligations with respect thereto. Each party shall be liable for any breach of this Agreement by its Representatives.

211.   Ellie Mae has breached the terms of paragraphs 7.1 and 7.3 of the Reseller Agreement by, among other things:

> (a)   converting and misappropriating DocMagic's proprietary information to

1    develop a competing loan document service;

2        (b)    converting and misappropriating DocMagic's confidential and proprietary

3    customer information to solicit DocMagic's customers;

4        (c)    failing to maintain DocMagic's proprietary information as strictly

5    confidential;

6        (d)    disclosing DocMagic's proprietary information to third parties for improper

7    purposes;

8        (e)    failing to use all commercially reasonable efforts to safeguard DocMagic's

9    proprietary information from unauthorized use or disclosure;

10       (f)    using and permitting the use of DocMagic's proprietary information other

11   than in the course of carrying out the contemplated purposes of the Reseller

12   Agreement; and

13       (g)    secretly diverting DocMagic's proprietary information to its own use in

14   flagrant violation of its contractual obligations with DocMagic.

15   212.    Ellie Mae also has violated the terms of the Reseller Agreement by failing and

16   refusing to return or irretrievably destroy DocMagic's proprietary information upon the

17   termination of the Reseller Agreement as required under Paragraph 9.5.  To the contrary, on

18   information and belief, with the aid of DocMagic's proprietary information, Ellie Mae has

19   duplicated DocMagic's document preparation service and has replicated the DocMagic user

20   experience in its competing document preparation services.

21   213.    These violations of the terms of the Reseller Agreement constitute material

22   breaches of the contract.

23   214.    As a direct and proximate result of Ellie Mae's breaches of the Reseller

24   Agreement, DocMagic has suffered damages, attorneys' fee, and other costs.

25   215.    Given the sensitive nature of the proprietary information that Ellie Mae has

26   misappropriated, pecuniary compensation alone would not afford adequate relief.

27   216.    Under applicable laws, including California Civil Code § 3422, DocMagic is

28   entitled to preliminary and permanent injunctive relief ordering the return of DocMagic's

- 50 -

1    proprietary information and prohibiting further use of such information by Ellie Mae, including,

2    without limitation, prohibiting the further manufacture, sale, and distribution of Ellie Mae Docs.

3            217.    Pursuant to Paragraph 11.10, DocMagic is entitled to recover its attorneys' fees

4    and costs incurred in connection with this action:

5            In the event that a dispute arises either directly or indirectly out of
             this Agreement, then and in the event that arbitration, suit or action
6            is instituted to enforce or interpret the terms of this Agreement, the
             prevailing party . . . shall be entitled to an award of its reasonable
7            attorneys fees . . . .

8                           **ELEVENTH CLAIM FOR RELIEF**

9                            **(Breach of Bridge Agreement)**

10           218.    DocMagic incorporates the allegations in paragraphs 1 through 217 as if fully set

11   forth herein.

12           219.    The Bridge Agreement constitutes a valid written contract between DocMagic and

13   Ellie Mae.

14           220.    DocMagic has performed all conditions, covenants, and obligations under the

15   Bridge Agreement, except as waived, prevented, or excused by Ellie Mae.

16           221.    Paragraph 10.4 of the Bridge Agreement prohibits Ellie Mae from using for any

17   purpose, other than performing the functions contemplated by the Bridge Agreement,

18   DocMagic's proprietary information that it received or gained access to through the Bridge

19   Agreement without prior written consent from DocMagic.  Paragraph 10.4 of the Bridge

20   Agreement also prohibits Ellie Mae from disclosing DocMagic's proprietary information without

21   prior written consent and imposes on Ellie Mae an obligation to "secure and maintain the

22   confidential and proprietary nature of such information."

23           222.    Ellie Mae has breached paragraph 10.4 of the Bridge Agreement by, among other

24   things:

25                   (a)     converting and misappropriating DocMagic's confidential and

26                           proprietary information to develop a competing loan document service;

27                   (b)     converting and misappropriating DocMagic's confidential and

28                           proprietary customer information to solicit DocMagic's customers;

DocMagic, Inc.'s First Amended Complaint

sf-2838358

1          (c)     failing to maintain DocMagic's proprietary information as strictly

2                  confidential;

3          (d)     disclosing DocMagic's proprietary information to third parties for

4                  improper purposes;

5          (e)     failing to use all commercially reasonable efforts to safeguard

6                  DocMagic's proprietary information from unauthorized use or disclosure;

7          (f)     using or permitting the use of DocMagic's proprietary information other

8                  than in the course of carrying out the purposes of the Bridge Agreement;

9                  and

10         (g)     secretly diverting DocMagic's proprietary information to its own use in

11                 flagrant violation of its contractual obligations with DocMagic.

12         223.    As a direct and proximate result of Ellie Mae's breaches of the Bridge Agreement,

13  DocMagic has suffered damages.

14         224.    Given the sensitive nature of the proprietary information that Ellie Mae

15  misappropriated, pecuniary compensation alone would not afford adequate relief.

16         225.    Under applicable laws, including California Civil Code § 3422, DocMagic is

17  entitled to preliminary and permanent injunctive relief ordering the return of DocMagic's

18  proprietary information and prohibiting further use of such information by Ellie Mae, including,

19  without limitation, prohibiting the further manufacture, sale, and distribution of Ellie Mae Docs.

20         226.    Pursuant to paragraph 11.7 of the Bridge Agreement, DocMagic is entitled to

21  recover attorneys' fees and costs incurred in connection with this action:

> In the event a dispute arises under this Agreement between the
> parties, which dispute results in legal action being taken . . . the
> prevailing party shall be entitled to recover its reasonable attorney
> fees, costs and other expenses . . . .

## TWELFTH CLAIM FOR RELIEF

### (Trade Secret Misappropriation)

227.    DocMagic incorporates the allegations in paragraphs 1 through 226 above, as if set

forth fully herein.

sf-2838358

228.    DocMagic holds trade secrets in the proprietary technical information used to develop and implement its loan document preparation services.  DocMagic likewise holds trade secrets in its customer information, including customer lists and customer-specific information.

229.    DocMagic's technical trade secrets are neither commonly known nor easily discoverable by DocMagic's competitors and others in the industry.

230.    DocMagic dedicates substantial personnel and capital resources and a significant percentage of its overall budget to the development and design of its flagship DocMagic products.  These expenses include the cost of engineering, design, testing, quality control, compliance, and marketing, substantial costs incurred in maintaining engineering and operational support, and costs associated with the protection of its trade secrets.

231.    Similarly, DocMagic's customer trade secrets are neither commonly known nor easily discoverable by DocMagic's competitors and others in the industry.  DocMagic devotes substantial resources learning and compiling data about its customer needs and updating its products and technology to meet those needs.  DocMagic likewise dedicates substantial personnel and capital resources to developing its client base.  These expenses include the cost of identifying and contacting potential new clients well-suited to benefit from DocMagic products, working with existing and potential customers to tailor products to meet customer needs and maintaining regular communications with existing and potential customers to address technical, compliance and market concerns.

232.    Through these extensive efforts, DocMagic has acquired and continuously updated its proprietary information.  Hence, DocMagic's proprietary technical and customer information gives DocMagic a significant and valuable competitive advantage in its marketplace and thus constitute trade secrets.

233.    DocMagic expends great effort and expense to preserve the strict confidentiality of its trade secrets, and to prevent any unauthorized disclosure thereof.  Among other things, DocMagic restricts access to trade secrets and all proprietary information only to employees in a secure company facility, and maintains much of its proprietary information and information

1   related thereto in password-protected computer files only for those employees with a "need to

2   know."

3          234.    In addition to taking great strides to protect the confidentiality of its trade secrets

4   and proprietary information internally, DocMagic requires any third parties with access thereto to

5   agree in writing, pursuant to confidentiality and other agreements, to protect the information from

6   public disclosure.  DocMagic also includes in its agreements with others clauses to prohibit

7   unauthorized use of its proprietary information, which includes trade secrets.

8          235.    Ellie Mae was authorized to use DocMagic's proprietary technical and customer

9   information, which includes trade secrets, solely for the purpose of performing its obligations

10   under the parties' several contractual agreements.  Ellie Mae was not authorized to use

11   DocMagic's proprietary information for any other purpose.

12          236.    Despite this, Ellie Mae deliberately and improperly used, copied, and

13   misappropriated DocMagic's proprietary information, including its trade secrets.

14          237.    On information and belief, Ellie Mae has used DocMagic's technical trade secrets

15   to develop and implement Ellie Mae's competing document preparation service.

16          238.    On information and belief, Ellie Mae has used DocMagic's customer trade secrets

17   to target and take DocMagic's customers when implementing the "migration" plan.

18          239.    The trade secret information that Ellie Mae copied, used, and otherwise

19   misappropriated from DocMagic derives independent economic value from not being generally

20   known to the public or to other persons who can obtain economic value from its disclosure or use.

21   It is protected by DocMagic as proprietary information and is the subject of reasonable efforts to

22   maintain its secrecy, including agreements imposing obligations of non-disclosure and limited

23   access and use.

24          240.    The information that Ellie Mae copied, used, and otherwise misappropriated was

25   not generally known to the public or generally known in the industry.

26          241.    At the time that Ellie Mae misappropriated DocMagic's trade secrets, Ellie Mae

27   knew or had reason to know that the trade secrets were acquired by improper means.  As detailed

28

DocMagic, Inc.'s First Amended Complaint

sf-2838358

1  above, Ellie Mae was and is subject to express and implied contractual obligations to maintain the

2  secrecy of all of DocMagic's confidential and proprietary information.

3      242.    Ellie Mae was aware, from the provisions in the parties' agreements and from the

4  nature of the information and the context of its creation, acquisition, and use in the course of

5  DocMagic's and Ellie Mae's business, that the information copied, used, and otherwise

6  misappropriated was confidential and proprietary and should not have been disclosed or used for

7  the benefit of Ellie Mae outside the scope of the purpose of the parties' agreements.

8      243.    Ellie Mae has disclosed, improperly retained and/or used DocMagic's trade secrets

9  and confidential information without DocMagic's consent, and threatens to continue to

10  improperly use and disclose DocMagic's trade secrets and confidential information in violation of

11  California's Uniform Trade Secrets Act ("UTSA"), Cal. Civ. Code § 3426 et seq.

12      244.    As a result of Ellie Mae's violations of the UTSA, DocMagic has been damaged.

13  Additionally, DocMagic has been harmed in non-monetary ways that can be remedied only by

14  injunctive relief.  DocMagic has no adequate remedy at law to compel Ellie Mae to cease its

15  unlawful misappropriation and use of DocMagic's confidential information and trade secrets.

16  Unless enjoined by an order of this Court, DocMagic will continue to be harmed by Ellie Mae's

17  wrongful acts.

18      245.    DocMagic is also entitled to an award of punitive damages and attorneys' fees

19  pursuant to the UTSA based on Ellie Mae's willful and malicious misappropriation of

20  DocMagic's confidential and proprietary information.

21                      **THIRTEENTH CLAIM FOR RELIEF**

22              **(Unfair Competition, Cal. Bus. & Prof. Code § 17200, et seq.)**

23      246.    DocMagic incorporates the allegations in paragraphs 1 through 245 as if set forth

24  fully herein.

25      247.    Ellie Mae's wrongful acts and conduct as alleged in this complaint constitute

26  unfair and unlawful competition under California's Unfair Competition Law (Bus. & Prof. Code

27  § 17200 et seq.).

28

248.    Ellie Mae's unlawful acts include violation of United States and California antitrust laws, Lanham Act violations, tortious interference with DocMagic's contracts and business relationships, misappropriation of DocMagic's trade secrets, and misuse of DocMagic's proprietary information in violation of the Reseller Agreement and Bridge Agreement.

249.    Ellie Mae's conduct also has been rife with unfair business practices, including the following.

- Ellie Mae has acted to lock up loan data, including consumer financial information, in Encompass to achieve a competitive advantage by precluding its customers and consumers from having any meaningful choice regarding the use of ancillary service providers during the mortgage transaction process.

- Ellie Mae has acted to systematically cut off DocMagic's access to its own customers.

- Ellie Mae terminated its contractual relationship with DocMagic, and took additional steps, for the purpose of stifling competition and gaining a competitive advantage over DocMagic and other document service providers rather than for any legitimate business reason.

- Ellie Mae has excluded DocMagic from participation in its ePASS Network based on a pretextual excuse regarding price.

- Ellie Mae misappropriated DocMagic's intellectual property and other proprietary information to build a competing document preparation service that duplicates the user experience on DocMagic's document preparation service.

- Ellie Mae induced DocMagic to promote Ellie Mae's products to DocMagic's customers for the parties' mutual benefit, while Ellie Mae worked secretly to eliminate DocMagic as a provider of document preparation services.

- Ellie Mae has implemented a customer "migration" program designed to steal DocMagic's customers and the customers of other document preparation companies.

- Ellie Mae has attempted to steal DocMagic's customers by disparaging

1    DocMagic's services, and by excluding DocMagic from accessing its

2    customers.

3    250.    Ellie Mae's unlawful acts and unfair business practices threaten to cause, and will

4    cause, great and irreparable injury to DocMagic, resulting in the diversion of substantial

5    economic benefit from DocMagic.  The damages that have been sustained, and will be sustained,

6    by DocMagic as a result of Ellie Mae's unlawful and unfair conduct cannot readily be ascertained

7    or calculated, and unless immediate injunctive relief as prayed for herein is granted, the unfair

8    competition will have been completed, rendering ineffective a final judgment.

9    251.    Ellie Mae's unlawful acts and unfair business practices likewise threaten harm to

10   competition in the market.  Ellie Mae's monopolization efforts will eliminate competition in the

11   Document Market, thus reducing consumers' choices, chilling innovation, and threatening

12   increased prices.

13   252.    By reason of Ellie Mae's unlawful acts and unfair business practices, DocMagic

14   has no adequate remedy at law for such acts and threatened acts.  Accordingly, DocMagic is

15   entitled to preliminary and permanent injunctive relief as prayed for herein.

16                              **FOURTEENTH CLAIM FOR RELIEF**

17                                   **(Declaratory Judgment)**

18   253.    DocMagic incorporates the allegations in paragraphs 1 through 252 above, as if set

19   forth fully herein.

20   254.    In this action, Ellie Mae has alleged that DocMagic "has copied and exported,

21   and/or has induced the illegal copying and exporting of, confidential materials to be used with its

22   own software."  Ellie Mae has further alleged that DocMagic has directly infringed Ellie Mae's

23   copyrights through the "unauthorized copying, distribution, and/or use of the Encompass software

24   and SDK" and has contributorily infringed Ellie Mae's copyrights because it "has knowingly

25   induced, caused, and/or materially contributed to the unauthorized copying, distribution, and/or

26   use of the Encompass software and SDK by DocMagic XL Technology users."  DocMagic

27   disputes each of these points.  Accordingly, actual cases or controversies exist between Ellie Mae

28   and DocMagic concerning each of these issues.

255.    As an initial matter, Ellie Mae does not have any proprietary rights in the mortgage application data that is compiled in its Encompass LOS system.  Therefore, accessing and copying of that raw data is not "illegal."  Furthermore, use of the DocMagic XL software does not require "copying" or "distribution" of Encompass or the Encompass SDK, so use of the DocMagic XL software does not infringe any copyright rights in the Encompass software or the Encompass SDK.  Finally, use of a software program, such as the Encompass software and the Encompass SDK, does not violate one of the exclusive rights reserved to copyright owners under Section 106 of the Copyright Act (17 U.S.C. § 106) and cannot constitute copyright infringement. Declaratory relief is both appropriate and necessary to establish these facts.

256.    Pursuant to 28 U.S.C. §§ 2201, et seq., DocMagic requests declaratory judgment that (i) Ellie Mae has no proprietary rights in the raw data that is compiled through the use of its Encompass LOS system by its customers, (ii) use of a software program, such as DocMagic XL, with the Encompass SDK to collect raw data from the Encompass LOS for use in preparing loan documents is not illegal, (iii) use of a software program, such as DocMagic XL, with the Encompass SDK to collect raw data from the Encompass LOS does not constitute copyright infringement, and (iv.) use of the Encompass SDK does not constitute copyright infringement.

**PRAYER FOR RELIEF**

WHEREFORE, DocMagic prays for judgment as follows:

1.    For an order that, by the acts complained of herein, Ellie Mae has:

(a)    violated Section 2 of the Sherman Act, 15 U.S.C. § 2;

(b)    violated Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a);

(c)    violated Section 501 of the Copyright Act, 17 U.S.C. § 501;

(d)    materially breached the Reseller Agreement;

(e)    materially breached the Bridge Agreement;

(f)    intentionally interfered with the contractual relationships of DocMagic;

(g)    intentionally interfered with DocMagic's prospective economic relationships;

(h)    engaged in unfair competition; and

- 58 -

DocMagic, Inc.'s First Amended Complaint

sf-2838358

1            (i)      misappropriated DocMagic's trade secrets;

2        2.        For a an order that preliminarily and permanently enjoins Ellie Mae, and its

3    officers, employees, agents, and representatives, from engaging in the unlawful conduct

4    complained of herein, including:

5            (a)      requiring Ellie Mae to cease from engaging in any conduct or taking any

6    action that precludes DocMagic from accessing its customers' loan data from the Encompass

7    LOS;

8            (b)      requiring Ellie Mae to provide DocMagic access to the ePASS Network on

9    commercially reasonable and nondiscriminatory terms;

10            (c)      requiring Ellie Mae to cease from engaging in any conduct or taking any

11    action that precludes DocMagic from accessing customers who use Encompass or ePASS;

12            (d)      requiring Ellie Mae to cease using trademarks or trade dress that is

13    confusingly similar to DocMagic's FATAL and WARNING trademarks and audit report trade

14    dress in connection with Ellie Mae's document preparation service;

15            (e)      requiring Ellie Mae to cease infringing DocMagic's exclusive rights in the

16    selection, arrangement, and display of its audit reports, including but not limited to copying,

17    printing, reprinting, publishing, importing, distributing, selling, and/or using any copies of the

18    copyrighted materials;

19            (f)      requiring Ellie Mae to cease disparaging DocMagic's products;

20            (g)      requiring Ellie Mae to cease engaging in conduct constituting an attempt to

21    monopolize the Document Market, as defined herein;

22            (h)      requiring Ellie Mae to cease copying, using, or disclosing DocMagic's

23    confidential and proprietary information and to return to DocMagic or destroy all such

24    information;

25            (i)      requiring Ellie Mae to cease using or disclosing DocMagic's trade secrets;

26    and

27

28

DocMagic, Inc.'s First Amended Complaint
sf-2838358

1           (j)     requiring Ellie Mae to cease engaging in any conduct that interferes with

2 the contractual and/or business relationships of DocMagic or with DocMagic's prospective

3 economic relationships;

4      3.     For an order declaring that:

5           (a)     Ellie Mae has no ownership or other interest in loan data that is maintained

6 in any server or computer using the Encompass LOS;

7           (b)     use of a software program, such as DocMagic XL, to interface with the

8 Encompass SDK to obtain loan data from the Encompass LOS for use in preparing closing

9 documents is not illegal;

10          (c)     use of a software program, such as DocMagic XL, to interface with the

11 Encompass SDK to collect loan data from the Encompass LOS does not constitute copyright

12 infringement;

13          (d)     use of the Encompass SDK does not constitute copyright infringement

14          (e)     that DocMagic has valid and enforceable rights in the trademarks and trade

15 dress that it uses in connection with the audit report feature of its document preparation service

16 and software; and

17          (f)     that DocMagic has valid and enforceable copyright rights in the selection,

18 arrangement, and display of data in the audit report feature of its document preparation service

19 and software;

20      4.     For an order awarding DocMagic its actual, incidental, special, and consequential

21 damages, trebled as required under the antitrust, trademark and copyright laws, and also awarding

22 DocMagic punitive and exemplary damages;

23      5.     For an order awarding DocMagic all gains, profits, and advantages derived by

24 Ellie Mae from its acts of infringement and other violations of law,

25      6.     For DocMagic's costs of suit and attorneys' fees;

26      7.     For pre-judgment interest; and

27      8.     For such other relief as the Court deems just and proper.

28

DocMagic, Inc.'s First Amended Complaint

sf-2838358

1   Dated: May 10, 2010                    Respectfully Submitted,

2                                          MORRISON & FOERSTER LLP

3

4                                          By:  /s/ Stuart C. Plunkett

5                                               James P. Bennett
                                                Stuart C. Plunkett
6                                               Susan V. Vaughan
                                                Jacqueline Bos
7
                                                Attorneys for Plaintiff DOCMAGIC, INC.
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DocMagic, Inc.'s First Amended Complaint

sf-2838358

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands trial by jury on all issues raised by the First Amended Complaint.

Dated: May 10, 2010                    Respectfully Submitted,

MORRISON & FOERSTER LLP


By:  /s/ Stuart C. Plunkett
     James P. Bennett
     Stuart C. Plunkett
     Susan V. Vaughan
     Jacqueline Bos

Attorneys for Plaintiff DOCMAGIC, INC.