United States District Court

For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

DOCMAGIC, INC.,

        Plaintiff,

  v.

ELLIE MAE, INC.,

        Defendant.

_____/

No. C 09-04017 MHP

**MEMORANDUM & ORDER**

**Re: Ellie Mae, Inc.'s Motion to Dismiss DocMagic, Inc.'s First Amended Complaint and DocMagic, Inc.'s Motion to Dismiss Ellie Mae, Inc.'s First, Second, Third, Fourth, Fifth, Seventh, Eighth, and Ninth Counterclaims**

      Plaintiff DocMagic, Inc. ("DocMagic"), a corporation providing online loan document preparation services, brought this action against defendant Ellie Mae, Inc. ("Ellie Mae"), a corporation providing various types of software and services to mortgage professionals. DocMagic's first amended complaint alleges that Ellie Mae unlawfully denied DocMagic access to Ellie Mae's online transaction network, and used DocMagic's proprietary information to create a competing document preparation service. On the basis of these allegations, DocMagic asserts thirteen claims for relief for antitrust violations, trademark infringement, copyright infringement, interference with contractual relationships, breach of contract, trade secret misappropriation and unfair competition. In response, Ellie Mae filed a first amended counterclaim alleging that DocMagic unlawfully accessed Ellie Mae's computer system, and used Ellie Mae's proprietary software to create a new program that permits DocMagic to interact directly with Ellie Mae customers without using Ellie Mae's online transaction network. Ellie Mae asserts nine counterclaims, including copyright infringement, computer fraud, breach of contract, interference

United States District Court

For the Northern District of California

with contractual relationships and unfair competition.  Before the court are the parties' cross-motions to dismiss.  Ellie Mae moves to dismiss DocMagic's complaint in its entirety, and DocMagic moves to dismiss Ellie Mae's first through fifth and seventh through ninth counterclaims.  Having considered the parties' arguments and submissions, and for the reasons discussed below, the court enters the following memorandum and order.

BACKGROUND

I.      Loan preparation

A brief description of how loans are prepared electronically is necessary to understand the factual background to this case.  The process of loan preparation typically begins when a loan originator, such as a mortgage broker or a lender, enters data about the prospective loan into a computer program known as a loan origination system ("LOS").  Docket No. 38 (First Am. Compl. ("Compl.")) ¶¶ 29-30. The advantage of using an LOS is that once the information has been entered into the LOS, the LOS can provide that data in an electronic format to compatible computer programs, making it unnecessary to engage in the time-consuming and error-prone process of manually re-keying the loan information.  *Id.* ¶ 30.  Large lenders, like Bank of America and Wells Fargo, develop their own proprietary LOSs.  The rest of the market uses third-party LOSs, which are produced by a number of different companies.  *Id.* ¶¶ 102, 104.

Settlement service providers, or "vendors," can use the electronically-stored data in the LOS to perform the various tasks necessary to actually prepare a loan.  The services provided by these vendors include, for example, document preparation services, appraisals, credit reports, fraud reports, flood information and title and escrow services.  *Id.* ¶¶ 20, 95.  However, a vendor will only be able to use the data in the LOS if the LOS and the vendor's own programs are compatible.

In order to connect a loan originator to a vendor and ensure that the loan originator's LOS is compatible with the vendor's programs, corporations have set up online transaction networks.  These networks permit loan originators to find and hire vendors providing the services they need.  *Id.* ¶ 20. A network can also automatically convert the data in the loan originator's LOS into a format that the

United States District Court

For the Northern District of California

vendor can use.  *Id.* ¶¶ 21-22.  A single network can be used by many different LOSs made by different software companies, *id.* ¶¶ 32-33, and can connect those LOSs to many different vendors. Loan originators usually can join and use a network for free, whereas vendors typically pay a fee to the network operator for every transaction the vendor completes over the network.

If a LOS and/or a vendor are not connected to a network, it is more difficult to achieve compatibility between the LOS and the vendor's programs.  To achieve compatibility without using a network, the LOS can be equipped with a software development kit ("SDK"), a program which retrieves data that has been entered into the LOS and converts it into a format usable by the vendor. *Id.* ¶ 67.  The vendor can then provide an adapter program that will transfer the data from the SDK into the vendor's programs, thus creating a bridge from the LOS, to the SDK, to the adapter program, to the vendor's services.  *Id.* ¶ 68.

II.    DocMagic, Ellie Mae and their contractual agreements

Ellie Mae is a LOS developer, and the creator of a LOS called Encompass.  Docket No. 35 (First Am. Counterclaim ("Counterclaim")) ¶ 6.  According to DocMagic, Ellie Mae's share of the third-party LOS market, defined below, is greater than 50%, and probably greater than 60%.  Compl. ¶ 105.  Ellie Mae is also the owner and operator of ePASS, an online transaction network of the type described above.  *Id.* ¶ 20.  According to DocMagic, Ellie Mae's share of the network market, also defined below, is as much as 60%.  *Id.* ¶ 99.  Ellie Mae also developed a SDK for Encompass, called Encompass SDK, capable of making Encompass compatible with vendors who are not no on ePASS. *Id.* ¶ 67.

DocMagic is a vendor providing loan document preparation services ("DPS").  *Id.* ¶ 15.

In November 2003, Ellie Mae and DocMagic entered into an agreement, known as the "Bridge Agreement," by which DocMagic became one of the vendors on ePASS.  *Id.* ¶ 38; Docket No. 44 (King Dec.), Exh. H (Electronic Bridge Agreement Between Ellie Mae and Participator ("Bridge Agreement")).  In exchange for access to the network, DocMagic agreed to pay a fee of between one and three dollars, depending on volume, per transaction that it made over ePASS. Bridge Agreement, Exh. A § 2(b).  DocMagic also agreed to provide Ellie Mae with proprietary

3

information about DocMagic's document preparation program, so that Ellie Mae could connect DocMagic's program to Ellie Mae's network and ensure compatibility between the LOSs accessing ePASS and DocMagic's program. *Id.* § 1.  The Bridge Agreement acknowledged that each party would have access to the other's proprietary customer information, and provided that neither party would disclose such proprietary information or use it for any purpose outside those contemplated by the agreement. *Id.* § 10.4.  The Bridge Agreement stated that it would automatically renew every year, unless terminated upon notice given 120 days prior to the beginning of the next automatic renewal. *Id.* § 9.2.

In September 2006, Ellie Mae and DocMagic also entered into a Reseller Agreement. Compl. ¶ 41; King Dec., Exh. G (Reseller Agreement).  Under the Reseller Agreement, Ellie Mae became a non-exclusive reseller of certain DocMagic document preparation services, which Ellie Mae was authorized to re-brand with Ellie Mae trademarks.  Reseller Agreement § 1.  The Reseller Agreement also acknowledged that each party would disclose proprietary information to the other, and required each party not to disclose the other's proprietary information, or use it outside of the purposes of the agreement. *Id.* § 7.3.  Like the Bridge Agreement, the Reseller Agreement automatically renewed every year unless terminated upon notice given 120 days before the next renewal date. *Id.* § 9.1.  The Reseller Agreement also provided that if it was terminated without cause, it would be followed by a sixty-day transition period during which the re-branded services would remain available to Ellie Mae customers, and DocMagic would refrain from marketing its services to Ellie Mae customers. *Id.* § 9.4(a).

On April 27, 2009, Ellie Mae sent DocMagic notice terminating the Reseller Agreement, effective on August 30, 2009.  King Dec., Exh. A.  On April 28, 2009, DocMagic likewise sent Ellie Mae notice terminating the Reseller Agreement, effective September 1, 2009. *Id.*, Exh. B.  On May 21, 2009, Ellie Mae sent DocMagic notice terminating the Bridge Agreement, effective August 30, 2009. *Id.*, Exh. D.

The parties' characterization of why these contracts were terminated, and of the events that followed, diverge dramatically.  Under DocMagic's version of the story, Ellie Mae stole

4

United States District Court

For the Northern District of California

DocMagic's document preparation software and used it to create a competing product.  DocMagic then alleges that Ellie Mae attempted to drive DocMagic out of the document preparation business by denying DocMagic access to customers using the Encompass LOS, forcing DocMagic off ePASS and forbidding Encompass users from connecting to DocMagic through the Encompass SDK.  Ellie Mae contends, on the other hand, that DocMagic refused to negotiate reasonable fees to be a part of ePASS; rather than pay those reasonable fees, Ellie Mae alleges that DocMagic illegally accessed and copied Ellie Mae's software in order to write an adapter program that would connect DocMagic to Encompass users for free.

III.     DocMagic's version of events

DocMagic begins by alleging that Ellie Mae purchased a DPS vendor called Online Documents, and then used DocMagic's proprietary information (to which Ellie Mae had access under the Bridge and Reseller Agreements) in combination with Online Documents' technology to effectively copy DocMagic's software and services.  Compl. ¶¶ 48-50, 53-58.  Specifically, DocMagic claims that Ellie Mae's new DPS, Ellie Mae Docs, intentionally copied the "structures, workflows, and data . . . screens, terminology, and overall look and feel of the DocMagic software," *id.* ¶ 50, and in particular, the organization and presentation of the DocMagic document audit report, including the use of the terms "WARNING" and "FATAL" to point out errors in the data provided, *id.* ¶¶ 51-57, 170.  According to DocMagic, Ellie Mae next terminated the Reseller Agreement so that Ellie Mae could replace the re-branded DocMagic services, available to loan originators accessing ePASS, with Ellie Mae's own services.  *Id.* ¶¶ 60-62.  According to DocMagic, Ellie Mae then terminated the Bridge Agreement so that DocMagic would not be able to access ePASS and compete with Ellie Mae's DPS available on ePASS.  *Id.*  DocMagic alleges that Ellie Mae's stated reason for terminating the Bridge Agreement, that the fees set by the Bridge Agreement were too low, was a pretext for Ellie Mae's anti-competitive larger plan of forcing DocMagic out of the document preparation market.  *Id.* ¶¶ 62-65.  DocMagic finally alleges that having ejected DocMagic from ePASS, Ellie Mae began preventing Encompass LOS users from accessing DocMagic by means of the Encompass SDK.  *Id.* ¶¶ 70-73.  DocMagic had created an adapter

5

United States District Court

For the Northern District of California

1   program, DocMagic XL, that could transfer data from various LOSs' SDKs to DocMagic's

2   document preparation programs. *Id.* ¶ 68. This adapter program permitted users of Ellie Mae's

3   Encompass LOS who had also licensed the Encompass SDK to connect to DocMagic's DPS without

4   DocMagic being on ePASS. *Id.* ¶ 69. According to DocMagic, however, Ellie Mae used various

5   means to prevent Encompass users from connecting to DocMagic via the Encompass SDK,

6   including threatening litigation against Encompass users, refusing to license the SDK to customers

7   whom it believed would use the SDK to connect to DocMagic, persuading its customers not to use

8   DocMagic via the SDK, intentionally disabling certain features of the SDK and changing the SDK

9   license agreement. *Id.* ¶¶ 70-71. DocMagic alleges that based on this conduct, Ellie Mae "has been

10  able to obtain a market share of the [DPS m]arket at least equivalent to its LOS [m]arket [s]hare," or

11  about 60%. *Id.* ¶ 110; *see also id.* ¶ 105 (alleging that Ellie Mae's LOS market share is

12  approximately 60%).[1]

13  IV.   Ellie Mae's version of events

14        Ellie Mae's counterclaim tells a very different story. It begins by denying any wrongdoing in

15  the termination of the Bridge Agreement. Instead, Ellie Mae alleges that after sending the

16  termination notice to DocMagic, it attempted to renegotiate a new bridge agreement with DocMagic,

17  but was rebuffed. Counterclaim ¶ 18. Then, according to Ellie Mae, DocMagic devised an illegal

18  way for it to connect to Encompass customers for free, by bypassing ePASS. Ellie Mae alleges that

19  after the termination of the Bridge Agreement, DocMagic used log-in credentials and license keys

20  belonging to other Ellie Mae clients to obtain unauthorized access to Ellie Mae's computers

21  (specifically, the Encompass servers). *Id.* ¶¶ 19-20. Next, Ellie Mae alleges that DocMagic engaged

22  in unauthorized use of the Encompass and Encompass SDK software, including using the

23  Encompass SDK as a basis for creating the adapter program DocMagic XL. *Id.* ¶¶ 19-22. Ellie Mae

24  also claims that DocMagic encouraged Encompass licensees to use the Encompass SDK and

25  DocMagic XL to connect to DocMagic's DPS, in violation of the licensees' licenses, so that

26  DocMagic would not have to join ePASS and pay Ellie Mae a transaction fee. *Id.* ¶¶ 76-78.

27  Finally, Ellie Mae claims that DocMagic breached the Reseller Agreement by, *inter alia*, terminating

28                                          6

for cause on a mere pretext to avoid the obligatory transition period; failing to notify Ellie Mae of scheduled downtimes; misusing Ellie Mae's proprietary information; and failing to properly update and service the re-branded services. *Id.* ¶¶ 31-41, 85.

LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a complaint may be dismissed against a defendant for failure to state a claim upon which relief can be granted against that defendant. A motion to dismiss under Rule 12(b)(6) "tests the legal sufficiency of a claim." *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). "Dismissal can be based on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990). A motion to dismiss should be granted if a plaintiff fails to plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This "plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, ___ U.S. ___, ___, 129 S. Ct. 1937, 1949 (2009) (quoting *Twombly*, 550 U.S. at 556). "Determining whether a complaint states a plausible claim for relief . . . [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 1950.

"[A]llegations of material fact are taken as true and construed in the light most favorable to the nonmoving party." *Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337–38 (9th Cir. 1996). The court need not, however, accept as true pleadings that are no more than legal conclusions or the "formulaic recitation of the elements of a cause of action." *Iqbal*, 129 S. Ct. at 1949–50 (quoting *Twombly*, 550 U.S. at 555); *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001); *Clegg v. Cult Awareness Network*, 18 F.3d 752, 754–55 (9th Cir. 1994). "[A] court may take judicial notice of 'matters of public record,' " *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001) (quoting *Mack v. South Bay Beer Distrib.*, 798 F.2d 1279, 1282 (9th Cir. 1986)), and may also consider "documents whose contents are alleged in a complaint and whose authenticity no party

7

1  questions, but which are not physically attached to the pleading" without converting a motion to

2  dismiss under Rule 12(b)(6) into a motion for summary judgment, *Branch v. Tunnell*, 14 F.3d 449,

3  454 (9th Cir. 1994), *overruled on other grounds by Galbraith v. County of Santa Clara*, 307 F.3d

4  1119 (9th Cir. 2002).  "The district court will not accept as true pleading allegations that are

5  contradicted by facts that can be judicially noticed or by other allegations or exhibits attached to or

6  incorporated in the pleading."  5C Charles Alan Wright & Arthur R. Miller, *Federal Practice &*

7  *Procedure* § 1363 (3d ed. 2004).

8

9  DISCUSSION

10  I.     Ellie Mae's motion to dismiss

11         Ellie Mae moves to dismiss all of the claims that DocMagic asserts in its complaint.  The

12  court addresses each claim for relief in turn

13         A.     First through fourth claims for relief: the antitrust claims

14         DocMagic's first through fourth claims seek relief for alleged anticompetitive activities

15  engaged in by Ellie Mae in violation of section 2 of the Sherman Act, 15 U.S.C. § 2.  Section 2

16  provides that "[e]very person who shall monopolize, or attempt to monopolize, or combine or

17  conspire with any other person or persons, to monopolize any part of the trade or commerce among

18  the several States, or with foreign nations, shall be deemed guilty of a felony . . . ."  15 U.S.C. § 2.

19  A private right of action for violations of section 2 is provided in 15 U.S.C. section 15.  In this case,

20  all four of DocMagic's claims against Ellie Mae are for attempting to monopolize the DPS market.

21  An attempted monopolization claim requires showing three elements: (1) specific intent to

22  monopolize; (2) anticompetitive conduct; and (3) a dangerous probability that the defendant will

23  achieve monopoly power.  *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993).

24         DocMagic's first, third and fourth antitrust claims allege discrete types of anticompetitive

25  conduct.  The first claim is for monopoly leveraging[2], based on DocMagic's allegations that Ellie

26  Mae used monopoly power in the "upstream" markets for LOSs and loan preparation networks to

27  attempt to acquire monopoly power in the DPS market.  The third claim is for refusal to deal[3], based

28

8

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

on DocMagic's allegations that Ellie Mae refused to give DocMagic access to ePASS and prevented Encompass users from connecting to DocMagic's services.  Finally, the fourth claim is for denial of access to an essential facility[4], based on Ellie Mae's alleged exclusion of DocMagic from ePASS.

The allegations in the first, third and fourth claims render the second claim, for attempted monopolization generally, entirely redundant.  In DocMagic's complaint, the second claim merely incorporates the allegations in the first claim for relief.  In addition, DocMagic has not identified any theory of attempted monopolization, other than monopoly leveraging, refusal to deal and denial of access to an essential facility, upon which the second claim could rest.  The second claim for relief therefore marshals no new factual allegations nor any new legal theories upon which DocMagic could obtain relief.  Federal Rule of Civil Procedure 12(f) permits the court to strike from a complaint any "redundant . . . matter."  Fed. R. Civ. P 12(f).  The second claim for relief meets that standard.  Accordingly, as a threshold matter, the second claim for relief, for attempted monopolization, is dismissed without leave to amend.

The arguments for dismissal of the remaining three antitrust claims requires much lengthier discussion.  Ellie Mae raises four arguments for dismissal of DocMagic's claims.  Firstly, Ellie Mae argues that DocMagic has not pled facts sufficient to establish the existence of an upstream network market or a downstream DPS market.  Secondly, Ellie Mae argues that even if such markets exist, DocMagic has not pled facts showing that Ellie Mae has monopoly power in the LOS market or the network market, or a dangerous probability of achieving monopoly power in the DPS market.  Thirdly, Ellie Mae argues that all of DocMagic's antitrust claims depend on Ellie Mae's refusal to deal, and that Ellie Mae's alleged conduct does not as a matter of law constitute a refusal to deal.  Fourthly, Ellie Mae argues that DocMagic lacks standing to bring any antitrust claims, because DocMagic only alleges harm against itself and not against the market as a whole.

Contrary to Ellie Mae's contentions, DocMagic has pled facts sufficient to establish the existence of the alleged markets.  DocMagic's antitrust claims all falter, however, because of DocMagic's failure to plead facts showing that Ellie Mae has a dangerous probability of achieving monopoly power in the DPS market.  Because each of DocMagic's remaining antitrust claims

necessarily depends on Ellie Mae's attempted monopolization of the DPS market, each requires adequate allegations of a dangerous probability of monopoly power in the DPS market. Since DocMagic's complaint falls short in that regard, DocMagic's first, third and fourth claims are dismissed with leave to amend.

### 1.   The alleged markets

In order to state an antitrust claim, a plaintiff must identify a relevant market within which the defendant has market power. *Newcal Indus., Inc. v. Ikon Office Solution*, 513 F.3d 1038, 1044 (9th Cir. 2008), *cert.denied*, 129 S. Ct. 2788 (2009). The relevant market need not be pled with specificity. *Id.* at 1045. "An antitrust complaint therefore survives a Rule 12(b)(6) motion unless it is apparent from the face of the complaint that the alleged market suffers a fatal legal defect. . . . [T]he validity of the 'relevant market' is typically a factual element rather than a legal element . . . ." *Id.*

In support of its claims, DocMagic alleges the existence of three relevant product markets: the LOS market, the network market and the DPS market. Compl. ¶¶ 94-110. Ellie Mae raises three arguments, none of which carry the day, for why DocMagic's allegations identifying relevant markets are insufficient.

Firstly, Ellie Mae contends that DocMagic has not sufficiently alleged the geographic scope of any of the three markets. Geographic scope, covering the "area of effective competition," is an important factor in identifying the relevant market. *See Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1063 (9th Cir. 2001). DocMagic has alleged that the geographic scope of each of these markets is the United States, and has supported this allegation with further factual allegations. Compl. ¶ 94; *see also id.* ¶¶ 18, 99, 105. Although DocMagic has also alleged that some DPS vendors do not operate nationwide, *id.* ¶ 127, there is no contradiction between the existence of a national DPS market and the simultaneous existence of local DPS markets that compete only at the regional level. DocMagic's allegations of geographic scope are therefore sufficient to survive Ellie Mae's motion to dismiss.

**United States District Court**

For the Northern District of California

1    Secondly, Ellie Mae argues that DocMagic's factual allegations are not sufficient to

2    plausibly show the existence of a market for networks.  A product market consists of "commodities

3    reasonably interchangeable by consumers for the same purposes."  *United States v. E.I. du Pont de*

4    *Nemours & Co.*, 351 U.S. 377, 395 (1956).  Ellie Mae asserts that DocMagic has not alleged that

5    reasonably interchangeable products compete within the network market.  This argument rests

6    largely on Ellie Mae's factual assertion that only Encompass users can access ePASS, so that ePASS

7    is not "reasonably interchangeable" with other networks.  However, that assertion contradicts the

8    allegations in the complaint.  Compl. ¶¶ 32-33; *see also id.* ¶ 98 (alleging the existence of other

9    competing networks).  Likewise, Ellie Mae's assertion that an adapter program such as DocMagic

10   XL is reasonably interchangeable with a network, and so should be included in the alleged market,

11   contradicts the complaint's allegations that participation in the network provides benefits beyond

12   mere connectivity.  *Id.* ¶¶ 23-27.  Finally, Ellie Mae's factual contentions about the available

13   network substitutes discussed in its SEC filing are not appropriate for resolution at the pleadings

14   stage.  Taking all of the factual allegations in the complaint as true, as the court must on Ellie Mae's

15   motion to dismiss, DocMagic has sufficiently pled the existence of a network market.

16   Thirdly, Ellie Mae suggests that DocMagic has failed to allege facts supporting the existence

17   of a DPS market.  DocMagic alleges that the DPS market consists of "online document preparation

18   services to brokers and lenders using third-party LOS's in conjunction with residential mortgage

19   transactions."  *Id.* ¶ 108.  Under this definition, the alleged DPS market includes document

20   preparation services provided either to users of Ellie Mae's Encompass LOS or to users of any other

21   third-party LOS.  DocMagic's factual allegations describe the alleged market, the product which this

22   market provides, and the competitors and customers in the market.  *Id.* ¶¶ 15-18, 47-58, 94, 108-110,

23   126-31.  These factual allegations are sufficient to plausibly support the existence of a market in

24   which reasonably interchangeable DPS vendors compete.

25               2.    Market power

26   As well as identifying a relevant market, a plaintiff bringing antitrust claims must allege that

27   the defendant has market power within that market.  *Rick-Mik Enters., Inc. v. Equilon Enters. LLC*,

28

11

532 F.3d 963, 972 (9th Cir. 2008); *Newcal*, 513 F.3d at 1044. "Market power is the ability to raise price profitability by restricting output"; when a party has sufficient market power to exclude competition or control prices, that party possesses monopoly power. IIB Phillip E. Areeda et al., *Antitrust Law* ¶ 501 (2007) (hereinafter Areeda). Market power need not be pled with specificity, and whether a defendant actually possesses market power is a factual question. *Newcal*, 513 F.3d at 1045, 1051. A plaintiff can show market power directly, by establishing that the defendant, by actually reducing its own output, raised market prices; or indirectly, by showing that the defendant has a dominant share of the market, that there are significant barriers to entry into that market, and that existing competitors cannot increase their production in the short run. *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995).[5] To bring a claim for attempted monopolization, like those asserted by DocMagic, a plaintiff must show a "dangerous probability" that the defendant will achieve monopoly power. *See Spectrum Sports*, 506 U.S. at 456 (stating the elements of a claim for attempted monopolization). DocMagic does not allege that Ellie Mae has actually reduced output in order to raise prices in any of the three markets. Instead, it has attempted to allege facts sufficient to support an indirect inference that Ellie Mae possesses market power in the LOS, network and DPS markets.

DocMagic has provided sufficient factual allegations describing Ellie Mae's position in the LOS and network markets to plausibly conclude that Ellie Mae has market power in both markets. Compl. ¶¶ 99, 105-07, 113-14, 143-44. Ellie Mae argues that DocMagic's allegations are insufficient, because DocMagic has not alleged that Ellie Mae actually controlled prices or excluded competitors in the LOS and network markets. With respect to the LOS market, DocMagic has in fact alleged actual exclusion of competitors. *Id.* ¶ 114 ("Ellie Mae has imposed restrictions on its LOS customers that essentially lock them into the Encompass environment, thereby excluding legitimate competition from LOS companies . . . ."). In any event, DocMagic is not required to show actual price control or competitor exclusion; it need only plausibly allege facts showing monopoly power over the market, not the exercise of that power. *See Rebel Oil*, 51 F.3d at 1434 (holding that market power may be demonstrated either by showing exercise of that power, or

United States District Court

For the Northern District of California

circumstantially by showing the structure of the market).  DocMagic has done so by alleging facts showing that Ellie Mae has a significant market share in the LOS and network markets, that there are high barriers to entry for both markets, and that competitors cannot effectively increase their output to return the market to an efficient price level.  *See* Compl. ¶¶ 98-101, 105-107, 113-115.

According to the facts alleged in the complaint, Ellie Mae had a significant market share in both the LOS and network markets.  *See, e.g.*, *id.* ¶ 105 (alleging Ellie Mae has a greater than 50%, and likely greater than 60%, market share in the LOS market); *id.* ¶ 99 (alleging Ellie Mae has a 60% market share in the network market).  Ellie Mae's arguments to the contrary inappropriately dispute facts alleged in the complaint.

Furthermore, DocMagic has alleged facts showing that there are high barriers to entry in each of these markets, and that competitors could not effectively make up for an increase in Ellie Mae's prices by increasing their own output.  With respect to the LOS market, DocMagic has alleged that there are high barriers to switching LOS providers.  *Id.* ¶ 107.  This both provides a barrier to entry, since new competitors in the LOS market will be unable to attract business that is "locked in" to old LOS providers, and indicates that Ellie Mae's competitors cannot effectively increase production to compensate for a rise in Ellie Mae's prices, since customers will be unable to take advantage of any increased supply of LOS services provided by Ellie Mae's competitors.  *Cf. Eastman Kodak Co. v. Image Technical Servs.*, 504 U.S. 451, 476 (1992) (noting that high switching costs can force "locked-in" consumers to tolerate supracompetitive prices rather than changing providers).

With respect to the network market, DocMagic has alleged that the "network effect" creates a high barrier to entry into the market.  "In markets characterized by network effects, one product or standard tends towards dominance, because 'the utility that a user derives from consumption of the good increases with the number of other agents consuming the good.' " *United States v. Microsoft Corp.*, 253 F.3d 34, 49 (D.C. Cir. 2001) (quoting Michael L. Katz & Carl Shapiro, *Network Externalities, Competition, and Compatibility*, 75 Am. Econ. Rev. 424, 424 (1985)).  "For example, '[a]n individual consumer's demand to use (and hence her benefit from) the telephone network . . .

13

United States District Court

For the Northern District of California

1   increases with the number of other users on the network whom she can call or from whom she can

2   receive calls.' " *Id.* (quoting Howard A. Shelanski & J. Gregory Sidak, *Antitrust Divestiture in*

3   *Network Industries*, 68 U. Chi. L. Rev. 1, 8 (2001)).  Where the network effect is sufficiently strong,

4   it can function as a barrier to entry into a market.  *Id.* at 83-84.  DocMagic alleges that the network

5   market is characterized by the network effect and that the success of ePASS, largely due to the

6   network effect, has created a barrier to entry into the network market.  Compl. ¶¶ 100-01.  Taken

7   altogether, DocMagic's factual allegations are sufficient to support its allegation that Ellie Mae has

8   monopoly power in the network and LOS markets.

9          DocMagic's factual allegations are not, however, adequate to show a dangerous probability

10   that Ellie Mae will attain monopoly power in the DPS market, as the DPS market is defined by

11   DocMagic, because DocMagic has not provided plausible allegations that there are any barriers to

12   entry into the DPS market.  As alleged, the DPS market consists of all online document preparation

13   services provided to users of third-party LOSs.  *Id.* ¶ 108.  DocMagic has alleged that Ellie Mae has

14   been able to obtain a market share of 60% in this market.  *Id.* ¶ 110.  DocMagic also contends that

15   there are barriers to entry into the DPS market, based on its allegations that Ellie Mae has prevented

16   Encompass users from connecting to DocMagic or any other DPS provider that is not a vendor on

17   ePASS.  *Id.* ¶¶ 70-72, 149-50.  However, the contractual and technical limitations that Ellie Mae has

18   placed on Encompass users' choice of DPS vendors have not created a barrier to entry into the DPS

19   market as a whole.  Rather, DocMagic's allegations show only that there is a barrier to entry for the

20   submarket consisting of document preparation services *provided to Encompass users*.  *See L.A. Land*

21   *Co. v. Brunswick Corp.*, 6 F.3d 1422, 1427-28 (9th Cir. 1993) (defining barriers to entry); *cf.*

22   *Newcal*, 513 F.3d at 1045 (recognizing the difference between a market and an economically distinct

23   submarket); *United States v. Syufy Enters.*, 903 F.2d 659, 666-67 (9th Cir. 1990) (describing

24   structural barriers to market entry that prevent any new competitors from joining the market).

25   Unlike in the LOS market, where it is difficult for new LOS vendors to reach any existing customers

26   because they are all "locked in" to their current LOSs, and unlike in the network market, where the

27   network effect makes it difficult to establish a competing new network, there is nothing (at least

28                                                         14

according to DocMagic's complaint) to prevent new DPS vendors from competitively entering the market.  A new DPS vendor wishing to enter the DPS market but excluded from ePASS can sell its product to any customers except those who are also Encompass users.  Therefore, while DocMagic's allegations may be sufficient to show a dangerous probability that Ellie Mae will attain (or perhaps already has) monopoly power in the submarket consisting of document preparation services provided to Encompass users, the complaint does not plausibly aver a dangerous probability of monopoly power over the DPS market as a whole.[6]  *See Syufy*, 903 F.2d at 664 & n.6.

For instance, if Ellie Mae raised the price of Ellie Mae Docs, the allegations show that Encompass users might be forced to pay this higher price (since Ellie Mae has prevented Encompass users from connecting to DPS vendors not on ePASS, Compl. ¶ 72, Ellie Mae can prevent new DPS vendors from joining ePASS, *id.* ¶ 119, and the other DPS vendors on ePASS do not provide effective competition to Ellie Mae Docs, *id.* ¶ 127).  Nevertheless, the price of document preparation services would remain exactly the same for the alleged 40% of third-party LOS users who do not use Encompass.  If Ellie Mae attempted to offer its services at an artificially high price to these users, that offer would be rejected and the market price would not change.  Moreover, DPS vendors catering to non-Encompass users would not be able to mimic Ellie Mae's artificially high prices, raising the price for the market as a whole, because they would be undercut by increased production from their competitors or from new entrants into the market.

It is possible that the control which Ellie Mae allegedly exercises over current Encompass users' choice of DPS vendor could constitute a barrier to entry into the market as a whole.  *See generally* Areeda ¶ 421f (explaining how inadequate access to customers in the market may constitute barrier to entry).  Likewise, it is possible that there are other barriers to entry into the DPS market beyond those alleged in the complaint, and that these other barriers make the 40% of the DPS market not controlled by Ellie Mae as inefficient as the 60% of the market which is controlled by Ellie Mae.  However, DocMagic has not at present alleged facts plausibly supporting either of these two conclusions.

15

1    Because DocMagic has failed to allege facts showing a dangerous probability that Ellie Mae

2    will acquire monopoly power in the DPS market, Ellie Mae's motion to dismiss DocMagic's first,

3    third and fourth claims for relief is granted; those claims are dismissed with leave to amend.

1

**B.** <u>Fifth claim for relief: trade dress and trademark claims</u>

2      DocMagic's fifth claim for relief alleges that Ellie Mae violated section 43(a) of the Lanham

3   Act, 15 U.S.C. § 1125(a), by designing its document preparation services (Ellie Mae Docs) to create

4   audit reports that infringe on DocMagic's trade dress and trademarks.  In order to state a trade dress

5   infringement claim, DocMagic must allege facts showing that: "(1) the trade dress is inherently

6   distinctive or has acquired distinctiveness through secondary meaning; (2) there is a likelihood that

7   the public will be confused by the infringing use; and (3) the trade dress is non-functional." *Stephen*

8   *W. Boney, Inc. v. Boney Servs., Inc.*, 127 F.3d 821, 828 (9th Cir. 1997).  DocMagic alleges that its

9   trade dress in the audit report consisted of a "3-column table-like list without internal borders, with

10  field names on the left, a message describing the deficiency in the middle and space for additional

11  details on the right."  Compl. ¶ 55.  The field names DocMagic allegedly utilized were the word

12  "FATAL," in red, followed by a description of the deficiency in red, and the word "WARNING," in

13  yellow, followed by a description of the (less-vital) deficiency in black.  *Id.* ¶¶ 54, 167.  DocMagic

14  further alleges that it possesses trademarks in the words "FATAL" and "WARNING" as they appear

15  in DocMagic's audit reports.  *Id.* ¶ 51.  According to DocMagic, Ellie Mae has copied this trade

16  dress and these trademarks in their entirety, except that the word "WARNING" in Ellie Mae's audit

17  report appears in black rather than yellow.  Finally, DocMagic avers that by organizing the audit

18  reports in Ellie Mae Docs in a manner identical to DocMagic's trade dress, Ellie Mae's conduct is

19  "likely to lead to confusion as to the source of Ellie Mae's document preparation services."  *Id.* ¶ 57.

20  Ellie Mae suggests that DocMagic's allegations are insufficient to satisfy any of the three elements

21  of a Lanham Act violation.  To the contrary, the complaint contains allegations of trademark and

22  trade dress infringement that are sufficient, albeit barely, under Rule 8(a).

23      Firstly, DocMagic has adequately alleged that its trade dress in the format of its audit reports

24  have "acquired distinctiveness through secondary meaning."[7]  *Boney*, 127 F.3d at 828.  DocMagic

25  alleges that its use of this trade dress was long-standing and exclusive, that it has been used

26  consistently on DocMagic's audit reports, and that users of the re-branded services knew that those

27  services were being provided by DocMagic based on this trade dress.  Compl. ¶¶ 53-55.  These facts,

28

United States District Court

For the Northern District of California

17

1   particularly the last one, raise a plausible inference that consumers generally viewed the alleged

2   trade dress as primarily identifying DocMagic as the source of the product, rather than merely

3   identifying the product itself.  *See Samara Bros.*, 529 U.S. at 211.

4        Secondly, DocMagic's complaint contains factual allegations from which the court can infer

5   a likelihood of confusion.  Ellie Mae attacks DocMagic's confusion allegations on two separate

6   grounds.  To begin with, Ellie Mae suggests that as a factual matter, there is no likelihood of public

7   confusion between Ellie Mae Docs and DocMagic because the products are dissimilar in appearance.

8   To support this contention, Ellie Mae submitted two screenshots of DocMagic computer audit

9   reports.  The screenshots, and therefore Ellie Mae's arguments founded upon them, are not

10  admissible to support Ellie Mae's motion to dismiss.  "[A] district court ruling on a motion to

11  dismiss may consider a document the authenticity of which is not contested, and upon which the

12  plaintiff's complaint necessarily relies."  *Parrino v. FHP, Inc.*, 146 F.3d 699, 706 (9th Cir. 1998).

13  However, DocMagic contends that its complaint relies on a different version of its audit report than

14  that submitted by Ellie Mae.  Since DocMagic's claim does not necessarily rely on the versions of

15  the audit reports submitted by Ellie Mae, they are inadmissible.  The court cannot decide at this

16  stage the factual question of whether DocMagic's audit reports actually appeared as they are

17  described in the complaint; therefore, Ellie Mae's argument provides no basis for dismissing this

18  claim.

19       Next, Ellie Mae contends that even if the court refuses to admit the screenshots submitted by

20  Ellie Mae, DocMagic has not adequately alleged consumer confusion.  Such is not the case.

21  DocMagic has alleged that Ellie Mae's audit report is nearly indistinguishable from its own, that

22  Ellie Mae intentionally copies DocMagic's trade dress, and that it is offered to consumers who

23  previously used DocMagic's products and who associate the trade dress in question with

24  DocMagic's products.  Compl. ¶¶ 57, 170.  These facts are sufficient to raise a plausible inference of

25  consumer confusion, either as to the source of the document preparation services or as to the

26  affiliation of DocMagic with Ellie Mae's services.  *See Cairns v. Franklin Mint Co.*, 292 F.3d 1139,

27  1149-50 (recognizing that consumer confusion may arise over the origin or endorsement of

28

18

products).  Ellie Mae argues, however, that consumer confusion is unlikely since the report is only created after the consumer has been exposed to other source-identifying information clearly showing who will create the report.  The question of whether other source-identifying information will dispel consumer confusion created by the similar trade dress is a factual one that the court cannot resolve at this stage, and so provides no basis for dismissing DocMagic's claim.

Finally, DocMagic has also alleged sufficient facts to support a barely plausible inference that its claimed trade dress is nonfunctional.  "A product feature is functional and cannot serve as a trademark if the product feature is essential to the use or purpose of the article or if it affects the cost or quality of the article, that is, if exclusive use of the feature would put competitors at a significant, non-reputation-related disadvantage." *Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 165 (1995) (internal quotation marks omitted).  Although DocMagic may have great difficulty proving that the features it alleges as its trade dress could be denied to other competitors without putting them at a non-reputation-related disadvantage, the question of whether DocMagic's trade dress is functional or nonfunctional is a factual one that cannot be resolved on a motion to dismiss.  *See Clicks Billiards, Inc. v. Sixshooters Inc.*, 251 F.3d 1252, 1258 (9th Cir. 2001); *Axis Imex, Inc. v. Sunset Bay Rattan, Inc.*, No.  C 08-3931 RS, 2009 WL 55178, at *3 (N.D. Cal. Jan. 7, 2009) (Seeborg, Mag. J.).  Construing DocMagic's complaint liberally, it has alleged facts showing that competitors would not need the features of its audit report which it identifies as its trade dress in order to compete without disadvantage.  Compl. ¶ 56 ("[T]he information to be displayed in the audit report could be selected, arranged, and presented in any number of ways . . . . Indeed, the audit report format had been used by no one else in the field until Ellie Mae decided to replicate DocMagic's software in 2009.").

As another basis for its Lanham Act claim, DocMagic argues that it holds a trademark in the words "WARNING" and "FATAL" as used on its audit reports.  As described above, the court is skeptical of DocMagic's ability to adduce evidence proving that it holds a protectable trademark in these words, particularly in showing that these words are inherently distinctive or have acquired secondary meaning, and that they are not functional.[8]  *See Talking Rain Beverage Co. Inc. v. S.*

United States District Court

For the Northern District of California

1    *Beach Beverage Co.*, 349 F.3d 601, 603 (9th Cir. 2003) (requiring showing of distinctiveness and

2    nonfunctionality for successful trademark claims).  However, given the factual allegations described

3    above, it is plausible that DocMagic possesses a protectable interest in these alleged marks, and that

4    Ellie Mae's actions constitute trademark infringement.  *See* Compl. ¶¶ 51-57, 166-170.  These

5    questions are best resolved on summary judgment.  Accordingly, Ellie Mae's motion to dismiss

6    DocMagic's fifth claim for relief is denied.

7           C.      Sixth claim for relief: false advertising

8           DocMagic's sixth claim for relief alleges that Ellie Mae committed false advertising in

9    violation of section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), by sending a letter to its

10   customers stating that Ellie Mae's document preparation service, in contrast to DocMagic's service,

11   would provide "greater automation, safeguards and control to help you easily stay compliant now."

12   Compl. ¶ 79.  In order to state a claim for false advertising, a plaintiff must allege facts showing

13   each of the following five elements:

14          (1) a false statement of fact by the defendant in a commercial advertisement about its
            own or another's product; (2) the statement actually deceived or has the tendency to
15          deceive a substantial segment of its audience; (3) the deception is material, in that it is
            likely to influence the purchasing decision; (4) the defendant caused its false
16          statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be
            injured as a result of the false statement, either by direct diversion of sales from itself
17          to defendant or by a lessening of the goodwill associated with its products.

18   *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997).

19          Ellie Mae argues that DocMagic has not alleged sufficient facts to plausibly support any of

20   these five elements.  A quick examination of the complaint indicates that DocMagic has failed to

21   adequately allege even the first element of the claim.  The alleged misrepresentation constitutes non-

22   actionable puffery.  Puffery consists of statements that are "extremely unlikely to induce consumer

23   reliance."  *Newcal*, 513 F.3d at 1038.  "Ultimately, the difference between a statement of fact and

24   mere puffery rests in the specificity or generality of the claim. . . . Thus, a statement that is

25   quantifiable, that makes a claim as to the 'specific or absolute characteristics of a product,' may be

26   an actionable statement of fact while a general, subjective claim about a product is non-actionable

27   puffery."  *Id.* (quoting *Cook, Perkiss, & Liehe v.  N. Cal. Collection Serv., Inc.*, 911 F.2d 242, 246

28

                                                    20

(9th Cir. 1990)).  The claims that Ellie Mae's program will provide "greater automation, safeguards and control" and will "help you easily stay compliant now" are neither quantifiable, nor claims as to the specific or absolute characteristics of its product.  *Cf. id*. at 1053 (finding that the "general assertion that IKON provides its customers with low costs and with flexibility" is "classic puffery"); *Cook*, 911 F.2d at 246 (holding that general assertions of superiority, such as claiming comparable services at lower rates, are "not . . . the kind of detailed or specific factual assertions that are necessary to state a false advertising cause of action").  Because the alleged misrepresentations are not actionable as a matter of law and do not come close to stating a claim for false advertising, Ellie Mae's motion to dismiss DocMagic's sixth claim is granted, and the claim is dismissed without leave to amend.

D.      Seventh claim for relief: copyright infringement

DocMagic's seventh claim is for copyright infringement, based on Ellie Mae's alleged copying of various elements in DocMagic's audit reports to create Ellie Mae's own audit reports. Specifically, DocMagic alleges that the following elements in its audit reports constitute protectable expression and were copied by Ellie Mae: "(1) the selection of deficiencies and field names; (2) the arrangement of deficiencies into two groups with specific field names; and (3) the arrangement and display of field names and deficiencies in a color-coded format."  Compl. ¶ 184-185.

Except under certain exceptions not relevant here, 17 U.S.C. section 411(a) requires that "no civil action for infringement of the copyright in any United States work shall be instituted until preregistration or registration of the copyright claim shall have been made in accordance with this title."  Pursuant to this registration requirement, a party may bring a suit for copyright infringement once the Copyright Office receives a complete application for copyright on the allegedly infringed materials.  *Cosmetic Ideas, Inc. v. IAC/Interactivecorp*, 606 F.3d 612, 615-16, 621 (9th Cir. 2010). The registration requirement is not jurisdictional, but it is a necessary element of a copyright infringement claim.  *Reed Elsevier, Inc. v. Muchnick*, ___U.S.___, ___, 130 S. Ct.  1237, 1237 (2010); *Cosmetic Ideas*, 606 F.3d at 615.  DocMagic alleges that it "has complied with Title 17 of the United States Code and is in the process of registering the . . . copyright [on its audit reports]

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

with the United States Copyright Office."  Compl.  ¶ 187.  An allegation that DocMagic "is in the process of registering" the copyright does not plausibly support the inference that the registration had already been made at the time this suit was filed.  At the hearing on this matter, DocMagic admitted that it had not submitted a copyright application prior to the filing of its complaint; post-hearing submissions from DocMagic confirmed this state of affairs.  *See* Docket No. 58 (Letter from DocMagic's counsel, attaching a copyright Certificate of Registration dated June 11, 2010).  Because allegations to support this element of DocMagic's claim are lacking, Ellie Mae's motion to dismiss DocMagic's seventh claim for relief is granted, and the claim is dismissed with leave to amend.  However, any amendment to this claim for relief will not relate back.

E.    Eighth claim for relief: intentional interference with contractual relations

DocMagic's eighth claim is for intentional interference with contractual relations, based on Ellie Mae's alleged actions to disrupt and destroy DocMagic's relationships with its customers.  However, DocMagic appears to misunderstand the nature of this tort.  The tort of intentional interference with contractual relations under California law is what is known as "inducement of breach of contract" in other jurisdictions.  *See* 5 Witkin, *Summary of California Law* § 731.  It requires the following five elements:

1.    The existence of a valid contract between the plaintiff and a third party;

2.    The defendant's knowledge of that contract;

3.    The defendant's intentional acts designed to induce a breach or disruption of the contractual relationship;

4.    Actual breach or disruption of the contractual relationship; and

5.    Resulting damage.

*Reeves v. Hanlon*, 33 Cal. 4th 1140, 1148 (2004).  Here, DocMagic does not allege any facts plausibly showing that Ellie Mae's actions caused the breach or disruption of any existing contracts which DocMagic and its customers were in the process of fulfilling at the time Ellie Mae's actions were taken.  *See* Compl. ¶¶ 15-18, 38 (indicating that DocMagic's interactions with customers consisted of discrete transactions, rather than long-term contracts).  Because DocMagic's allegations do not show that DocMagic had existing *contracts*—as opposed to mere economic relations—that

22

were breached or disrupted as the result of Ellie Mae's actions, Ellie Mae's motion to dismiss the eighth claim for relief is granted, and this claim is dismissed with leave to amend.

F.   Ninth claim for relief: intentional interference with prospective economic advantage

DocMagic's ninth claim for relief is for intentional interference with prospective economic advantage (IIPEA), based on its allegations that Ellie Mae acted to cut DocMagic off from access to customers with which DocMagic had ongoing business relations.  An IIPEA claim requires the following elements:

1.   An economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff;

2.   The defendant's knowledge of the relationship;

3.   Intentional acts on the part of the defendant designed to disrupt the relationship;

4.   Actual disruption of the relationship; and

5.   Economic harm to the plaintiff proximately caused by the acts of the defendant.

*Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1153 (2003).  In addition, the intentional acts alleged as the third element must have been "wrongful by some legal measure other than the fact of interference itself." *Id.* (quoting *Della Penna v. Toyota Motor Sales, U.S.A., Inc.*, 11 Cal. 4th 376, 393 (1995)); *see also Korea Supply*, 29 Cal. 4th at 1158-59 ("The tort of intentional interference with prospective economic advantage is not intended to punish individuals or commercial entities for their choice of commercial relationships or their pursuit of commercial objectives, unless their interference amounts to independently actionable conduct.").

DocMagic alleges generally that it had existing economic relationships with third parties—Encompass LOS and ePASS users—that gave it the prospect of future economic benefits—additional agreements to prepare loan documents for loan originators or lenders using a third-party LOS.  *See* Compl. ¶¶ 15-18, 192-204.  That said, DocMagic does not identify any particular relationship that was disrupted because of Ellie Mae's actions.  At this stage and given the nature of the harm alleged by DocMagic, DocMagic need not specify every single economic relationship with which Ellie Mae interfered.  *Twombly*, 550 U.S. at 570 ("[W]e do not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible

United States District Court

For the Northern District of California

on its face."). However, in order to provide Ellie Mae with sufficient information to answer the complaint, DocMagic must, for at least one actual relationship, plead facts sufficient to satisfy all of the elements of an IIPEA claim. Because such allegations are missing from the complaint, Ellie Mae's motion to dismiss DocMagic's ninth claim for relief is granted, and this claim is dismissed with leave to amend.

G.  Tenth and eleventh claims for relief: breach of contract claims

DocMagic's tenth and eleventh claims are for breach of contract, based on Ellie Mae's alleged breach of the Reseller Agreement and Bridge Agreement respectively. Specifically, DocMagic claims Ellie Mae breached these agreements by misappropriating and misusing proprietary information, including both technology and customer information, that DocMagic provided to Ellie Mae pursuant to these agreements. To assert a claim for relief for breach of contract, a plaintiff must plead: (1) the existence of the contract, (2) the plaintiff's performance or excuse for non-performance, (3) the defendant's breach of the contract, and (4) the resulting damages to the plaintiff. *Armstrong Petroleum Corp. v. Tri-Valley Oil & Gas Co.*, 116 Cal. App. 4th 1375, 1391 n.6 (2004). DocMagic has adequately pled each of these elements in its complaint with respect to each contract, and supported them with factual allegations. *See* Compl. ¶¶ 39-42, 45, 47-49, 58, 74-80, 205-26. Contrary to Ellie Mae's contention, DocMagic has not only pled that Ellie Mae had access to DocMagic's proprietary information, but also that Ellie Mae actually misappropriated and misused it. *Id.* ¶¶ 58, 76, 86, 92, 211, 222. DocMagic is not required to plead with specificity the precise proprietary information that Ellie Mae misappropriated and misused. *Twombly*, 550 U.S. at 570 (holding that heightened fact pleading of specifics not required). Likewise, DocMagic's factual allegations are sufficient to make plausible the inference that Ellie Mae actually breached the contract. *See* Compl. ¶¶ 74-77 (alleging that Ellie Mae used DocMagic's proprietary customer information to contact DocMagic's customers); *id.* ¶¶ 47-50 (alleging that Ellie Mae used DocMagic's proprietary software information to create Ellie Mae Docs). Ellie Mae's motion to dismiss the tenth and eleventh claims for relief is therefore denied.

H.      Twelfth claim for relief: trade secret misappropriation

DocMagic's twelfth claim for relief, for trade secret misappropriation, is also based on Ellie Mae's alleged misappropriation and misuse of the proprietary information that DocMagic provided to Ellie Mae under the Reseller Agreement and Bridge Agreement.  In California, a trade secret misappropriation claim has "two primary elements: (1) the existence of a trade secret, and (2) misappropriation of the trade secret." *AccuImage Diagnostics Corp v. Terarecon, Inc.*, 260 F. Supp. 2d 941, 950 (N.D. Cal. 2003) (Patel, J.) (citing Cal. Civ. Code § 3426.1(b).  DocMagic's allegations are sufficient to support each of those elements.  As discussed above, DocMagic need not plead with specificity what particular proprietary information was misappropriated by Ellie Mae; the description of the proprietary information given in the complaint is sufficient to satisfy Rule 8(a). *See* Compl. ¶¶ 228-232; *Twombly*, 550 U.S. at 570; *see also StonCor Grp., Inc. v. Campton*, No. C05-1225JLR, 2006 WL 314336, at *5 (W.D. Wash. Feb. 7, 2006) (finding alleged misappropriation of "proprietary and confidential information concerning . . . sales and marketing strategies, pricing and pricing policies, and customer lists and installers" sufficient to state a claim).  DocMagic's factual allegations are also sufficient to support a plausible inference of misappropriation.  Compl. ¶¶ 47-50, 57-58 (technical information); *id.* ¶¶ 74-78 (customer information).  Likewise, DocMagic alleges facts supporting Ellie Mae's actual misuse of its proprietary trade secret information, in creating Ellie Mae Docs and in soliciting DocMagic's customers.  *Id.*

Ellie Mae's argument that it already had independent access to all of the customers in question, and so that it is implausible to infer that Ellie Mae misappropriated DocMagic's customer information, ignores DocMagic's allegation that the customer information which it had compiled was only obtained and made usable at significant expense.  *Id.*  ¶ 231.  Given the alleged difficulty of independently obtaining the customer information at issue, it becomes plausible that Ellie Mae would misappropriate DocMagic's compiled customer information rather than preparing its own. The alleged difficulty of obtaining customer information distinguishes this case from *Metro Traffic Control, Inc. v. Shadow Traffic Network*, 22 Cal. App. 4th 853, 863 (1994), on which Ellie Mae relies.  In that case, only a single customer was at issue, and the evidence presented showed that the

25

customer had independently given the alleged misappropriator all of the alleged trade secret information that it had provided to the plaintiff.  In this case, by contrast, DocMagic's customer information allegedly relates to a relatively wide client base, and it is too early a stage in the litigation for any evidence to show whether Ellie Mae compiled the information independently rather than by misappropriating it.  Furthermore, DocMagic's allegations that Ellie Mae specifically tailored Ellie Mae Docs to DocMagic's customers, and could not have done so without using DocMagic's proprietary information, support the inference that Ellie Mae used DocMagic's proprietary information rather than gathering its own.  *See* Compl. ¶¶ 49, 74.  Since DocMagic alleges facts plausibly supporting its claim for trade secret misappropriation, Ellie Mae's motion to dismiss the twelfth claim for relief is denied.

> I.      Thirteenth claim for relief: unfair competition

DocMagic's thirteenth claim for relief is brought under California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 *et seq.*, alleging that all of Ellie Mae's acts described in the complaint constituted unfair competition within the meaning of that statute.  Section 17200 prohibits "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising . . . ."  Cal. Bus. & Prof. Code § 17200.  Because section 17200 is written in the disjunctive, "a business act or practice need only meet one of the three criteria—unlawful, unfair, or fraudulent—to be considered unfair competition under the UCL."  *Daro v. Superior Court*, 151 Cal. App. 4th 1079, 1093 (2007).  In its complaint, DocMagic alleges that Ellie Mae's conduct violated both the unlawful and unfair prongs of the UCL.

"Under its 'unlawful' prong, the UCL borrows violations of other laws . . . and makes those unlawful practices actionable under the UCL."  *See Berryman v. Merit Prop. Mgmt.*, 152 Cal. App. 4th 1544, 1554 (2007) (internal quotation marks and citation omitted; alteration in original).  "Thus, a violation of another law is a predicate for stating a cause of action under the UCL's unlawful prong."  *Id.*; *see Smith v. State Farm Mut. Auto. Ins. Co.*, 93 Cal. App. 4th 700, 717-18 (2001) (holding the unlawful prong forbids "anything that can be properly called a business practice and that at the same time is forbidden by law").  Here, as is discussed above, DocMagic has plausibly

United States District Court

For the Northern District of California

1    alleged that Ellie Mae committed trademark and trade dress violations, and misappropriated and

2    misused its trade secrets.  These actions may serve as the basis for an unfair competition claim under

3    section 17200.  *See Acad. of Motion Picture Arts & Scis. v. Creative House Promotions, Inc.*, 944

4    F.2d 1446, 1457 (9th Cir. 1991) (trademark); *Imax Corp. v. Cinema Tech., Inc.*, 152 F.3d 1161, 1169

5    (9th Cir. 1998) (trade secret misappropriation).  DocMagic also argues that its unfair competition

6    claim can be based on Ellie Mae's breach of the Reseller Agreement and Bridge Agreement.  A

7    breach of contract may only form the basis of a section 17200 claim if that breach itself is "unlawful,

8    unfair, or fraudulent." *Puentes v. Wells Fargo Home Mortg., Inc.*, 160 Cal. App. 4th 638, 645

9    (2008).  As is discussed above, DocMagic alleges that Ellie Mae breached its contracts by

10   misappropriating and misusing DocMagic's proprietary information, Compl. ¶¶ 211, 222.  The

11   breach of contract claims are thus coterminous with the trade secret misappropriation claim in the

12   basis which they provide for DocMagic's unfair competition claim.

13          DocMagic has not plead facts sufficient to state a claim for a violation of the UCL's unfair

14   prong.  The California Supreme Court has defined an "unfair" business act or practice as "conduct

15   that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those

16   laws because its effects are comparable to or the same as a violation of the law, or otherwise

17   significantly threatens or harms competition." *Cel-Tech*, 20 Cal. 4th at 187.  On its face, the

18   California definition of "unfair" competition appears to embrace conduct that might not violate the

19   Sherman Act.  That said, the Ninth Circuit has held, albeit in an unpublished opinion, that "[w]here .

20   . . the same conduct is alleged to support both a plaintiff's federal antitrust claims and state-law

21   unfair competition claim, a  finding that the conduct is not an antitrust violation precludes a finding

22   of unfair competition." *LiveUniverse, Inc. v. MySpace, Inc.*, 304 Fed. Appx. 554, 557 (9th Cir.

23   2008) (citing *Carter v. Variflex, Inc.*, 101 F. Supp. 2d 1261, 1270 (C.D. Cal. 2000); *Chavez v.

24   Whirlpool Corp.*, 93 Cal. App. 4th 363, 375 (2001)).  As described above, DocMagic has not alleged

25   facts showing that Ellie Mae's conduct violated the Sherman Act by posing a dangerous threat of

26   monopoly in the DPS market.  As a result, any claims DocMagic might be asserting under the

27   UCL's unfair prong necessarily fail as well.  Accordingly, Ellie Mae's motion to dismiss the

28

27

United States District Court

For the Northern District of California

1   thirteenth claim for relief is granted in part and denied in part; all of DocMagic's claim under the

2   UCL's unfair prong is dismissed with leave to amend.

3                                                    * * * * *

4          In summary, Ellie Mae's motion to dismiss is GRANTED in part and DENIED in part.

5   DocMagic's first (monopoly leveraging), third (refusal to deal), fourth (denial of access to essential

6   facility), seventh (copyright infringement), eighth (intentional interference with contractual

7   relationship), and ninth (IIPEA) claims for relief are dismissed with leave to amend.  DocMagic's

8   second (attempted monopolization) and sixth (false advertising) claims for relief are dismissed with

9   prejudice.  DocMagic's thirteenth claim for relief (UCL) is dismissed with leave to amend to the

10  extent it is predicated on a violation of the UCL's unfair prong.  In all other respects, Ellie Mae's

11  motion to dismiss is denied.

12

13  II.     DocMagic's motion to dismiss

14         DocMagic moves to dismiss Ellie Mae's first through fifth and seventh through ninth

15  counterclaims.  (DocMagic does not move to dismiss Ellie Mae's sixth counterclaim, which alleges

16  that DocMagic breached the Reseller Agreement.)  The court addresses each counterclaim in turn.

17         A.      First counterclaim for relief: copyright infringement

18         Ellie Mae's first counterclaim alleges that DocMagic directly infringed Ellie Mae's copyright

19  on the Encompass LOS and the Encompass SDK software, by copying, using and distributing the

20  Encompass software and SDK without Ellie Mae's consent.  Counterclaim ¶ 47; *see also id.* ¶¶ 19-

21  24.  The same counterclaim also alleges that DocMagic contributorily infringed Ellie Mae's

22  copyrights on the same software by knowingly inducing others to engage in similarly unauthorized

23  copying and use.  *Id.* ¶ 48; *see also id.* ¶¶ 21-26.

24         "To establish copyright infringement, the holder of the copyright must prove both valid

25  ownership of the copyright and infringement of that copyright by the alleged infringer."  *Entm't*

26  *Research Grp., Inc. v. Genesis Creative Grp., Inc.*, 122 F.3d 1211, 1217 (9th Cir. 1997).

27  Infringement may consist of any violation of the copyright-holder's exclusive rights guaranteed by

28                                                        28

United States District Court

For the Northern District of California

the Copyright Act, 17 U.S.C. § 101 *et seq.*, including the right to reproduce—that is, copy—and distribute the work.  17 U.S.C. § 106; *Kelly v. Arriba Soft Corp.*, 336 F.3d 811 (9th Cir. 2003). DocMagic does not contest that Ellie Mae possessed a copyright in the Encompass software or the Encompass SDK.  Instead, DocMagic contends that Ellie Mae has not properly alleged infringement of Ellie Mae's exclusive copyright, because it has not pled facts showing that its work was "copied" within the meaning of the Copyright Act.

DocMagic argues firstly that Ellie Mae's allegations of direct infringement are too vague, due to the counterclaim's repeated use of the term  "and/or" to refer to alternative acts.  While the use of "and/or" in pleadings is not encouraged, especially in the wake of *Twombly* and *Iqbal*, Ellie Mae's allegations nevertheless satisfy Federal Rule of Civil Procedure 8(a).  Ellie Mae plainly alleges that once DocMagic was lawfully denied access to the ePASS network and Encompass users, DocMagic sought alternative mechanisms for connecting with Encompass users.  As part of their conduct, Ellie Mae alleges that DocMagic used Encompass and the Encompass SDK without authorization and copied the Encompass SDK without authorization, actions which constitute copyright infringement.  Specifically, the counterclaim alleges that DocMagic "illegally obtained unauthorized access to, and used, the Encompass software, including the SDK," Counterclaim  ¶ 19; that DocMagic "reverse engineered, duplicated, modified, and/or otherwise used the SDK . . . without Ellie Mae's authorization, to create software [i.e., DocMagic XL]," *id.* ¶ 21; and that "DocMagic XL . . . uses, duplicates, incorporates, and/or invokes Ellie Mae's Encompass SDK," *id.* ¶¶ 22.  These allegations contain "enough facts to state a claim to relief that is plausible on its face," *Twombly*, 550 U.S. at 570, and give DocMagic sufficient notice to prepare its defense.

Notwithstanding DocMagic's protestations to the contrary, unauthorized use of a copyrighted computer program constitutes copyright infringement.  In order to use a software program on a computer, the program must be copied from a storage device, such as a hard disk, into the computer's random access memory ("RAM").  The Ninth Circuit has held that loading the program into the computer's RAM constitutes an act of "copying" for the purposes of copyright law.  *MAI Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 518 (9th Cir. 1993).  DocMagic's assertion that its

alleged "use" of the copyrighted software cannot serve as the basis of a copyright claim rests erroneously on *Altera Corp. v. Clear Logic, Inc.*, 424 F.3d 1079 (9th Cir. 2005). In *Altera*, the court found that a state law tort claim was not preempted by federal copyright law, because "the unauthorized use of *the software's end-product* is not within the rights protected by the federal Copyright Act." *Id.* at 1090 (emphasis added). The unauthorized use of a software's end-product is, however, legally and factually distinct from the unauthorized use of the software itself. As Ellie Mae's counterclaim alleges unauthorized use of copyrighted software, not unauthorized use of a copyrighted software's end-product, its allegations related to use state a claim for direct copyright infringement.[9]

Ellie Mae's claims of contributory infringement also state a claim upon which relief can be granted. "The three elements required to prove a [party] liable under the theory of contributory copyright infringement are: (1) direct infringement by a primary infringer, (2) knowledge of the infringement, and (3) material contribution to the infringement." *See Metro-Goldwyn-Mayer Studios, Inc. v. Grokster Ltd.*, 380 F.3d 1154, 1160 (9th Cir. 2004), *reversed on other grounds*, 545 U.S. 913 (2005) (citing *Ellison v. Robertson*, 357 F.3d 1072, 1076 (9th Cir. 2004)). By alleging that DocMagic provided the DocMagic XL program to Encompass licensees, and "instructed Encompass licensees to use the DocMagic XL [program] in conjunction with Encompass and the [Encompass] SDK, without Ellie Mae's consent or authorization and in direct violation of the SDK license terms," Counterclaim ¶¶ 24-25, Ellie Mae satisfies all three of the elements of contributory infringement. *See Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*, 494 F.3d 788, 795 (9th Cir. 2007).

In its motion, DocMagic argues that Ellie Mae has only alleged that DocMagic instructed third parties to engage in unauthorized use of Ellie Mae's software, and not that any third parties did so. Such is not the case; Ellie Mae has sufficiently alleged that third parties, with DocMagic's encouragement, engaged in actual use and copying of copyrighted material. *See* Counterclaim ¶¶ 22-26, 48 ("DocMagic has . . . knowingly induced, caused, and/or materially contributed to the unauthorized copying, distribution, and/or use . . . of the Encompass software and SDK by DocMagic XL . . . users.").

United States District Court
For the Northern District of California

1    Additionally, DocMagic argues that Ellie Mae's licensees' alleged unauthorized use of

2   Encompass and the Encompass SDK is not copyright infringement (and so cannot support a claim of

3   contributory infringement).  However, as discussed above, the unauthorized loading of a software

4   program onto the RAM of a computer constitutes an act of copying, and thus of copyright

5   infringement.  *MAI*, 991 F.2d at 518.  Insofar as Ellie Mae has alleged that the DocMagic XL

6   program is itself a copy of the Encompass SDK, *see* Counterclaim ¶¶ 21-22, the licensees' act of

7   loading the DocMagic XL program onto their computers allegedly created a new, unauthorized copy

8   of the Encompass SDK.  This alleged infringement by the licensees is sufficient to support a claim

9   of contributory infringement against DocMagic.  Furthermore, Ellie Mae's allegation that DocMagic

10   induced Ellie Mae's licensees to "use" Encompass and the Encompass SDK outside the scope of the

11   respective licenses by encouraging the licensees to use DocMagic XL, also states a claim for relief.

12   *See* Counterclaim ¶ 25 ("[D]ocMagic has instructed Encompass licensees to use the DocMagic XL

13   Technology in conjunction with Encompass and the SDK . . . in direct violation of the SDK license

14   terms in order to connect directly to DocMagic.").  Exceeding the scope of a license granted by a

15   copyright holder constitutes copyright infringement, *see LGS Architects, Inc. v. Concordia Homes of*

16   *Nev.*, 434 F.3d 1150, 1156 (9th Cir. 2006); thus, to the extent that DocMagic XL provided

17   Encompass and Encompass SDK users with a means for exceeding the scope of their licenses and

18   DocMagic knowingly encouraged them to do so, DocMagic engaged in contributory copyright

19   infringement.  Therefore, DocMagic's motion to dismiss the first counterclaim is denied.

20    B.    Second counterclaim for relief: Computer Fraud and Abuse Act

21    Ellie Mae's second counterclaim alleges that DocMagic violated the Computer Fraud and

22   Abuse Act ("CFAA"), 18 U.S.C. § 1030, by accessing Ellie Mae's protected computers without

23   authorization and taking Ellie Mae's proprietary information.  DocMagic in response argues firstly

24   that Ellie Mae has not pled facts showing that Ellie Mae has a private right of action under the

25   CFAA, and secondly that Ellie Mae has not pled facts establishing all of the elements of a violation

26   of the CFAA.

27

28

31

United States District Court

For the Northern District of California

The CFAA establishes that a civil action may be brought by "[a]ny person who suffers damage or loss by reason of a violation of this section . . . [but] only if the conduct [complained of] involves 1 of the factors set forth in subclauses (I), (II), (III), (IV), or (V) of subsection (c)(4)(A)(I)." 18 U.S.C. § 1030(g).  Subclause (I) of subsection (c)(4)(A)(i)(I), the only subclause relevant to this case, covers conduct resulting in "loss to 1 or more persons during any 1-year period . . . aggregating at least $5,000 in value." *Id.* § 1030(c)(4)(A)(i)(I).  The statute defines "loss" as "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service."  18 U.S.C. § 1030(e)(11).  Ellie Mae's counterclaim contains only a single, generalized allegation related to loss from conduct that violated the CFAA: that "Ellie Mae has suffered damages and loss . . . including, without limitation, harm to Ellie Mae's data and/or computer(s) and other losses and damages in an amount to be proven at trial, but in any event, over $5000 aggregated over a one-year period."  Counterclaim ¶ 59.

Such an allegation is insufficient to satisfy the CFAA's loss requirement for at least two reasons.  To begin with, the averment verges on the type of conclusory, "formulaic recitation of the elements of a cause of action," that *Iqbal* and *Twombly* require a court to disregard.  *Iqbal*, 129 S. Ct. at 1949–50 (quoting *Twombly*, 550 U.S. at 555).  More importantly, even if the court were to consider the allegation, paragraph 59 fails to plead facts sufficient to meet the CFAA's requirement for a private cause of action.  In the counterclaim, Ellie Mae alleges that it suffered "*damages and loss* . . . over $5000 aggregated over a one-year period." Counterclaim ¶ 59 (emphasis added).  The statute, however, requires that an entity suffer a "loss . . . during any 1-year period . . . aggregating at least $5,000 in value."  18 U.S.C § 1030(c)(4)(A)(i)(I).  Because it is impossible to determine from Ellie Mae's counterclaim whether its loss, as loss is defined by the CFAA, standing alone and excluding damages, would aggregate to more than $5000 in a given year, Ellie Mae's counterclaim fails to adequately plead facts necessary to support a cause of action under the CFAA.  Accordingly,

United States District Court

For the Northern District of California

DocMagic's motion to dismiss the second counterclaim for relief is granted, and the counterclaim is dismissed with leave to amend.

C.   Third counterclaim for relief: Comprehensive Computer Data Access and Fraud Act

Ellie Mae's third counterclaim, seeks relief under the California Comprehensive Computer Data Access and Fraud Act ("CCDAFA"), Cal. Penal Code § 502(e).  The CCDAFA is similar to the CFAA, but prohibits a wider range of conduct.  *See* Cal. Penal Code § 502(c)(1)-(9).  Furthermore, it contains no loss requirement in order to support a private right of action.  Ellie Mae asserts that DocMagic engaged in four of the nine types of conduct prohibited by the CCDAFA: (1) "[k]nowingly access[ing] and without permission . . . us[ing] any data, . . . computer system, or computer network in order to . . . wrongfully control or obtain money, property, or data," *id.* § 502(c)(1); (2) "[k]nowingly access[ing] and without permission . . . us[ing] . . . any data from a computer, computer system, or computer network, or tak[ing] or cop[ying] any supporting documentation, whether existing or residing internal or external to a computer, computer system, or computer network," *id.* § 502(c)(2); (3) "[k]nowingly and without permission provid[ing] . . . a means of accessing a computer, computer system, or computer network" in violation of the CCDAFA, *id.* § 502(c)(6); and (4) "[k]nowingly and without permission access[ing] any computer, computer system, or computer network," *id.* § 502(c)(7).

DocMagic contends that, for two reasons, the counterclaim fails to state a claim under any of these provisions.  First, DocMagic asserts that Ellie Mae has not made any factual allegations from which it could be inferred that DocMagic engaged in prohibited conduct with the requisite intent.  Each of the provisions at issue requires that a plaintiff plead and prove that the defendant, in accessing or inducing access to a computer, acted knowingly.  Contrary to DocMagic's characterization of the counterclaim, Ellie Mae adequately alleges that DocMagic acted intentionally and knowingly.  Ellie Mae avers that DocMagic's unauthorized access was "systematic" and "repeated," and involved the use of other parties' license keys and "pre-textual" log-in credentials.  Counterclaim ¶ 20; *see Iqbal*, 129 S. Ct. at 1952 (2009) (holding that factual allegations can permit

33

United States District Court

For the Northern District of California

1    inference of wrongful intent).  Ellie Mae's allegations are therefore sufficient to satisfy the scienter

2    element of its claims under the CFAA.

3           Next, DocMagic argues that using a third-parties' log-in credentials, with the third-parties'

4    consent, to access DocMagic's servers and remove information from the servers, does not, as a

5    matter of law, state a claim for relief.  *See* Counterclaim ¶ 20.  Again, DocMagic is mistaken.

6    "Penal Code section 502 prohibits knowing access, followed by unauthorized (i.e., 'without

7    permission') taking, copying, or use of data," including where the access is by means of a third-

8    parties', voluntarily-provided log-in credentials.  *Facebook, Inc. v. ConnectU LLC*, 489 F. Supp. 2d

9    1087, 1091 (N.D. Cal. 2007) (Seeborg, Mag. J.); *see* Cal. Penal Code § 502(c)(2).[10]  That is exactly

10   the type of conduct described in Ellie Mae's counterclaim.  Accordingly, DocMagic's motion to

11   dismiss the third counterclaim for relief is denied.

12          D.     Fourth counterclaim for relief: breach of the Bridge Agreement

13          Ellie Mae's fourth counterclaim seeks relief for DocMagic's alleged breach of the Bridge

14   Agreement.  Specifically, Ellie Mae alleges that DocMagic breached Section 1 of the Bridge

15   Agreement, which forbade DocMagic from reverse engineering, duplicating, or modifying the

16   ePASS technology to which DocMagic had access under the Bridge Agreement; and that DocMagic

17   breached Section 10.4, which forbade each party from using or disclosing any proprietary

18   information obtained under the Bridge Agreement.  Counterclaim ¶¶ 13, 15-16, 21-22, 68-69; Bridge

19   Agreement at 2, 9.

20          DocMagic argues briefly that Ellie Mae has alleged no facts showing that Section 1 was

21   breached.  However, Ellie Mae has alleged that DocMagic "has reverse engineered, duplicated,

22   modified, and/or otherwise used . . . Ellie Mae Proprietary Information, without Ellie Mae's

23   authorization, to create software [the DocMagic XL program]."  Counterclaim ¶ 21.  Ellie Mae

24   defines "Ellie Mae Proprietary Information" in its counterclaim as "certain confidential or

25   proprietary information" that it provided DocMagic "[i]n connection with the . . . Bridge Agreement

26   . . . to facilitate DocMagic's connectivity with Ellie Mae's licensees through the ePASS technology

27   embedded in the Encompass software."  *Id.* ¶ 13.  These allegations are sufficient to state a claim

28

34

1  that DocMagic violated the Bridge Agreement by reverse engineering, duplicating, or modifying the

2  ePASS technology in order to create DocMagic XL.  While the court agrees with DocMagic that this

3  claim could have been more clearly explained in the counterclaim, Ellie Mae's pleadings are not so

4  deficient as to violate Rule 8(a).

5          DocMagic argues in more detail that Ellie Mae has failed to state a claim for breach of

6  section 10.4 of the Bridge Agreement, because Ellie Mae has not alleged that DocMagic used

7  information "obtained in connection with" the Bridge Agreement outside the purposes of the

8  agreement.  Instead, DocMagic asserts, Ellie Mae has only alleged that DocMagic used information

9  obtained from third parties, such as the Ellie Mae's licensees' license keys and log-in credentials.

10 However, DocMagic misunderstands Ellie Mae's counterclaim.  As noted above, Ellie Mae has

11 defined "Ellie Mae Proprietary Information" in the counterclaim to include information provided to

12 DocMagic under the Bridge Agreement.  *Id.* ¶ 13.  Ellie Mae  alleges that DocMagic "retained its

13 access to Encompass users through the unauthorized and illegal access of Ellie Mae Proprietary

14 Information, including the Encompass SDK."[11]  *Id.* ¶ 68.  Likewise, Ellie Mae alleges that

15 DocMagic used this proprietary information to create the DocMagic XL software.  *Id.* ¶ 21.  Ellie

16 Mae has thus sufficiently alleged that DocMagic breached Section 10.4 of the Bridge Agreement, by

17 using proprietary information acquired under the agreement for purposes not contemplated by the

18 agreement.  Accordingly, DocMagic's motion to dismiss the fourth counterclaim for relief, breach of

19 the bridge agreement, is denied.

20          E.      Fifth counterclaim for relief: inducement of breach of contract

21          Ellie Mae's fifth counterclaim is for inducement of breach of contract, based on its

22 allegations that DocMagic encouraged and instructed Encompass licensees to breach the terms of

23 their licenses with Ellie Mae.  *Id.*  ¶¶ 77-79.  The elements of a claim for inducement of breach of

24 contract, which are identical to the elements for intentional interference with contractual

25 relationships, are discussed above.  DocMagic has moved to dismiss the fifth counterclaim on the

26 grounds that Ellie Mae has not alleged facts sufficient to support any of the elements.

27

28
                                                    35

United States District Court

For the Northern District of California

1    Under *Iqbal* and *Twombly*, Ellie Mae need not identify each and every party that DocMagic

2 induced into breaching contracts with Ellie Mae.  But what Ellie Mae has done—identify a group of

3 entities, Encompass licensees (i.e., entities that had entered into the Encompass Software License

4 Agreement and the Encompass SDK license Agreement), who entered into contracts with Ellie Mae

5 that were breached as a result of DocMagic's conduct—is not sufficient at the pleading stage.

6 Counterclaim ¶ 73-77.  As with DocMagic's IIPEA claim for relief, in order to provide DocMagic

7 with sufficient information to answer the complaint, Ellie Mae must, for at least one actual

8 contractual relationship, plead facts sufficient to satisfy all of the elements of an inducement of

9 breach of contract claim.  Because such allegations are missing from the complaint, DocMagic's

10 motion to dismiss the fifth counterclaim is granted, and the counterclaim is dismissed with leave to

11 amend.

12    F.    Seventh counterclaim for relief: intentional interference with contractual relationships

13    Ellie Mae's seventh counterclaim is for intentional interference with contractual

14 relationships.  *Id.* ¶¶ 89-94.  Although elements required to prove this claim and the inducement of

15 breach of contract are identical, *see* 5 *Witkin, Summary of California Law* § 731, the conduct that

16 Ellie Mae alleges DocMagic engaged in differs in the fifth and seventh counterclaims.

17    In its seventh counterclaim for relief, Ellie Mae alleges that DocMagic interfered with

18 contracts between Ellie Mae and Encompass licensees for Ellie Mae to provide the licensees with

19 document preparation services.  Specifically, Ellie Mae alleges that it had "contractual relationships

20 with various Ellie Mae Clients . . . for access to closing document preparation software through

21 Encompass."  Counterclaim ¶ 89.  Ellie Mae also avers that "DocMagic, knowing of Ellie Mae's

22 contractual relationships with the Ellie Mae Clients, intended to and did disrupt the contractual

23 relationship between Ellie Mae and the Ellie Mae Clients by promoting and inducing the direct

24 access to DocMagic Products by the Ellie Mae Clients in lieu of accessing Rebranded [DocMagic]

25 products from Ellie Mae."  *Id.* ¶ 91.  This claim, however, contains a fatal defect; it fails to include

26 an allegation that contracts for document preparation services, as opposed to the possibility of

27 contracts for document preparation, existed between Ellie Mae and Encompass users.  As alleged,

28

United States District Court

For the Northern District of California

the Encompass and Encompass SDK license agreements precluded Encompass users from using document preparation services other than Ellie Mae's re-branded DocMagic service or those on the ePASS network.  But nowhere has Ellie Mae alleged that Encompass users were required to purchase any document preparation services.  Ellie Mae alleges only that "Ellie Mae has entered into valid contractual relationships with various Ellie Mae Clients . . . for *access* to closing document preparation software."  *Id.* ¶ 89 (emphasis added).  The access to closing document preparation software is not a contractual provision that could be breached by the Ellie Mae clients; the access is a right or privilege, not a duty or obligation.  The only inference that can be drawn from the counterclaim is that it was necessary for Encompass users to enter into a separate contract with a loan document preparation service provider, either Ellie Mae or another loan document service provider on the ePASS network, in order to have loan documents prepared.  And only if DocMagic induced Ellie Mae clients to breach that second contract could this distinct claim for intentional interference with a contractual relationship stand.  Because the counterclaim fails to allege that such contracts actually existed or were breached due to DocMagic's conduct, DocMagic's motion to dismiss the seventh counterclaim for relief is granted, and the counterclaim is dismissed with leave to amend.

       G.    <u>Eighth counterclaim for relief: intentional interference with prospective economic advantage</u>

    Ellie Mae's eighth counterclaim is for intentional interference with prospective economic advantage ("IIPEA"), based on DocMagic's actions in creating the DocMagic XL program and soliciting Ellie Mae's customers to use DocMagic's services (via the DocMagic XL adapter) rather than Ellie Mae's.  *Id.* ¶¶ 96-98; *see also* Docket No. 54 (Ellie Mae Opp'n) at 18.  The elements of an IIPEA claim are discussed above.

    The conduct at issue in the eighth counterclaim for relief is similar to, albeit slightly more expansive than, that alleged in the seventh counterclaim for relief.  Ellie Mae alleges that it had "valid and existing business relationships with the Ellie Mae Clients," Counterclaim ¶ 96, and has defined "Ellie Mae Clients" as the Encompass users who had access to Ellie Mae's re-branded document preparation services, *id.* ¶ 29.  Ellie Mae further avers that DocMagic was aware of the

1    relationships, acted to and actually did disrupt the relationships, thereby causing Ellie Mae damages.

2    *Id.* ¶ 97-101.

3        As with DocMagic's IIPEA claim, Ellie Mae's cause of action must be dismissed for failure

4    to identify at least one specific, ongoing business relationship that was disrupted by DocMagic.  The

5    generalized reference to Encompass users is too broad to provide DocMagic with sufficient

6    information to answer the counterclaim.  Accordingly, DocMagic's motion to dismiss the eighth

7    counterclaim for relief is granted, and the counterclaim is dismissed with leave to amend.  In

8    amending the counterclaim, Ellie Mae must, for at least one actual relationship, plead facts sufficient

9    to satisfy all of the elements of an IIPEA claim.

10        H.   Ninth counterclaim for relief: unfair competition

11       Ellie Mae's ninth counterclaim alleges that DocMagic's conduct, as described throughout the

12   counterclaim, constitutes unfair competition in violation of California's Unfair Competition Law,

13   Cal. Bus. & Prof. Code § 17200 *et seq.*  From the counterclaim itself, which simply "realleges and

14   incorporates by reference all previous paragraphs of its Counterclaim . . . ," Counterclaim ¶ 102, it is

15   difficult to discern under which prong of the UCL Ellie Mae seeks to ground its claim.  At the

16   hearing on this motion, however, Ellie Mae explained that it was pursuing a UCL claim under only

17   the unfair prong.  As is discussed above an "unfair" business act or practice is "conduct that

18   threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those

19   laws because its effects are comparable to or the same as a violation of the law, or otherwise

20   significantly threatens or harms competition." *Cel-Tech*, 20 Cal. 4th at 187.

21       Even at the pleading stage, Ellie Mae's counterclaim, which does not identify a single

22   specific instance of unfair competition by DocMagic, is too vague and conclusory to support a viable

23   cause of action.  At the hearing, Ellie Mae indicated, in a general manner, that DocMagic's actions

24   have allowed it to acquire an advantage over other DPS providers.  Not only is the purported

25   "advantage" not specified in the counterclaim, but the counterclaim makes no attempt to explain

26   how that "advantage" was accomplished by means of conduct that violated or threatened a violation

27

28

United States District Court

For the Northern District of California

1   of an antitrust law.  Accordingly, DocMagic's motion to dismiss the ninth counterclaim is granted,

2   and the counterclaim is dismissed with leave to amend.

3                                                     * * * * *

4            In summary, DocMagic's motion to dismiss Ellie Mae's first through fifth and seventh

5   through ninth counterclaims for relief is GRANTED in part and DENIED in part.  The second

6   (CFAA), fifth (inducement of breach of contract), seventh (intentional interference with contractual

7   relationship), eighth (intentional interference with contractual relationship) and ninth (IIPEA)

8   counterclaims are dismissed with leave to amend.  In all other respects, DocMagic's motion is

9   denied.

10

11  CONCLUSION

12           Ellie Mae's motion to dismiss is GRANTED in part and DENIED in part.  DocMagic's first

13  (monopoly leveraging), third (refusal to deal), fourth (denial of access to essential facility), seventh

14  (copyright infringement), eighth (intentional interference with contractual relationship), and ninth

15  (IIPEA) claims for relief are dismissed with leave to amend.  DocMagic's second (attempted

16  monopolization) and sixth (false advertising) claims for relief are dismissed without leave to amend.

17  DocMagic's thirteenth claim for relief (UCL) is dismissed with leave to amend to the extent it is

18  predicated on a violation of the UCL's unfair prong.  In all other respects, Ellie Mae's motion to

19  dismiss is denied.

20           DocMagic's motion to dismiss Ellie Mae's first through fifth and seventh through ninth

21  counterclaims for relief is GRANTED in part and DENIED in part.  The second (CFAA), fifth

22  (inducement of breach of contract), seventh (intentional interference with contractual relationship),

23  eighth (intentional interference with contractual relationship) and ninth (IIPEA) counterclaims are

24  dismissed with leave to amend.  In all other respects, DocMagic's motion is denied.

25                                                    * * * * *

26           In conclusion, the court observes that the parties have done little to efficiently and effectively

27  manage this case.  Good lawyering does not require pleading every cause of action that may even

28

United States District Court

For the Northern District of California

1  remotely appear possible.  Rather, it requires careful analysis and selectivity.  To assist in this

2  endeavor the parties shall submit with their amended complaint proposed jury instructions necessary

3  to each claim the party asserts.

4

5         IT IS SO ORDERED.

6

7  Dated: 10/12/2010

8         _____
       MARILYN HALL PATEL
       United States District Court Judge
       Northern District of California

United States District Court

For the Northern District of California

40

**ENDNOTES**

1.  Elsewhere in the complaint, DocMagic alleges only that Ellie Mae is *able* to obtain a market share of over 50%, but not that it has already done so. Compl. ¶¶ 127-28. Construing the complaint liberally, the court assumes that DocMagic is alleging that Ellie Mae currently possesses a 60% market share in the DPS market.

2.  Monopoly leveraging constitutes the use of monopoly power in one market to acquire, or attempt to acquire, monopoly power in a related product market. *Image Technical Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1208 (9th Cir. 1997).

3.  In general, a company has the right to deal or not to deal with another party at its own discretion. *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko*, 540 U.S. 398, 408 (2004). However, that right is not absolute; a company may not refuse to deal in circumstances where "a refusal to cooperate with rivals [would] constitute anticompetitive conduct and violate [15 U.S.C.] § 2." *Id.* The Ninth Circuit has pointed out three factors which can indicate to a court that a particular refusal to deal was anticompetitive: the unilateral termination of a voluntary and profitable course of dealing, a refusal to sell to a competitor at the same price offered to non-competitors, and the refusal to sell products to a competitor that are being offered at retail to other customers. *MetroNet Servs. Corp. v. Qwest Corp.*, 383 F.3d 1124, 1132-34 (9th Cir. 2004). A refusal to deal need not be absolute in order to be actionable. "An offer to deal with a competitor only on unreasonable terms and conditions can amount to a practical refusal to deal." *Id.* at 1132.

4.  "A company which has monopoly power over an essential facility may not refuse to make the facility available to others when there is no legitimate business reason for the refusal. The wrong perpetrated by that misuse of the facility is that a monopolist 'can extend monopoly power from one state of production to another, and from one market to another.'" *City of Anaheim v. S. Cal. Edison Co.*, 955 F.2d 1373, 1379 (9th Cir. 1992) (quoting *MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*, 708 F.2d 1081, 1132 (7th Cir. 1983)); *accord MetroNet*, 383 F.3d at 1128-29.

     For a facility to be essential, it must be otherwise unavailable, and impossible to reasonably or practically replicate. *MetroNet*, 383 F.3d at 1129-30. Furthermore, "[a] facility that is controlled by a single firm will be considered 'essential' only if control of the facility carries with it the power to *eliminate* competition in the downstream market." *Alaska Airlines, Inc. v. United Airlines, Inc.*, 948 F.2d 536, 544 (9th Cir. 1991) (emphasis original).

5.  The three factors necessary for showing indirectly that a defendant possesses market power demonstrate that the market will not function efficiently if the defendant raises its prices. In an efficient market, when a large producer sets artificially high prices, consumers will switch from that producer to other producers who sell at efficient prices. The demand of these switching consumers is met either by increased production from other producers already in the market or by new competing producers entering the market. In either case, the price in the market does not rise or does so only briefly—the large producer charging a price above the market price simply loses business. However, if either of the mechanisms for meeting the increased demand is unavailable, then consumers will be unable to switch away from the large producer, and so will be forced to pay the large producer's artificially high prices. In this situation, the large producer has monopoly power, because it can control the market price of its goods. *See generally* Areeda ¶ 501.

6.  The court expresses no opinion as to whether the submarket consisting of document preparation services provided to Encompass users or ePASS users could constitute a properly defined submarket, within which Ellie Mae has non-contractually-acquired market power, for the purposes of an antitrust claim. *See Newcal*, 513 F.3d at 1045-51.

United States District Court

For the Northern District of California

41

United States District Court

For the Northern District of California

7.  Because DocMagic is alleging trade dress in its product design, rather than product packaging, it is not permitted, as a matter of law, to allege that its trade dress is inherently distinctive; to satisfy the first element of a trade dress claim it must allege secondary meaning.  *See Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 212-214, 216 (2000).

8.  It should also be noted that in a post-hearing submission, DocMagic admitted it does not hold a registered trademark in either of the words, nor has it applied for one.

9.  To the extent that Ellie Mae relies on the allegations in Counterclaim ¶ 20 to support its claim of direct copyright infringement, DocMagic properly notes that Ellie Mae has failed to identify which "confidential materials" are it issue, and whether Ellie Mae holds a copyright in the unidentified "confidential materials."  In paragraphs 26 and 27, the only copyrights that Ellie Mae asserts that DocMagic infringed are the copyrights for Encompass and the Encompass SDK.  To the extent the counterclaim could be read to allege that DocMagic infringed any other copyrights, those allegations are stricken.

10.  The cases upon which DocMagic relies to argue the opposite position, cases which arise under the CFAA, not the CCDAFA, are readily distinguishable.  In *AtPac, Inc. v. Aptitude Solutions, Inc.*, No. CIV. 2:10294 WBS KJM, 2010 WL 1779901 (E.D. Cal. Apr. 29, 2010), and *SecureInfo Corp. v. Telos Corp.*, 387 F. Supp. 2d 593 (E.D. Va. 2005), the plaintiffs brought suit against the defendants when the defendants accessed computers belonging to third parties, with the third parties' authorization, and viewed plaintiffs' proprietary information stored on the third parties' computers.  *See AtPac*, 2010 WL 1779901, at *6; *SecureInfo*, 387 F. Supp. 2d at 608-09.  Ellie Mae, however, alleges that DocMagic accessed Ellie Mae's own computers, not merely that DocMagic obtained Ellie Mae's proprietary information by accessing a third-party's computers.  *See* Counterclaim ¶ 20.  This allegation states a claim under the CCDAFA.  *See AtPac*, 2010 WL 1779901, at *6 (holding that CFAA claim may lie where the defendant "uses subterfuge—like using user names and passwords that do not belong to it—to gain access to plaintiff's protected materials *on plaintiff's own website, computer, or servers*") (emphasis added); *State Analysis, Inc. v. Am. Fin. Servs. Ass'n*, 621 F. Supp. 2d 309, 316 (E.D. Va. 2009).  Ellie Mae need not also allege that DocMagic lacked the permission of those third parties to use the third parties' license keys or passwords.

11.  The court notes that paragraph 68 of Ellie Mae's counterclaim indicates that the Encompass SDK was included in the Ellie Mae Proprietary Information provided to DocMagic under the Bridge Agreement, whereas paragraph 14 of the counterclaim indicates that DocMagic was not given an Encompass SDK license key.  The court assumes, as it must, that both of these allegations are true.