NOAH BRUMFIELD (SBN 203653)
nbrumfield@whitecase.com
ELLEN MCGINTY KING (SBN 71490)
eking@whitecase.com
JEREMY K. OSTRANDER (SBN 233489)
jostrander@whitecase.com
**WHITE & CASE LLP**
3000 El Camino Real
Five Palo Alto Square, 9th Floor
Palo Alto, CA 94306
Telephone: (650) 213-0300
Facsimile: (650) 213-8158

Attorneys for Defendant/Counterclaimant
ELLIE MAE, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| DOCMAGIC, INC., <br><br>        Plaintiff,<br><br>    v.<br><br>ELLIE MAE, INC.,<br><br>        Defendant.<br><br>AND RELATED COUNTERCLAIM | Case No. 3:09-CV-4017-MHP<br><br>**DECLARATION OF JONATHAN CORR IN OPPOSITION TO DOCMAGIC'S APPLICATION FOR A TEMPORARY RESTRAINING ORDER**<br><br>JURY TRIAL DEMANDED<br><br>Date:      October 25, 2010<br>Time:     2:00 p.m.<br>Ctrm:     15<br><br>Hon. Marilyn Hall Patel |

1    I, Jonathan Corr, declare as follows:

2    1.    I am the Chief Strategy Officer for Ellie Mae, Inc. ("Ellie Mae") and have held that position since August 2005. I am responsible for overall business strategy, marketing, business development and product management at Ellie Mae. I make this declaration in opposition to the application for a temporary restraining order filed herein by DocMagic, Inc. ("DocMagic"). Unless otherwise indicated below, I have personal knowledge of the facts set forth herein and would be competent to testify thereto if called upon to do so.

**The Ellie Mae Software License**

2.    Among other things, Ellie Mae provides loan origination software ("LOS") known as Encompass to mortgage loan brokers and mortgage lenders. Ellie Mae also provides an Internet-based platform ("ePASS") which allows Ellie Mae's licensees to access the websites of providers of other mortgage-related services while remaining in the Encompass software environment. There are a variety of loan service providers (*e.g.,* appraisers) available on ePASS, including nine document preparation vendors independent of Ellie Mae.

3.    When an Ellie Mae licensee uses Encompass software, the licensee inputs data about a prospective borrower. This and other data about the loan are inputted into the Encompass software under measures designed to protect the security and confidentiality of the data, but the data entered by the licensee is the property of the licensee.

4.    DocMagic's TRO argument includes a claim that Ellie Mae is attempting to "prevent… Encompass users from accessing loan data to do business with DocMagic." (MPA at 5:16-18). This statement is false and is not (and cannot be) supported by any facts. There is no such restriction on an Ellie Mae licensee's access to its loan data. Licensed Encompass users have unfettered access to the loan data that they input into Encompass. For the Encompass licensees that host the Encompass software on their own computers and servers, the loan data resides on hardware that is under their own control and not Ellie Mae's. For Encompass licensees that are hosted on Ellie Mae servers, access is similarly free.

5.    In addition, Encompass licensees are free to provide their loan data to DocMagic or to any other third party vendor, provided that the method of transmission is conducted within

1   the rights provided to them under the controlling license agreement.  At the same time, however,
2   Encompass licensees are not free to violate the terms of their license.

3         6.      An Encompass licensee expressly agrees to refrain from using the Ellie Mae
4   Software Development Kit ("SDK") to transfer loan data to a third party service provider that is
5   not an ePASS partner.

6         7.      Prior to August 2009, Ellie Mae licensed the Encompass software and
7   corresponding SDK under separate licenses.  In August 2009, Ellie Mae combined the licenses
8   into a standard license agreement for both the Encompass LOS software and the accompanying
9   SDK.  The license specifically provides that the licensee is not allowed to use the SDK to transfer
10  data from Encompass software to a third party service provider without prior written approval.
11  As an example, attached hereto as Exhibit A is a true and correct copy of the license to GMI
12  Home Loans LLC dated August 16, 2010.  The agreed upon prohibition on the unauthorized
13  transfer of data is set forth at Section 1.3.

14        8.      All customers that are current users of the Encompass LOS software, including the
15  SDK, have agreed to Ellie Mae's standard license terms.  In addition to GMI Home Loans
16  mentioned above, other customers that have agreed to the SDK license terms and limitations on
17  use include those identified in DocMagic's Application: National Fidelity Mortgage, Cross River
18  Bank, Network Capital, Mariner's Bank, and Franklin First Financial.  None of these customers
19  identified in DocMagic's Application has received written approval from Ellie Mae to use the
20  SDK to transfer data from Encompass to a third party provider.

21  **DocMagic's Efforts to Connect With and Pull Data From Encompass is Prohibited**

22        9.      I have read the declarations of Don Iannitti and Roland Garza in support of
23  DocMagic's application for a temporary restraining order.  In those declarations, both Mr. Iannitti
24  and Mr. Garza state that DocMagic developed a custom input form that allows Encompass
25  licensees to transfer data from Encompass Banker to DocMagic. (I understand that the creation
26  of custom input forms is discussed more fully in an accompanying declaration of Ken Kolda.)  I
27  have also read the declaration of Michael Morford in which he states that DocMagic has
28  conducted over 168,000 transactions that transferred data from Encompass to DocMagic by use

1   of the custom input form that pulls data from Encompass. To the extent that these transactions
2   were conducted by using the SDK to create code for a custom input form, the transactions were in
3   violation of the applicable license restrictions.

4       10.    In addition to the use of the SDK in conjunction with custom input forms, Mr.
5   Iannitti admits in paragraph 8 of his declaration that DocMagic has also used the SDK in
6   conjunction with its "DocMagic XL software" to pull mortgage data from Encompass. Use of the
7   SDK for such a purpose is expressly prohibited by the license, regardless of whether it is through
8   creation of custom input forms or use of DocMagic's XL software.

9       11.    Ellie Mae has no objection to DocMagic creating custom input forms for an
10  Encompass licensee, provided that DocMagic does not violate the Ellie Mae license terms agreed
11  to by its customers. DocMagic itself has no license from Ellie Mae to use the SDK. However, if
12  DocMagic attaches *code designed to transfer data* to DocMagic – whether in the form of a DLL
13  or otherwise – Ellie Mae does object because this involves DocMagic's unlicensed use of the
14  SDK.

15      12.    By instituting an impermissible method of transferring data from Encompass,
16  DocMagic has put Ellie Mae licensees at risk. DocMagic has induced licensees to breach their
17  license from Ellie Mae.

18      13.    Under the Ellie Mae license agreement agreed to by Ellie Mae customers, Ellie
19  does not take ownership of the loan data that is entered into Encompass by an Ellie Mae
20  customer. Customers in either a hosted or non-hosted situation determine what data to input, how
21  to use the data, and whether to maintain or delete the data.

22      14.    Encompass users can extract data from the LOS at any time. The customer is able
23  to transmit that information electronically using a publicly available DU format, a method that is
24  commonly used. The customer can also transmit data over the ePASS network. Based on the fact
25  that Ellie Mae Encompass customers use document preparation solutions outside the Ellie Mae
26  environment for an estimated 75% or more of Encompass-originated transactions, these users
27  clearly are able to exercise complete control over the data they maintain in Encompass.

28

- 3 -    DECL. OF JONATHAN CORR IN OPP.
TO DOCMAGIC'S APP. FOR A TRO
Case No. 3:09-CV-4017-MHP

WHITE & CASE LLP

**The Maintenance of Data Protection Measures is Critical to Protecting Ellie Mae's Customers and Maintaining the Reputation and Goodwill of the Ellie Mae Business**

15. The use of malicious software is well known, whether it is spam, a virus, or software that collects data from the user's computers. If software outside Ellie Mae's control, such as the DocMagic software, can access Ellie Mae software and pull data from Ellie Mae software as described at footnote 1 and page 5 of the DocMagic Application for a Temporary Restraining Order, Ellie Mae is at risk of harm to its reputation and goodwill.

16. Ellie Mae's Encompass product is marketed as a controlled loan origination software environment.

17. Ellie Mae has invested significant money, time, and other resources toward making sure its software and the data customers entrust to Ellie Mae's software are secure.

18. To maintain this controlled environment, Ellie Mae's software uses encryption to protect customer data and to protect the integrity of the system.

19. Ellie Mae software provides encryption for transactions made via ePASS.

20. Ellie Mae also provides encryption through the SDK for transactions with a limited number of approved third-party service providers that are executed in accordance with the SDK license.

21. Maintaining software integrity and quality requires Ellie Mae to monitor the interaction with Ellie Mae software by third party software.

22. Access to third-party software is permitted through the SDK and under the SDK license as long as data integrity and security procedures and protocols are met.

23. DocMagic could develop an independent process that enabled its customers to pull data from Encompass without using the encryption capabilities of the SDK, but this approach would not protect customer data. If DocMagic created software that directly interacted with and pulled data out of Encompass, such a step would risk the integrity of the Encompass system. In order to take advantage of the SDK's encryption capabilities, DocMagic would require a license.

24. Ellie Mae's monitoring and patches to fix unauthorized connections to its software are steps taken in response to the industry's and Ellie Mae's heightened concern over security and best practices for loan origination.

25. If third-party software is able to work around Ellie Mae's protections, there is the risk to Ellie Mae's business that customers will view its Encompass environment as unsecure. If anyone could create software that could pull data from Encompass, Ellie Mae's business would be at risk.

26. Because a breach of security only has to occur once to have a detrimental effect on Ellie Mae's reputation and goodwill with its entire customer base, Ellie Mae's software does not permit unsecured interactions with third-party software applications. This is a function of the software to meet customer security requirements and applies to third-party software generally, not just DocMagic software. For example, it is not possible to integrate Microsoft Outlook email software to enable the emailing of Encompass-based loan files. If such a breach of security is permitted by a licensed customer, then the customer may be in violation of its license agreement (the "Encompass360 Software License Agreement") and at risk of liability for any damage caused by the unauthorized access.

27. To avoid the risk of such a breach, Ellie Mae monitors its Encompass environment to ensure that any third-party connections are authorized under the controlling agreements.

**Ellie Mae's Software Protections Provide Valuable Peace of Mind to Customers Who are Subject to the FTC's Safeguard Rule and the Gramm-Leach-Bliley Act**

28. The steps that Ellie Mae takes to protect its software from unauthorized breaches by third-party software is also undertaken to comply with the Federal Trade Commission's Safeguards Rule ("Safeguards Rule") and the Gramm-Leach-Bliley Act ("GLB").

29. In response to the Safeguards Rule and GLB, Ellie Mae's customers implement security measures to protect the confidentiality and integrity of their customer's financial information. Ellie Mae's customers are required to only select and use service providers capable of maintaining appropriate safeguards for their customer's personal information under the Safeguards Rule and the GLB.

30. Accordingly, Ellie Mae actively implements and maintains safeguards in its software to detect targeted or even indirect contact by third-party software.

31. If Ellie Mae did not take steps to block third-party software attacks, Ellie Mae would lose the trust of its customers.

32. Connections to and transmission of data out of Ellie Mae's controlled environment poses a significant risk of misuse of consumers' financial information. It increases the risk, for example, of identity theft and fraud if a loan originator transmits customer information from the secure Encompass and ePass system in an unsecured manner, and increases the risk of data theft and exposure under the Safeguards Rule.

33. In light of the risks associated with meeting the requirements of the Safeguards Rule, Ellie Mae's customers expect Ellie Mae to adopt measures that help its customers keep consumer loan information secure. Ellie Mae's security safeguards are, thus, part of its customers' efforts to maintain a comprehensive security program with appropriate technical safeguards.

34. Ellie Mae's reputation will be put at risk if data theft and security breaches of a customer are associated with Ellie Mae's software, which is marketed to customers as a secure environment.

35. Data transmission via third-party software poses a real and serious risk of exposing sensitive and protected customer information and data to unauthorized third parties. When a problem arises and an individual's data is stolen or misused, Ellie Mae does not want to be put in the position of debating with a third party software provider over whose security system is at fault.

**Ellie Mae's Software Protections Also Respond to the Need of Ellie Mae's Customers to Meet Fannie Mae's Best Practices Requirements**

36. Ellie Mae customers sell their loans directly or indirectly to Fannie Mae. Fannie Mae requires vendors to protect consumer financial information. Because fraud and identity theft can result from the unsecured sharing of personal information during the loan origination process, Fannie Mae expects both financial institutions and their software partners to adopt and implement

1  best loan origination practices consistent with Fannie Mae's "Seller's Guide" and Master

2  Agreement with lenders.  Fannie Mae requires lenders to select and retain service providers,

3  including software providers, that implement and maintain appropriate safeguards to prevent

4  unencrypted data transfers and unauthorized access to or interaction with the software.

5      37.    Ellie Mae is thus expected to establish secure formats for the exchange of personal

6  data to the extent the software is used to communicate with third party systems or software.

7      38.    Consistent with industry best practices, Ellie Mae regularly monitors for attempted

8  breaches in their software security, and updates and maintains the security of its software.

9      39.    Ellie Mae thus continuously updates its software to block unauthorized third-party

10  software connections.

11  **Compensation for Use of Ellie Mae's Intellectual Property**

12      40.    As described, Ellie Mae has valuable intellectual property that is protected by

13  copyright.

14      41.    Customers and third-parties that wish to use the Encompass software, the SDK, or

15  ePASS compensate Ellie Mae by agreeing to license terms.

16      42.    DocMagic has no license to use any of Ellie Mae's intellectual property.

17      43.    DocMagic cannot use Encompass by communicating and interacting with

18  Encompass unless it has a license.

19      44.    DocMagic's unlicensed software connections to Encompass have been blocked

20  just as Ellie Mae blocks unauthorized access to Encompass by other third-parties, to protect Ellie

21  Mae's software, intellectual property, and customers and against the risks posed by connections to

22  Ellie Mae's software environment outside Ellie Mae's control.  If DocMagic wants authorized

23  access to Encompass, it must become an authorized licensee under the same terms as its other

24  competitors.

25  **Ellie Mae's LOS "Market Share" is Modest, and There are Numerous Alternatives**

26  **to Encompass**

27      45.    Ellie Mae is one of many alternative suppliers of LOS software.   Ellie Mae

28  provides its LOS product, known as Encompass, to mortgage lenders, including loan brokers and

1  mortgage loan bankers. According to third-party estimates, as much as 65% or more of U.S.
2  lenders use LOS alternatives to Ellie Mae's Encompass software. (This percentage is actually
3  higher than 65% because the study excluded the so-called "mega-lenders" who all have internal
4  proprieatry LOS systems.)

5  46. According to the most recent study of market share by a respected third party,
6  roughly 65% of lenders use an LOS alternative *other than* Ellie Mae's product offering. Attached
7  as Exhibit B hereto is a true and correct copy of the Mortgage Lenders 2010 Study by Access
8  Mortgage Research & Consulting, Inc., showing the share of customers by Ellie Mae is *not more*
9  *than 35.1%.*

10  47. According to this Access Mortgage Research study, approximately 11% of lenders
11  use either no LOS at all or an internal solution. This confirms that traditional loan origination
12  methods and internal solutions are also competitive with Ellie Mae's LOS.

13  **Ellie Mae's Document Closing Service "Market Share" Does Not Exceed 12%**

14  48. Of the home loan transactions closed in 2009 nationwide, Ellie Mae provided
15  closing documents for an estimated 5-7% of closed transactions. This calculation is based on
16  Ellie Mae's estimated LOS share of 35.1% per Access Mortgage Research and the fact that no
17  more than 15-20% of Ellie Mae's mortgage lender customer transactions are closed with Ellie
18  Mae Docs.

19  49. I understand DocMagic asserts that there may be a market for closing documents
20  derivative of Encompass and, thus, measured by the number of closing transactions originated
21  with the Encompass software. DocMagic's assertion that Ellie Mae has "leveraged" its
22  Encompass software or ePASS post-DocMagic is demonstrably false.

23  50. In fact, the "share" of Encompass-originated transactions closed using either Ellie
24  Mae Docs or a independent vendor service available on ePASS *declined* after DocMagic left
25  ePASS. The percentage of Encompass-originated transactions that closed with either the Ellie
26  Mae Docs service or an ePASS vendor's service peaked at 36% in June 2009. By contrast, the
27  percentage of transactions for the next 12 months that were originated with Encompass and
28

1  closed with either the Ellie Mae Docs service or an ePASS vendor's service averaged 22% and
2  never exceeded 80% of the June 2009 peak.

3    51.    The following sets out the share of closing document services provided to Ellie Mae Encompass users:

    a. Pre-DocMagic Exit From ePASS.  For the 12 months prior to when DocMagic exited ePASS (September 2008 through August 2009), Encompass was used to originate approximately 1.9 million closed loans.

        i. Approximately 88% of closing documents for loans originated via Encompass were closed using a non-Ellie Mae service.

        ii. Even if closing services provided by non-Ellie Mae vendors on ePASS are included with Ellie Mae's share, that still means approximately 75% of Ellie Mae-originated transactions were closed outside the Encompass environment allegedly "controlled" by Ellie Mae.

        iii. Ellie Mae's share of closing document services provided on Encompass-originated transactions was approximately 12%.

        iv. Other vendors on ePASS provided closing document services to an additional 13% of Encompass-originated transactions that closed.

        v. DocMagic was by far the largest document service vendor measured by share of transactions on ePASS, completing approximately 75% or more of ePASS-based closing document orders.

    b. Post-DocMagic Exit from ePASS.  For the 12 months after DocMagic exited ePASS (September 2009 through August 2010), Encompass was used to originate approximately 1.5 million closed loans.

        i. Approximately 85% of closing documents for loans originated via Encompass were closed using a non-Ellie Mae service.  Even if closing services provided by non-Ellie Mae vendors on ePASS are included with Ellie Mae's share, that still means approximately 78% of Ellie

1    Mae-originated transactions were closed outside an Ellie Mae
2    environment.
3        ii. Ellie Mae's share of closing document services provided on
4            Encompass-originated transactions was approximately 15.5%, a year-
5            over-year increase of 3.5%.
6        iii. With the departure of DocMagic as a closing document provider on
7            ePASS, the share of ePASS vendors fell by a little more than half, from
8            13% to 6% on a year-over-year basis.
9        iv. Unlike when DocMagic dominated ePASS, in the 12 months after
10           DocMagic's exit from ePASS, no vendor had a share of ePASS-based
11           transactions exceeding 45%. IDS, the vendor with the largest share of
12           ePASS-based transactions, completed approximately 42% of such
13           transactions. Schwartz had the second largest share (22%) and MRG
14           had the third largest share (14%).
15   I declare under penalty of perjury under the laws of the United States that the foregoing is
16   true and correct.
17
18   Dated: October 18, 2010            /s/ Jonathan Corr

**ATTESTATION OF E-FILED SIGNATURE**

I, Jeremy K. Ostrander, am the ECF User whose ID and Password are being used to file this Declaration. In compliance with General Order 45, X.B., I hereby attest that Jonathan Corr has concurred in this filing.

Dated: October 18, 2010  /s/ Jeremy K. Ostrander