United States District Court

For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

DOCMAGIC, INC., a California corporation

          Plaintiff,

  v.

ELLIE MAE, INC., a Delaware corporation,

          Defendant.

No. 3:09-CV-4017-MHP

**MEMORANDUM & ORDER**

**Re: Defendant's Motion for Partial Summary Judgment; Plaintiff's Application for a Temporary Restraining Order**

      Plaintiff DocMagic, Inc. ("DocMagic") brought this action against Ellie Mae, Inc. ("Ellie Mae") alleging, *inter alia*, that Ellie Mae denied DocMagic access to Ellie Mae's online transaction network and loan origination software ("LOS") in order to monopolize the market for online loan document preparation services ("DPS"). Now before the court is: (1) Ellie Mae's motion for summary judgment on the First (monopoly leveraging), Second (refusal to deal) and Third (denial of access to an essential facility) Claims for Relief in DocMagic's Second Amended Complaint; and (2) DocMagic's application for a temporary restraining order. Having considered the parties' arguments and submissions, and for the reasons discussed below, the court enters the following memorandum and order.

BACKGROUND

As required in considering motions for summary judgment, the following facts are set forth in terms most favorable to DocMagic, except where noted otherwise.

I.     Loan preparation

Loan preparation typically begins when a loan originator, such as a mortgage broker or a lender, enters data about the prospective loan into a computer program known as a LOS.  Second Am. Compl. ("SAC") ¶¶ 29-30.  The advantage of using an LOS is that once the information has been entered into the LOS, the LOS can provide that data in an electronic format to compatible computer programs, making it unnecessary to engage in the time-consuming and error-prone process of manually re-keying the loan information.  *Id.* ¶ 30.  Large lenders, like Bank of America and Wells Fargo, develop their own proprietary LOSs.  Docket No. 113 (Iannitti Decl.) ¶ 3.  The rest of the market uses third-party LOSs, which are produced by a number of different companies.  *Id.*

Settlement service providers, or "vendors," can use the electronically-stored data in the LOS to perform the various tasks necessary to actually prepare a loan.  The services provided by these vendors include, for example, DPS, appraisals, credit reports, fraud reports, flood information and title and escrow services.  *Id.* ¶ 4.  However, a vendor will only be able to use the data in the LOS if the LOS and the vendor's own programs are compatible.  In order to connect a loan originator to a vendor and ensure that the loan originator's LOS is compatible with the vendor's programs, corporations set up online transaction networks.  These networks permit loan originators to find and hire vendors providing the services they need.  Docket No. 96 (Roof Decl.) ¶ 4.  A network can also automatically convert the data in the loan originator's LOS into a format that the vendor can use.  SAC ¶¶ 21-22.  Loan originators usually can join and use a network for free, whereas vendors typically pay a fee to the network operator for every transaction the vendor completes over the network.  If a vendor is not connected to a network, it is more difficult to achieve compatibility between the LOS and the vendor's programs.  *Id.* ¶¶ 21-26.

2

**United States District Court**
For the Northern District of California

II.     DocMagic, Ellie Mae and their contractual agreements

Ellie Mae is an LOS developer, and the creator of an LOS called Encompass.  Roof Decl. ¶ 3.  According to DocMagic, Ellie Mae's share of the third-party LOS market is greater than 50%, and probably greater than 60%.  SAC ¶ 105.  Ellie Mae contests these figures.  Ellie Mae is also the owner and operator of ePASS,[1] an online transaction network of the type described above.  Roof Decl. ¶ 3.  ePass allows data already entered in a LOS to be seamlessly transferred to and used by participating vendors.  Iannitti Decl. ¶ 4.  According to DocMagic, Ellie Mae's share of the network market is as much as 60%.  SAC ¶ 99.

DocMagic is a vendor providing DPS to mortgage lenders.  Iannitti Decl. ¶ 2.  Nearly all of DocMagic's clients use an LOS to manage mortgage loan transactions.  Ellie Mae's product, Encompass, is the leading LOS product in the United States.  *Id.* ¶ 3.

In November 2003, Ellie Mae and DocMagic entered into an Electronic Bridge Agreement ("Bridge Agreement").  Docket No. 109 (Joint Statement of Undisputed Facts ("JSUF")) ¶ 1.  Pursuant to that agreement, DocMagic became a vendor on ePASS.  *Id.* ¶ 2.  In exchange for access to the network, DocMagic agreed to pay a fee of $1, $2, or $3 per transaction that it made over ePASS, depending on the monthly volume of DocMagic's transactions.  *Id.* ¶ 3.  Effective September 1, 2006, DocMagic and Ellie Mae amended the Bridge Agreement.  *Id.* ¶ 4.  The amendment provided that the Bridge Agreement would automatically renew each year, except that it could be terminated 90 days before the beginning of the next automatic renewal.  Price terms were also adjusted such that DocMagic agreed to pay a fee based on a sliding scale of $1 or $3 per transaction, depending on the monthly volume of DocMagic's transactions.  *Id.*  In September 2006, Ellie Mae and DocMagic also entered into a Reseller Agreement.  Roof Decl. Exh. E.  Under the Reseller Agreement, Ellie Mae was permitted to "resell" DocMagic closing document services under Ellie Mae's brand names.  *Id.* ¶¶ 2.1, 2.6.

On April 27, 2009, Ellie Mae sent DocMagic notice terminating the Reseller Agreement JSUF ¶ 8; Roof Decl., Exh. F.  On April 28, DocMagic likewise sent Ellie Mae notice terminating

the Reseller Agreement.  JSUF ¶ 9; Roof Decl., Exh. G.  On May 21, Ellie Mae sent DocMagic

notice terminating the Bridge Agreement stating in relevant part:

> "Ellie Mae, Inc. is providing the required 90 days' notice to terminate our Electronic Bridge Agreement…This termination will be effective on August 30, 2009, and on that day...[DocMagic] will stop using the Electronic Bridge. We are taking this action because the transaction fee amounts that you are currently paying are significantly discounted from our normal fees. If you would like to discuss this, please let me know…Do not hesitate to contact me if you have any questions or comments."

Roof Decl., Exh. H.

The parties' characterizations of why these contracts were terminated and the events that

followed diverge dramatically.  Ellie Mae contends that it invited DocMagic to negotiate a revised

agreement with new transaction fees in the May 21 Bridge Agreement Termination letter.  Roof

Decl. ¶ 11 ("If you would like to discuss this, please let me know").  Ellie Mae Senior Vice Present

Richard Roof states that Ellie Mae was willing to negotiate a new Bridge Agreement with DocMagic

in 2009.  Roof Decl. ¶ 12.  Ellie Mae argues that in entering the 2003 and 2006 Bridge Agreements

with DocMagic, Ellie May extended favorable price terms to DocMagic only in the context of the

parties' "broader" relationships during the periods covered by these agreements, which included

Ellie Mae's access to DocMagic's DPS product under the Reseller Agreement.  Roof Decl. ¶ 8.

Ellie Mae alleges that DocMagic, rather than renegotiating a reasonable fee, filed this lawsuit.

Under DocMagic's version of the events, Ellie Mae attempted to drive DocMagic out of the

document preparation business so that it could monopolize the DPS market with its own product,

Ellie Mae Docs.  DocMagic alleges that Ellie Mae denied it access to customers using the

Encompass LOS, forced DocMagic off ePASS and forbade Encompass users from connecting to

DocMagic through other means.  SAC ¶ 4.  DocMagic contends that Ellie Mae terminated the

Bridge Agreement without any warning or prior discussion, differentiating it from the manner in

which Ellie Mae previously conducted business with respect to ePASS.  Iannitti Decl. ¶¶ 11-12.

According to DocMagic, whenever price-related issues arose in the parties' prior business

relationship, Ellie Mae always contacted DocMagic to resolve these issues.  *Id.* ¶ 11.  Specifically,

when the parties renegotiated the original Bridge Agreement in 2006, Ellie Mae neither sent to

**United States District Court**
For the Northern District of California

4

United States District Court

For the Northern District of California

1    DocMagic a termination letter nor threatened to terminate the Bridge Agreement. *Id.* DocMagic

2    further asserts that the May 21 Bridge Termination letter did not constitute an offer to remain on

3    ePass. *Id.*

4           DocMagic and Ellie Mae discussed the May 21 Bridge Termination letter during a June 5,

5    2009 telephone conversation. Iannitti Decl. ¶ 13. Ellie Mae alleges that it invited DocMagic to

6    negotiate by offering DocMagic CEO Don Iannitti the opportunity to remain on ePASS at the

7    prevailing standard price of $6.00 per transaction for closing document vendors. Roof Decl. ¶¶ 12-

8    13. Ellie Mae claims DocMagic indicated that it would "get back" to Ellie Mae regarding Ellie

9    Mae's alleged offer. *Id.*

10          On the other hand, DocMagic tells a different story. DocMagic claims that in the June 5

11   telephone conversation Ellie Mae neither expressed any interest in doing business with DocMagic,

12   nor extended an offer to do business. *Id.* ¶ 14. Ellie Mae only discussed their supposed "normal

13   fee" of $6.00 per transaction in response to a question from DocMagic, and DocMagic understood

14   from the June 5 telephone conversation that Ellie Mae did not intend to allow DocMagic to remain

15   on ePASS regardless of price. *Id.* ¶¶ 15-17. Contrary to Ellie Mae's assertion, DocMagic contends

16   that it never promised to "get back" to Roof because Ellie Mae had left DocMagic with the clear

17   understanding that Ellie Mae would not enter into a new Bridge Agreement at any price. Iannitti

18   Decl. ¶ 15. DocMagic also asserts that "confidential" internal Ellie Mae emails suggest that Ellie

19   Mae intended to terminate its long-standing relationship with DocMagic regardless of price. Docket

20   No. 112 (Sabri Decl.), Exh. E (filed under seal).

21   III.    Post-termination events

22          After Ellie Mae terminated the Bridge and Reseller Agreements, DocMagic pursued

23   alternative means of providing document preparation services to Encompass users. In 2008,

24   DocMagic had introduced a program called DocMagic XL, which operated on the workstations of

25   DocMagic clients and allowed them to transfer data from LOS, including but not limited to

26   Encompass. Docket No. 61(Iannitti TRO Decl.) ¶ 8. DocMagic XL interacted with Encompass'

27   Software Development Kit ("SDK")— an application suite that allows Ellie Mae customers to

28

United States District Court

For the Northern District of California

customize their Encompass experience—in order to pull mortgage data from Encompass. *Id.* In August 2009, Ellie Mae blocked DocMagic XL from being able to interact with the SDK. *Id.* ¶ 10. Also in August 2009, Ellie Mae combined the license agreements for the Encompass software and the SDK to expressly prohibit customers from using the SDK in order to transfer data from Encompass to third-parties without prior written approval. *See* Docket No. 72 (Roof TRO Decl.) ¶ 27; Docket No. 74 (Corr TRO Decl.) ¶ 7 & Exh. A § 1.3.

In late August 2009, DocMagic developed another work-around. It used a customization feature of the Encompass Banker SDK called "Input Form Builder" to create the "DocMagic Input Form," which would collect the relevant fields of the client's data from Encompass and transfer that data from the client's computer to DocMagic. *Id.* ¶ 11; Docket No. 64 (Morford TRO Decl.) ¶ 2. For approximately one year, there were no reported problems using DocMagic Input Form in conjunction with Encompass, and as of August 2010, over 168,000 transactions had been processed using the DocMagic Input Form. Morford TRO Decl. ¶ 3; Docket No. 62 (Garza TRO Decl.) ¶ 3.

On August 24, 2010, however, a DocMagic client reported to DocMagic technical support that when it tried to use DocMagic Input Form with an upgraded version of Encompass Banker, it received an error message indicating that use of the form was not permitted within Encompass. Garza TRO Decl. ¶ 4. DocMagic spent nearly a month working with its clients to regain access to Encompass, which it eventually did by removing all internal references to DocMagic from the DocMagic Input Form. *Id.* ¶ 5-6. Only a few days later on October 2, 2010, however, DocMagic was informed that its client again was receiving an error message in Encompass prohibiting use of the revised form. *Id.* ¶ 7. DocMagic has been unable to develop a further solution. *Id.* As of October 8, 2010, DocMagic has identified six clients who have been unable to use the DocMagic Input Form to access their data in Encompass and accordingly use DocMagic's services. *Id.* ¶¶ 7-13. DocMagic claims that its inability to access client data through Encompass (1) threatens the viability of its business, (2) harms its reputation as a timely, trustworthy provider of document preparation services, and (3) interferes with its clients' ability to close loans and put a roof over their families' heads. Iannitti TRO Decl. ¶¶ 16-19.

IV.     Procedural History

On August 28, 2009, DocMagic filed this action alleging five claims for relief for antitrust violations, unfair competition, interference with contractual relationships, and interference with prospective economic advantage.  Docket No. 1 (Complaint) ¶¶ 31-63.  On October 6, 2009, Ellie Mae filed a Counterclaim alleging five claims for relief for copyright infringement, violation of the Comprehensive Computer Data Access and Fraud Act, intentional interference with contractual relationships, breach of contact, and unfair competition.  Docket No. 13 (Counterclaim) ¶¶ 25-60.  On May 5, 2010, DocMagic filed an Amended Complaint asserting nine additional claims for relief.  Docket No. 38 (First Amended Complaint) ¶¶ 111-252.  Ellie Mae filed an Amended Counterclaim on April 26, 2010, alleging four additional claims for relief.  Docket No. 34 (First Amended Counterclaim) ¶¶ 44-104.

On October 8, 2010, DocMagic filed an application for a Temporary Restraining Order ("TRO") which would require Ellie Mae to reverse its measures to prevent the use of the DocMagic Input Form, allow Encompass users to transfer data to DocMagic and otherwise cease interfering with Ellie Mae clients' use of DocMagic services.  Docket No. 59.  As the bases for the TRO, DocMagic argued that it was likely to succeed on its Ninth Claim for Relief for Interference with Prospective Economic Advantage and on its Thirteenth Claim for Relief under California Business and Professions Code Section 17200.   On October 12, 2010, this court dismissed six of DocMagic's claims with leave to amend, two of DocMagic's claims without leave to amend, and five of Ellie Mae's counterclaims with leave to amend.  *See* Docket No. 66; *DocMagic, Inc. v. Ellie Mae, Inc.*, — F. Supp. 2d —, 2010 WL 3987495 (N.D. Cal. Oct. 12, 2010) (Patel, J.).  The court dismissed the Ninth and Thirteenth Claims for Relief without prejudice, and the TRO hearing was vacated.  *See* Docket Nos. 66, 76.  On October 22, 2010, DocMagic filed a Second Amended Complaint.  *See* Docket Nos. 78, 89.  Ellie Mae filed its Answer and Second Amended Counterclaims on November 5, 2010.  Docket Nos. 91, 92.  Ellie Mae now moves for summary judgment on the First (monopoly leveraging), Second (refusal to deal) and Third (denial of access to an essential facility) Claims for Relief in DocMagic's Second Amended Complaint.  After further briefing a hearing on the TRO was

1   reset for February 28, 2011 at the same time as the hearing on Ellie Mae's motion for partial

2   summary judgment.

3

4   LEGAL STANDARD

5   I.       Summary Judgment

6           Summary judgment may be granted only when, drawing all inferences and resolving all

7   doubts in favor of the non-moving party, there are no genuine issues of material fact and the moving

8   party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *see generally Anderson v.*

9   *Liberty Lobby, Inc.*, 477 U.S. 242, 247-55 (1986).  A fact is "material" if it may affect the outcome

10  of the proceedings, and an issue of material fact is "genuine" if the evidence is such that a

11  reasonable jury could return a verdict for the non-moving party.  *Id*. at 248.  The court may not make

12  credibility determinations.  *Id*. at 255.  The moving party bears the burden of identifying those

13  portions of the pleadings, discovery and affidavits that demonstrate the absence of a genuine issue of

14  material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).  Once the moving party meets its initial

15  burden, the non-moving party must go beyond the pleadings and, by its own affidavits or discovery,

16  set forth specific facts showing that there is a genuine issue for trial.  Fed R. Civ. P. 56(e); *see*

17  *Anderson*, 477 U.S. at 250.

18  II.      TRO/Preliminary Injunction

19          A plaintiff seeking a TRO or a preliminary injunction "must establish that he is likely to

20  succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief,

21  that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Winter*

22  *v. Natural Resources Defense Council, Inc.*, 129 S. Ct. 365, 374 (2008); *see Stuhlberg Int'l Sales Co.*

23  *v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001) (noting that the TRO and preliminary

24  analyses are "substantially identical").  A TRO is an "extraordinary remedy that may only be

25  awarded upon a clear showing that the plaintiff is entitled to such relief."  *Winter*, 129 S. Ct. at 376.

26

27

28

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1  DISCUSSION

2  I.        Summary Judgment

3         Ellie Mae moves for summary judgment on DocMagic's First (monopoly leveraging),

4  Second (refusal to deal) and Third (denial of access to an essential facility) Claims for Relief.  Ellie

5  Mae argues that there is no genuine dispute that it offered DocMagic access to ePass at a higher, yet

6  reasonable rate and therefore that it did not refuse to deal with DocMagic.  It is undisputed that the

7  First, Second and Third Claims for Relief fundamentally depend on whether Ellie Mae refused to

8  deal with DocMagic by refusing to renegotiate the Bridge Agreement.  DocMagic's own pleadings

9  predicate its Sherman Act claims on a purported refusal to deal.  SAC ¶ 119 (stating Ellie Mae

10  "refus[ed] to deal" with DocMagic as part of First Claim for Relief); ¶ 143 (stating Ellie Mae

11  "refused to deal with DocMagic to permit it access to the ePASS Network" as part of the Second

12  Claim for Relief); ¶¶ 155, 160 (referring to "Ellie Mae's anticompetitive refusal to allow DocMagic

13  access to customers via the ePASS Network" and Ellie Mae's decision to deny "DocMagic access

14  to… the ePASS Network" as part of the Third Claim for Relief); *See also* Docket No. 79

15  (DocMagic's Proposed Jury Instructions) at 3 (claim of denial of an essential facility requires proof

16  that Ellie Mae refused to grant DocMagic reasonable access to the ePASS network), 4 (DocMagic

17  must prove that "Ellie Mae refused to deal with DocMagic" to prove the Second Claim for Relief).

18         A cognizable refusal to deal for purposes of antitrust law, however, need not be "outright."

19  An "offer to deal with a competitor only on unreasonable terms and conditions can amount to a

20  practical refusal to deal."  *MetroNet Servs. Corp. v. Qwest Corp.*, 383 F.3d 1124, 1132 (9th Cir.

21  2004).  A practical refusal to deal requires that a party make an offer on such unreasonable terms

22  that it amounts to no offer at all.  *Id.*  A mere change in price generally is not a practical refusal to

23  deal.  *Id.* at 1126.  Further, there is no practical refusal to deal where the price structure in question

24  was in place prior to any alleged competition, and where it reflects the standard price that the

25  defendant charges in the marketplace.  *Id.* at 1133-34.

26         Businesses are generally free to choose the parties with whom they will deal, as well as the

27  prices, terms, and conditions of that dealing.  *United States v. Colgate & Co.*, 250 U.S. 300, 307

28

United States District Court
For the Northern District of California

(1919).  However, in limited circumstances a firm's unilateral refusal to deal with its rivals can give rise to antitrust liability.  *Verizon Comm'ns, Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004) (refusal to cooperate with rivals can, in "some circumstances," constitute anticompetitive conduct in violation of the Sherman Act); *see also Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,* 472 U.S. 585, 608-611 (1985).  For example, in *Aspen Skiing* the defendant owned three of four Aspen skiing areas, while the plaintiff owned the fourth skiing area.  For many years the plaintiff and defendant had cooperated in the issuance of a joint, multiple-day, all-area ski ticket.  *Id.* at 593-94.  After demanding a greater share of the proceeds, the defendant canceled the joint ticket.  The plaintiff, concerned that skiers would bypass its mountain absent a joint offering, unsuccessfully pursued various measures to recreate the joint ticket.  *Id*.  Highlighting that the defendant sought to reduce competition over the long run by harming its smaller competitor, the Supreme Court found that the defendant violated the Sherman Act, § 2.  *Id*. at 608.  The Court found determinative the fact that defendant "refused to sell [the plaintiff] any lift tickets, either at the tour operator's discount or at retail," despite that plaintiff pursued a plethora of "desperate measures" in an attempt to deal with the defendant.  *Id*. at 593-94.

A.      Refusal to Deal

The court first considers whether Ellie Mae refused to deal with DocMagic in 2009.  Ellie Mae asserts that it is entitled to summary judgment for three reasons: (i) DocMagic repeatedly admitted that Ellie Mae offered it the opportunity to remain on ePass,[2] (ii) DocMagic never requested terms for a new agreement, and (iii) Ellie Mae actually extended an offer to DocMagic to remain on ePass if DocMagic agreed to pay $6.00 per transaction.  The record, however, does not indisputably support any of these contentions.

Firstly, Ellie Mae contends that DocMagic admitted on several occasions that Ellie Mae made an offer for DocMagic to remain on ePass at the price of $6.00 per transaction.  Docket No. 30 (Submission Regarding Antitrust Claims) at 2, n.5; Docket No. 36 (Case Management Conference, April 19, 2010) at 25; SAC ¶ 63.  For a statement to qualify as a judicial admission, it must be deliberate, clear, and unequivocal.  See *Heritage Bank v. Redcom Laboratories, Inc.*, 250 F.3d 319,

329 (5th Cir. 2001); *State Farm Mut. Auto. Ins. Co. v. Worthington*, 405 F.2d 683 (8th Cir. 1968); Wright & Graham, *Federal Practice and Procedure* § 7026 (2000).  Here, the record does not clearly and unequivocally establish DocMagic's admission that Ellie Mae extended an offer to remain on ePass.  *See* Iannitti Decl. ¶¶ 14 ("Roof, through his manner, tone, very carefully chosen words, and long periods of silence clearly indicated to me that Ellie Mae had no interest in permitting DocMagic on ePass, regardless of price"), 16 ("Roof  never made an offer whatsoever, either during the June 5 [telephone conversation] or at any other time").  Statements contained in DocMagic's Submission Regarding Antitrust Claims ("Ellie Mae offered DocMagic access to its Encompass customers for a toll fee...increase of between 100% and 600%"), Second Amended Complaint (Ellie Mae "suggest[ed] that the relationship could perhaps be salvaged if DocMagic paid more money"), and Case Management Conference do not amount to an unequivocal admission that Ellie Mae extended an offer.  Submission Regarding Antitrust Claims at 2; SAC ¶ 63.  Federal Rule of Civil Procedure 8(e)(2) permits a pleader who is in doubt as to which of two statements of fact is true to plead them alternatively or hypothetically, regardless of consistency.  *See Oki American, Inc. v. Microtech International, Inc.*, 872 F.2d 312, 314 (9th Cir. 1989).  Construing the pleadings and subsequently developed record in a light most favorable to DocMagic, these statements were not unequivocal admissions of Ellie Mae's offer, but rather efforts to develop an alterative theory that if Ellie Mae did in fact extend an offer, this offer was mere pretext amounting to a practical refusal to deal.  Accordingly, to the extent that DocMagic's statements and evidence do not represent unequivocal admissions, Ellie Mae is not entitled to summary judgment on the basis that DocMagic has admitted the existence of an offer to renegotiate.

Second, Ellie Mae claims that there can be no refusal to deal because DocMagic never requested terms for a new agreement.  DocMagic cannot proceed on a refusal to deal theory if it made no efforts to renegotiate the Bridge Agreement.  *See Aspen Skiing*, 472 U.S. at 592-93; *Verizon*, 540 U.S. at 409; *Cleary v. Nat'l Distillers and Chem Corp.*, 505 F.2d 695, 697 (9th. Cir.1974) ("[P]laintiff can have no relief when his failure to obtain a desired product is attributable to his own failure to make a request").  However, Ellie Mae's assertion that DocMagic failed to

United States District Court

For the Northern District of California

1   make "anything resembling" a request to remain on ePass is contradicted by the record.  Docket No.

2   119 (Reply) at 1.  A trier of fact could reasonably conclude from the evidence presented by

3   Docmagic that DocMagic made at least two attempts to remain on ePass: (i) after receiving the May

4   21 Bridge Termination letter, DocMagic initiated contact with Ellie Mae by scheduling the June 5

5   telephone conversation, and (ii) during this conversation DocMagic requested that Ellie Mae inform

6   DocMagic of Ellie Mae's "normal fees" referenced in the May 21 Bridge Termination letter.  Iannitti

7   Decl. ¶¶ 13, 15.

8        Third, Ellie Mae argues that it extended an offer to DocMagic.  Ellie Mae contends that it

9   invited DocMagic to negotiate a revised Bridge Agreement with new transaction fees in the May 21

10  Bridge Termination letter by stating: "If you [DocMagic] would like to discuss this, please let me

11  know."  Roof Decl. ¶ 11.  Ellie Mae further alleges that it repeated its invitation to negotiate with

12  DocMagic by making an offer during the June 5 telephone conversation between Roof and Iannitti.

13  *Id.* ¶ 12.  According to Ellie Mae, Roof offered DocMagic the opportunity to remain on ePass if

14  DocMagic agreed to pay $6.00 per transaction.  *Id.* ¶ 14.  Although DocMagic allegedly indicated

15  that it would get back to Ellie Mae regarding the offer, DocMagic never again communicated with

16  Ellie Mae to negotiate fees for a new Bridge Agreement.  *Id.*

17       DocMagic, however, tells a different story.  DocMagic points out that the Bridge Agreement

18  was terminated without warning or prior discussion, differentiating it from the manner in which Ellie

19  Mae had conducted business with respect to ePass in the past.  Iannitti Decl. ¶¶ 11-12.  During the

20  parties' past relationship, pricing issues were not addressed via mail, but rather were negotiated by

21  telephone or in person.  *Id.* ¶ 12.  Although Ellie Mae wrote in the May 21 Bridge Termination letter

22  that its reason for terminating the Bridge Agreement was that DocMagic was paying fees that were

23  "significantly discounted from our normal fees," nothing in the parties' communications explicitly

24  indicates that Ellie Mae simply sought a higher fee in exchange for allowing DocMagic to remain on

25  ePass.  Iannitti Decl. ¶¶ 11-15.  A trier of fact could reasonably infer from this evidence that had

26  Ellie Mae simply sought a higher fee in exchange for allowing DocMagic to remain on ePass, it

27  would have explicitly stated so in the May 21 Bridge Termination letter.

28

Concerning the June 5 telephone conversation, Ellie Mae fails to allege that it made an offer to DocMagic.  Roof Decl. ¶ 13-14.  DocMagic points out that Ellie Mae discussed its $6.00 per transaction "standard price" only in response to a direct inquiry from DocMagic.  Roof himself states that he only informed DocMagic that Ellie Mae's standard price was $6.00 per transaction for closing documents in "response to an inquiry from Mr. Iannitti." *Id*. ¶ 13.  DocMagic describes the conversation as "strained" and "uncomfortable."  Iannitti *Decl.* ¶ 14.  DocMagic also claims that Roof revealed his unwillingness to negotiate a new Bridge Agreement by stating early in the June 5 telephone conversation something to the effect of: "clearly this relationship has run its course." *Id.* Moreover, DocMagic points to internal Ellie Mae documents that create a reasonable inference that Ellie Mae intended to terminate its long-standing relationship with DocMagic regardless of price. Sabri Decl., Exh. E (filed under seal).

DocMagic correctly asserts that whether or not Ellie Mae refused to deal with DocMagic beginning in 2009 is a material fact in genuine dispute.  Resolving the conflicting accounts of the June 5 telephone conversation and the events leading up to it requires weighing the relative credibility of Roof and Iannitti, an inappropriate endeavor on a motion for summary judgment. Reasonable inferences that can be drawn from the evidence presented by DocMagic are: (i) Ellie Mae had no intention of negotiating a new Bridge Agreement with DocMagic, and (ii) had Ellie Mae actually extended an offer to DocMagic, it would have stated so explicitly.  To win summary judgment, Ellie Mae must "eliminate any vestige of contrary material fact." *Autodesk, Inc. v. Dassault Systemes Solid Works Corp*, 685 F. Supp. 2d 1001, 1007 (N.D. Cal. 2009).  Ellie Mae is unable to meet its burden at this juncture.

### B.      Practical refusal to deal

Even assuming arguendo that Ellie Mae extended an offer to DocMagic to remain on ePass if it agreed to pay $6.00 per transaction, there is a material dispute as to whether there was a practical refusal to deal.  Ellie Mae is not entitled to summary judgment if there is a genuine issue of material fact as to whether the terms of any renegotiation were so unreasonable as to constitute a practical refusal to deal.

**United States District Court**
For the Northern District of California

1      Ellie Mae contends that there was no practical refusal to deal because $6.00 per transaction is

2   the standard price paid by DocMagic's competitors.  Roof Decl. ¶ 13.  Ellie Mae's official

3   "Transaction Fees" price list supports this contention.  Roof Decl., Exh. I.  Ellie Mae asserts that it

4   has been offering, and competitors to DocMagic have been accepting, the $6.00 per transaction rate

5   since at least 2007.  Roof Decl. ¶ 17.  Of the nine independent DPS vendors on ePass, seven are

6   paying at least $6.00 per transaction.  *Id.* ¶ 20.  Of the two DPS vendors paying less than $6.00 per

7   transaction, one pays a monthly lump sum minimum and the other is subject to a complex pricing

8   structure.  *Id.* ¶ 22.  Ellie Mae claims that since 2007, there have been no exceptions to the standard

9   $6.00 rate.  Ellie Mae supports its version of the events by pointing out that it was not until

10  DocMagic's First Amended Complaint was filed in May 2010 that DocMagic first asserted that Ellie

11  Mae's offer to renegotiate the Bridge Agreement was pretextual.  Docket No. 38 (First Amended

12  Complaint) ¶¶ 61-65.

13      DocMagic counters that even if Ellie Mae did extend an offer allowing DocMagic to remain

14  on ePass, $6.00 per transaction is not the standard rate for DPS vendors providing services similar to

15  DocMagic's services.  Sabri Decl. ¶¶ 3-6, Exhs. A-D; Iannitti Decl. ¶¶ 24-25.  Firstly, according to

16  DocMagic, many of the vendors supposedly paying $6.00 are not competitors of DocMagic, making

17  any price comparison irrelevant.  Iannitti Decl. ¶ 24.  Of the nine DPS vendors on ePass mentioned

18  above, four are Texas-based law firms that provide DPS in connection with their legal work.  Roof

19  Decl. ¶ 20; Sabri Decl. ¶¶ 3-6, Exhs. A-D.  DocMagic further contends that the majority of these

20  nine vendors, including Accurate Document Services, CoreLogic Document Services, and ProClose,

21  have extremely low volume and do not compete with DocMagic, making a price comparison

22  inappropriate.  Iannitti Decl. ¶ 24.  Secondly, DocMagic points to at least one vendor that has

23  entered into a new or amended Bridge Agreements since 2007 for a fee of less than $6.00 per

24  transaction.  Roof Decl., Exh G (filed under seal) (vendor pays $0.50 for initial disclosures).

25  Thirdly, DocMagic points out that two of its potential competitors remaining on ePass pay less than

26  $6.00 per transaction: one pays $1.41 each for all ePass transactions, and the other pays $0.50 for

27

28

initial disclosures, allegedly a significant category of DPS transactions.  Roof Decl. Exh. E (filed under seal), Exh. G (filed under seal).

As a trier of fact could reasonably infer that $6.00 is not the price currently offered to and paid by companies situated similarly to DocMagic, there is a material dispute as to whether Ellie Mae's alleged $6.00 offer constitutes a practical refusal deal. Accordingly, Ellie Mae's motion for summary judgment on the First, Second, and Third Claims for Relief in DocMagic's Second Amended Complaint must be denied.  This is not to say that the evidence in this case overwhelmingly points towards liability for Ellie Mae, but the record as currently developed raises at least a reasonable inference in DocMagic's favor as to the existence of a refusal to deal.

## II.     TRO/Preliminary Injunction

DocMagic argues that it is entitled to a TRO because it is likely to succeed on the merits of its claims for Interference with Prospective Economic Advantage ("IPEA") and for Unfair Competition under Cal. Bus. & Prof. Code § 17200, *et seq.*  Although DocMagic might ultimately be able to persuade the trier of fact that it is entitled to relief under one or both of these claims, the court is unable to conclude at this juncture that DocMagic has made the requisite "clear showing" that such success is likely.  *See Winter*, 129 S. Ct. at 376.

### A.     IPEA Claim

In order to establish a claim for Interference with Prospective Economic Advantage, DocMagic must show the following elements:

1.    An economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff;

2.    The defendant's knowledge of the relationship;

3.    Intentional acts on the part of the defendant designed to disrupt the relationship;

4.    Actual disruption of the relationship; and

5.    Economic harm to the plaintiff proximately caused by the acts of the defendant.

*Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1153 (2003).  In addition, the intentional acts alleged as the third element must have been "wrongful by some legal measure other than the fact of interference itself."  *Id.* (quoting *Della Penna v. Toyota Motor Sales, U.S.A., Inc.*, 11

United States District Court
For the Northern District of California

1    Cal. 4th 376, 393 (1995)); *see also Korea Supply*, 29 Cal. 4th at 1158-59 ("The tort of intentional

2    interference with prospective economic advantage is not intended to punish individuals or

3    commercial entities for their choice of commercial relationships or their pursuit of commercial

4    objectives, unless their interference amounts to independently actionable conduct.").

5         Solely for purposes of this motion, Ellie Mae does not argue that the first, second, fourth or

6    fifth elements are not likely to be satisfied. *See* Docket No. 69 (Opp.) at 13.  Instead, it argues that

7    DocMagic has not sufficiently shown that Ellie Mae has committed any wrongful act that would

8    serve as a predicate to the third element of the IPEA claim.

9         DocMagic first theory of a wrongful act is that "Ellie Mae's exercise of improper dominion

10   over Loan Data constitutes conversion under California law."  Docket No. 59 (Mot.) at 11.  "A

11   conversion occurs where the defendant wrongfully exercises dominion over the property of another.

12   To establish conversion, a plaintiff must show (1) his ownership of or right to possess the property at

13   the time of the conversion, (2) that the defendant disposed of the plaintiff's property rights or

14   converted the property by a wrongful act, and (3) damages."  *Bank of New York v. Fremont Gen.*

15   *Corp.*, 523 F.3d 902, 914 (9th Cir. 2008) (citations omitted).  DocMagic does not argue that it had

16   "dominion" over customer loan data or that it held any possessory interest in that data.  Instead, it

17   argues that it has been harmed as a result of Ellie Mae' conversion of loan data owned by third-party

18   Encompass users.

19        DocMagic's conversion theory is unpersuasive for two reasons.  Firstly, DocMagic has not

20   provided evidence sufficient to demonstrate that its customers have forfeited "dominion" over their

21   loan data.  Although Encompass users may not use the SDK to transmit data from Encompass to

22   third-party vendors, Ellie Mae asserts that Encompass users have "unfettered access" to the data they

23   input, that customers are able to extract and transmit data from Encompass using a publicly available

24   DU file format, and that—at least for users that host Encompass software on their own servers—loan

25   data remains on the users' servers.  Corr TRO Decl. ¶¶ 4, 13, 14.  According to Ellie Mae,

26   Encompass users still retain access to and control of their loan data notwithstanding their inability to

27   convey that data to DocMagic via the SDK.  *Compare with FMC Corp. v. Capital Cities/ABC, Inc.*,

28

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

915 F.2d 300, 304 (7th Cir. 1990) (finding a valid conversion claim under California law where the defendant's retention of the only known copies of the plaintiff's documents deprived the plaintiff of the use of its own business information).  At the motion hearing, DocMagic disputed these characterizations, but counsel's arguments appear at least somewhat inconsistent with the materials it submitted with its TRO application.  Given the conflicting accounts of how Encompass both stores customer information and blocks the DocMagic Input Form, the court cannot conclude that DM has met its burden to show the loss of full dominion over loan data.

Secondly, the Encompass/SDK license expressly prohibits the use of SDK to transmit data from Encompass to third-parties, and customers must assent to the terms of the license before entering data into Encompass.  DocMagic cannot establish a claim for conversion where the customers in question contractually consented to the alleged deprivation of property.  *Bank of New York*, 523 F.3d at 914 ("A plaintiff in a conversion action must also prove that it did not consent to the defendant's exercise of dominion.") (collecting cases).  At the motion hearing, DocMagic again presented arguments regarding the applicability of the SDK license to the Input Form Builder that seem inconsistent with the parties' submissions.  Ultimately, however, DocMagic has done little more that sketch out an argument for conversion of loan data.  At this juncture, the court cannot conclude that DocMagic is likely to succeed on this theory.

DocMagic's second theory of wrongful act is that Ellie Mae has violated Section 2 of the Sherman Act.  Although, for the reasons explained above, the court denies Ellie Mae's motion for partial summary judgment on DocMagic's Sherman Act claims, DocMagic has not presented sufficient evidence to establish its ultimate likelihood of success on these claims.  There remains a material factual dispute regarding whether Ellie Mae ever offered to renegotiate the Bridge Agreement at a fair market price, but DocMagic's evidence of the alleged refusal to deal nonetheless remains relatively sparse and circumstantial.  Summary judgment may be inappropriate at this juncture, but the extraordinary remedy of a TRO/preliminary injunction is similarly inappropriate in the absence of a clear showing of entitlement.

Apart from the question of whether Ellie Mae offered to renegotiate with DocMagic, Ellie Mae has come forward with relevant market statistics that cast significant doubt on the viability of DocMagic's Sherman Act claims.  Firstly, despite DocMagic's allegations that Ellie Mae is a monopolist in the LOS market, a 2010 study by Access Mortgage Research & Consulting, Inc. indicates that only about 35% of loan originators use Encompass.  *See* Corr TRO Decl. Exh. B at 2, 26.  This share is generally insufficient to indirectly raise an inference of market power.  *See Forro Precision, Inc. v. Int'l Bus. Machs. Corp.*, 673 F.2d 1045, 1059 (9th Cir. 1982) ("In the absence of further information about the market, a 35% market share . . . provides little or no support to a claim of market power.").  Moreover, this share is substantially lower than the 60% share that was alleged in the First Amended Complaint and that supported the court's conclusion that DocMagic had plausibly alleged market power in the LOS and network markets.  *See DocMagic*, 2010 WL 3987495, at *8.  The particular characteristics of these markets—namely, high barriers to entry and network effects—might be sufficient to establish the requisite degree of market power, but  Ellie Mae's market share contentions, if true, make it significantly less likely that DocMagic will prevail on its monopolization theories.

DocMagic has not shown a likelihood of success on its IPEA claim.[3]

B.      Section 17200 Claim

Section 17200 prohibits "any unlawful, unfair or fraudulent business act or practice . . .." Cal. Bus. & Prof. Code § 17200.  Because section 17200 is written in the disjunctive, "a business act or practice need only meet one of the three criteria—unlawful, unfair, or fraudulent—to be considered unfair competition under the UCL." *Daro v. Superior Court*, 151 Cal. App. 4th 1079, 1093 (2007).  DocMagic argues that it is likely to succeed under the unlawful and unfair prongs.

Under its "unlawful" prong, the UCL borrows violations of other laws . . . and makes those unlawful practices actionable under the UCL." *See Berryman v. Merit Prop. Mgmt.*, 152 Cal. App. 4th 1544, 1554 (2007) (internal quotation marks and citation omitted; alteration in original). "Virtually any law—federal, state or local—can serve as a predicate for an action under [Section 17200]." *Durell v. Sharp Healthcare*, 183 Cal. App. 4th 1350, 1360 (2010); *see Smith v. State Farm*

United States District Court

For the Northern District of California

*Mut. Auto. Ins. Co.*, 93 Cal. App. 4th 700, 717-18 (2001) (holding the unlawful prong forbids "anything that can be properly called a business practice and that at the same time is forbidden by law"). As predicates for the unlawful prong, DocMagic reasserts the IPEA and Sherman Act violations discussed above. Because it has failed to establish a likelihood of success as to those predicate violations, it has not shown a likelihood of success under Section 17200's unlawful prong.

An "unfair" business act or practice under Section 17200 is "conduct that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as violations of the law, or otherwise significantly threatens or harms competition." *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 187 (1999). As this court concluded in its October 12, 2010 order, "where the same conduct is alleged to support both a plaintiff's federal antitrust claims and state-law unfair competition claim, a finding that the conduct is not an antitrust violation precludes a finding of unfair competition." *DocMagic*, 2010 WL 3987495, at *16 (collecting cases). DocMagic has not established a likelihood of success on its antitrust claims, as explained above, and it therefore follows that it has not established a likelihood of success under the unfair prong of Section 17200.

Although Ellie Mae has effectively prevented DocMagic from accessing loan data in Encompass via customers' licensed SDK software, such an exclusion does not, without more, violate the letter or spirit of antitrust laws or significantly threaten to harm competition in the market for document preparation services. *See Pinhas v. Summit Health, Ltd.*, 894 F.2d 1024, 1032 (9th Cir. 1989) ("To maintain a successful antitrust action, [the plaintiff] must show that the alleged conspiracy among the appellees did more than injure him; he must prove an injury to the competition in the relevant market.") (citations omitted). DocMagic has not demonstrated, beyond speculative allegation, that any other document preparation service has been excluded from the market—whether that market consists of all loan document preparation or the submarket of Encompass-originated loans. It has provided examples of DocMagic customers being inconvenienced by Ellie Mae's blocking of the DocMagic Input Form, *see* Garza TRO Decl. ¶¶ 8-13; Iannitti TRO Decl. ¶¶ 14-19, but it has not demonstrated that these customers were unable to go

United States District Court

For the Northern District of California

to a competitor (besides Ellie Mae Docs) and receive equivalent document preparation services at a reasonably equivalent price. The court has no doubt that DocMagic has been injured as a result of Ellie Mae's efforts to block transfers of data from Encompass. It cannot, however, comfortably attribute such injury to Ellie Mae's monopolistic efforts as opposed to either DocMagic's refusal to negotiate a reasonable license fee and/or its strategic decision to focus on Encompass users while cultivating its customer base. DocMagic has not shown a likelihood of success under the unfair prong of Section 17200.

   C.  Remaining TRO/Preliminary Injunction Factors

   Having unsuccessfully demonstrated a likelihood of success on the merits of its IPEA or Section 17200 claims, DocMagic has not established that it is entitled to provisional injunctive relief. The remaining factors do not so clearly tip in DocMagic's favor so as to convince the court that the exercise of its equitable powers is nonetheless appropriate. Although DocMagic may suffer substantial, and perhaps irreparable, harm as a result of its inability to transfer data from Encompass, the court is not prepared to grant DocMagic the free, unfettered access to Encompass data it requests. Ellie Mae has indicated that its inability to block unauthorized third-party access to Encompass creates security risks that are unacceptable both to it and to its customers. Corr TRO Decl. ¶¶ 29-31, 33-34, 36-37. Moreover, given DocMagic's inability to establish a likelihood of success on the merits at this time, the record before the court creates a reasonable inference that DocMagic's injuries are a result of its refusal to pay a reasonable license fee and its subsequent unsuccessful efforts at circumventing Encompass security measures. DocMagic has already benefitted from an entire year's worth of free access to Encompass data through the DocMagic Input Form, allowing it to process documents for 168,000 Encompass-originated loans while incurring lower costs. It is certainly conceivable, therefore, that a TRO/preliminary injunction would provide a profitable windfall and/or an undeserved competitive advantage for DocMagic.

1

2   CONCLUSION

3          For the foregoing reasons, Ellie Mae's motion for summary judgment on the First, Second,

4   and Third Claims For Relief in DocMagic's Second Amended Complaint is DENIED.  DocMagic's

5   Application for a TRO is also DENIED.

6

7          IT IS SO ORDERED.

8

9   Dated: March 10, 2011                              _____

10                                                     MARILYN HALL PATEL
                                                       United States District Court Judge
11                                                     Northern District of California

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California

ENDNOTES

1. ePass has been operated since 2000 under various names and is today called the which is now called the "Ellie Mae Network."

2. Ellie Mae did not present this claim in its Motion for summary judgment, but rather raised this argument for the first time in its Reply. *See* Docket No. 119 at 4.

3. DocMagic also alleges that "Ellie Mae is [] interfering with its clients' contracts and their relationship with their customers, and may also be in breach of Ellie Mae's contracts with its own clients and/or breaching the implied covenant of good faith and fear [sic] dealing." Docket No. 59 at 11-12. DocMagic in no way elaborates further on this allegation, let alone cites to supporting evidence.